## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ARMANDO A. SAMMARTINO, *et al.*,            *

      Plaintiffs,            *

       v.            *            Civil Action:  1:08-cv-00967-RJL

AC & R INSULATION CO., INC., *et al.*,            *

      Defendants.            *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT KRAFFT-MURPHY'S RESPONSE IN
## OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

Defendant Krafft-Murphy Company (hereinafter "Krafft-Murphy" or "Removing Defendant"), by its undersigned counsel, hereby opposes Plaintiffs' Motion for Remand, and in support of that opposition, states the following:

## I.    BACKGROUND

**A.    PROCEDURAL HISTORY**:

Plaintiffs filed their complaint in the Superior Court of the District of Columbia on or about May 1, 2008, alleging occupational exposure of Plaintiff Armando Sammartino to asbestos-containing materials. *See* **Exhibit 1**.  Prior to service of the complaint on Krafft-Murphy, on or about May 5, 2008, Daniel Brown, Plaintiffs' Counsel, contacted the Defendants in this case and informed them of the failing health of Armando Sammartino (hereinafter "Plaintiff Sammartino" or "Mr. Sammartino").  Plaintiffs' Counsel requested that a discovery deposition take place on May 7,

2008, only six days after filing Plaintiffs' Complaint. Out of consideration for Mr. Sammartino's declining health, Defendants agreed to take the discovery deposition of Mr. Sammartino without requiring Plaintiffs to file Answers to Defendants' Interrogatories. However, Defendants did request that Plaintiffs furnish some sort of work history summary so that the places and dates of employment could be established prior to Mr. Sammartino's deposition. Thus, on May 6, 2008, Krafft-Murphy and other defense counsel received an e-mail correspondence from Plaintiffs' counsel relaying discovery materials which included a document titled "Armando Sammartino - Work History" (hereinafter "Work History Chart") which contained the purported work history of Plaintiff Sammartino in the above-captioned matter. During the deposition of Mr. Sammartino, Plaintiffs' counsel later confirmed that this Work History Chart is a chart that is "part of Mr. Sammartino's responses to interrogatories," provided from Plaintiffs' Counsel to Defendants.[1] *See* **Exhibit 2**, Discovery Deposition of Armando Sammartino, May 30, 2008, at 153. Mr. Sammartino was deposed on May 7, 2008, May 14, 2008 and May 30, 2008. Subsequent to Plaintiffs' correspondence attaching the Work History Chart, and the first day of Mr. Sammartino's discovery deposition, Krafft-Murphy was served with Plaintiffs' Complaint on May 23, 2008.

The Work History Chart listed job sites at issue where exposure to asbestos-containing materials was alleged. Among those job sites were the White House, Soldiers' Home, Smithsonian Institution, Ronald Reagan Washington National Airport, U.S. Capitol Power Plant, Washington, D.C. VA Medical Center and Walter Reed Army Medical Center, all of which are exclusive federal enclave job sites. *See* **Exhibit 3**. *See also* Notice of Removal, Exhibit 2. On this chart, some of the

---

[1] To date, Plaintiffs have not provided to Defendants Plaintiffs' Answers to Interrogatories, or any other discovery responses in this case.

allegations of asbestos exposure at certain job sites was based upon information gleaned from discovery in prior litigation and was thus known to Plaintiffs' counsel. (P's Memo at 13). Nowhere on this chart do Plaintiffs indicate that they decline to allege Mr. Sammartino's exposure to asbestos-containing products at any particular job site. *See* **Exhibit 3**. This Work History Chart constitutes Krafft-Murphy's first notice that some of the alleged exposure to asbestos-containing materials potentially occurred on exclusive federal enclaves.

Thus, pursuant to 28 U.S.C. §1441 and §1446, Defendant Krafft-Murphy filed a Notice of Removal with the United States District Court for the District of Columbia (hereinafter "U.S. District Court") on the basis of a Federal Question under 28 U.S.C. §1331, namely that of federal enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. § 457. This removal was timely filed on June 5, 2008, and was accompanied by the written joinder and consent of all other proper Defendants. Further, this removal was based upon information contained in purported discovery responses, later confirmed as attachments to what will be Plaintiffs' Answers to Interrogatories. Nonetheless, Plaintiffs filed a Motion for Remand on July 7, 2008.

## B.  LEGAL BACKGROUND REGARDING FEDERAL JURISDICTION

Removal is permitted by defendants in an action over which the U.S. district courts have original jurisdiction. The defendants' right of removal in a civil action is provided in 28 U.S.C. § 1441(a), which states:

> (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

The procedures for removing an action are governed by 28 U.S.C. § 1446. This section provides, in part, the following:

> (a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such actions pending a notice of removal signed pursuant to Rule I 1 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process. pleadings, and orders served upon such defendant or defendants in such action.

> (b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting for the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been fled in court and is not required to be served on the defendant, whichever period is shorter . . . .

28 U.S.C. § 1446.

Thus, pursuant to 28 U.S.C. §§ 1441 and 1446, defendants may remove an action to federal court if the case is one over which the U.S. district courts have original jurisdiction, and if the removing defendants adhere to the procedural requirements for removal. Federal courts have "original jurisdiction" over cases involving diversity of citizenship between parties, because of claims arising under federal law, or by virtue of some other explicit grant of jurisdiction. *Powers v. South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,* 719 F.2d 760, 763 (5th Cir. 1983). Claims "arising under" federal law are those based on federal question jurisdiction under 28 U.S.C. §1331, which states, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Federal enclave jurisdiction is a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331. The federal government acquires jurisdiction over lands by one of two methods: by

4

consent pursuant to Article I., section 8, clause 17 of the Constitution; or by a state's cessation of its rights of sovereignty. *U.S. v. Holmes,* 414 F.Supp. 831, 837 (D.C.Md. 1976). Under the first method, Clause 17 consent, the Constitution grants Congress the power, pursuant to art. I., § 8, cl. 17.,

> To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cessation of particular States, and Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dockyards, and other needful Buildings,

Such consent may be in the form of a general consent statute or consent to a particular acquisition. *United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 372 n.15 (1973). Under the second method, cessation, states enact legislation expressly ceding jurisdiction to the United States. *See, e.g., Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 529 (1938); *Kleppe v. New Mexico,* 426 U.S. 529, 542 (1976).

Both methods are capable of creating federal enclaves "within which the United States has exclusive jurisdiction." *Akin v. Ashland Chemical,* 156 F.3d 1030, 1034 (l0th Cir. 1998), *citing Mater v. Holley,* 200 F.2d 123, 124-25 (5th Cir. 1952). Further, "[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court on the basis of federal question jurisdiction." *Akin, supra,* 156 F.3d at 1034; *Mater, supra*, 200 F.2d at 124-25.

There is an additional source of federal district court "original jurisdiction" over federal enclaves, namely 16 U.S.C. § 457, which provides the following:

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application* of *State laws.* In the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Feb. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in exclusive federal enclaves. *Stokes v. Adair,* 265 F.2d 662, 665-66 (4th Cir. 1959). The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1331. *Id.*

Thus, there are two different bases for the U.S. district courts' original jurisdiction over personal injury actions arising on a federal enclave. First, federal courts have original jurisdiction over claims involving federal enclaves pursuant to the "arising under" provision of 28 U.S.C. §1331 [hereinafter "federal enclave jurisdiction"]. Additionally, death and personal injury claims arising in exclusive federal enclaves are governed by 16 U.S.C. § 457, which provides federal courts original jurisdiction over such actions through an explicit grant of jurisdictional authority [hereinafter "16 U.S.C. § 457 jurisdiction"].

## D.  REMOVAL IS STILL APPROPRIATE WHERE SOME EXPOSURE OCCURRED ON FEDERAL ENCLAVES AND OTHER EXPOSURE OCCURRED OFF OF FEDERAL ENCLAVE SITES.

As outlined above, due to the medical causation issues central to litigation of an asbestos-related claim, demonstrating that Plaintiff Sammartino was potentially exposed to asbestos at even

one federal enclave job site is sufficient grounds for removal.  In this case, it is evident that Plaintiff Sammartino worked on several federal enclave job sites where his potential asbestos exposure is at issue.

## II.    DISCUSSION

The numerous procedural and substantive arguments which Plaintiffs raise in the Motion to Remand are baseless,[2] and are refuted in the following sections:

## A.  DEFENDANTS MET THE PROCEDURAL REQUIREMENTS FOR REMOVAL

The Removing Defendant fully complied with the procedural requirements set forth in 28 U.S.C. §§ 1441 and 1446, including the "rule of unanimity,'" by obtaining the written joinder and consent of the other Defendants to this action, and filing the Notice of Removal within 30 days of service.  Each proper Defendant joined in, and consented to, the Notice of Removal through an individual with the authority to bind each Defendant to its consent through letters transmitted to counsel for Krafft-Murphy.  The letters were all signed by the parties or their counsel, and each fully indicates that particular Defendants joined in, and consented to, the removal of this action from the Superior Court of the District of Columbia to the U.S. District Court based on both federal enclave jurisdiction and 16 U.S.C. § 457 jurisdiction.

### 1.  Consent Letters Filed with This Court as an Exhibit to the Notice of Removal Meet the Requirements of the "Rule of Unanimity."

---

[2] Plaintiffs' arguments expressing their dislike for the MDL, as well as the unfortunate circumstances surrounding Mr. Sammartino's health, are wholly irrelevant to the issues of whether this action was properly removed.  Thus, these statements will not be addressed in this Response.

7

These letters meet or exceed every procedural requirement pertaining to joinder and consent, were submitted by Removing Defendant in both hard copy and via CD-Rom to the Office of the Clerk at the time of removal, and leave absolutely no doubt that all Defendants fully agreed to the removal of this action.  Plaintiffs devoted considerable time and energy attempting to impugn the sufficiency and validity of these joinder and consent letters. However, Plaintiffs' arguments are factually and legally erroneous.

Where there are multiple defendants in a case, "removal generally requires unanimity among the defendants." *Williams v. Howard University,* 984 F. Supp. 27, 29 (D.D.C. 1997)(Green, J.)(quoting *Balazik v. County of Dauphin, 44* F.3d 209, 213 (3d Cir. 1995)). Each "defendant's consent to removal must be unambiguous and independent[;]" *Williams v. Howard University,* 984 F. Supp. 27, 29 (D.D.C. 1997)(Green, J.), however, "there is some variety in the timing and formality required for defendants to express their unanimous consent to removal[.]" *Id.*  "[W]hile § 1446 does not require that all defendants sign the same notice of removal, it does require that each defendant file a notice of removal, either independently or *by unambiguously joining in or consenting to another defendant's notice,* within the thirty-day period following service of process" (internal citations omitted, emphasis added). *Anne Arundel Co.,* 905 F.Supp. at 278 *(citing Creekmore v. Food Lion, Inc.,* 797 F.Supp. 505, 508 (E.D.Va. 1992)).  In the case at bar, every Defendant provided a written letter expressing the Defendants' unambiguous joinder in, and consent to, the removal and documentation of this consent was provided to this Court.

Plaintiffs incorrectly portrayed the case law of this Court, as well as that of other jurisdictions, as requiring every Defendant to personally sign the Notice of Removal or personally file their own written consent to removal directly to the court. Upon a review of the cases cited in Plaintiffs'

Motion, it is clear that the mere representation by counsel for one defendant to a district court that another defendant had joined in, consented to, or did not object to removal, with no documentation demonstrating that consent to the court in a timely manner, is insufficient to constitute a showing of consent by that other party. However, this is clearly inapposite to the case *sub judice,* in which every Defendant provided an independently written letter expressing that Defendant's unambiguous joinder in, and consent to, the removal.  The Court was not left to rely on any representation by Krafft-Murphy, alone, as to the joinder and consent of all Defendants to removal.  Instead, within the 30-day time period for removal, all Defendants provided correspondence to counsel for Krafft-Murphy joining in, and consenting to, the removal of this case to federal court, at which point Krafft-Murphy then provided this documentation evidencing joinder and consent to this Court as part of its Notice of Removal. *See* Notice of Removal, Exhibit 3.

The other authorities cited by Plaintiffs on the issue of unanimity involve circumstances in which courts determined that the unanimity requirement is not satisfied when one party represents to the court another party's <u>verbal</u> consent (or in some instances where the party argues that another party implicitly consented based on filing answers or motions in federal court, or by failing to object after removal). For example, Plaintiffs rely on two inapposite cases from the Fourth Circuit: *Creekmore v. Food Lion, Inc,,* 797 F.Supp. 505, 508 (E.D.Va. 1992) (holding that Food Lion's representations that two co-defendants had verbally consented to the removal were insufficient to demonstrate their affirmative and unambiguous desire to have the case removed); and *Martin Oil Co. v. Philadelphia Life Ins. Co.,* 827 F.Supp. 1236, 1237-38, 1239 (N.D.W.Va. 1993) (determining that joinder was insufficient when Philadelphia Life Insurance Company's notice of removal represented, without more, that counsel for a co-defendant had consented to the removal; the court

held that, "it is insufficient for a defendant who has not signed the removal petition to merely advise the removing defendant that it consents to removal and that the removing defendant may represent such consent to the Court on its behalf").[3]  Such cases are thus inapposite to the present action, in which all proper defendants provided signed letters expressing their unambiguous joinder in the removal within the 30-day time period for removal and these letters were provided to the Court within the same prescribed 30-day time period.

The Plaintiffs' reliance on *Edelman v. Page*, 535 F. Supp. 2d 290 (D. Conn. 2008), as support for their proposition that letters filed with this Court are insufficient expressions of consent, is unfounded.  In *Edelman*, the court remanding the case to state court because the multiple defendants, while unanimously consenting to removal, did not demonstrate their consent to the court.  *Id.* at 292-293.  In that case, the multiple defendants consented to removal of the case and gave their consent to the removing defendant via e-mail prior to the removing defendant filing the Notice of Removal in that case.  However, those e-mails were never directed to the court to demonstrate consent of all defendants until after the 30 day time period for removal had expired. *Id.* Emphasizing that it is necessary for showing "some form of unambiguous written evidence of consent to the court *in a timely fashion*," *id.* (quoting *Russell Corp. v. Am. Home Assurance Co.*, 264 F.3d 1040, 1049 (11th Cir. 2001), the court remanded the case because the demonstration of consent of all defendants came after the 30-day period expired. *Id.* at 293.

Unlike the correspondence expressing consent in *Edelman*, the correspondence demonstrating

---

[3] Additionally, Plaintiffs' rely on *Amteco, Inc. v. BWAY Corp.*, 421 F.Supp.2d 1028, 1032 (E.D.Mo. 2003) (BWAY Corp.'s representation that St. Louis Paint Manufacturing Company had <u>orally</u> consented to removal was not sufficient under the removal statute); *Landman v. Borough of Bristol.* 896 F.Supp. 406 (E.D.Pa.1995) (finding that the Borough of Bristol had not provided its consent within 30 days based simply on Amtrak asserting in its removal petition that Bristol consented to the removal, with nothing more, or based on Bristol filing an answer in federal court).

consent in the instant case was provided to this Court in a timely fashion, prior to the expiration of the 30-day time period for removal. All Defendants provided a written letter expressing the Defendants' unambiguous joinder in, and consent to, the removal that was then provided to this Court in a timely fashion. The Court was not left to rely on any representation by Krafft-Murphy, alone, as to the joinder and consent of all Defendants to removal. Instead, all Defendants provided correspondence to Counsel for Krafft-Murphy showing that they unambiguously join in, and consent to, the removal of this case to federal court and Krafft-Murphy then provided documentation of this joinder and consent to this Court as part of its Notice of Removal. *See* Notice of Removal, Exhibit 3.

Plaintiffs' reliance on *Codapro Corp. v. Wilson,* 997 F.Supp. 322 (E.D.N.Y. 1998), as support for their proposition that letters filed with this Court are insufficient expressions of consent, is similarly unfounded. *Codapro Corp.* is distinguishable from the present action for numerous reasons. The "consent letter" that was filed with the court in that case was written by an untrustworthy *pro se* attorney seeking removal to an unknown third person, and as such the Court found that this letter does not express the consent of the non-moving defendant. *Id.* at 326. In *Codapro Corp.,* the case, which was centered on common law fraud claims, had been removed from New York State Court to federal court by an attorney named Samuel Boyd, a *pro se* defendant accused, *inter alia,* of using his attorney trust account as part of a fraudulent deal. *Codapro Corp.,* 997 F.Supp. at 324. As to the other "consent letters" rejected by the court in *Codapro Corp.*, the court's rejection of these letters centered around the veracity of the those letters produced by Boyd, because the court viewed Boyd's representations with justifiable skepticism as to whether the Defendants did, indeed, consent in that specific case. *Id.* at 324. The language of the opinion makes

clear that the district court was highly skeptical of Boyd's representations. *Id.* Thus, for example, the Court did not accept Boyd's claim of joinder as to co-defendant Edward Canino, *id.* at 326 ("In the Court's view, a letter written *by Boyd* to an unknown third person cannot qualify as an unambiguous written manifestation of Canino's consent"), and it rejected Boyd's assertion that "he was authorized to act on behalf of all the other defendants when he filed the Notice of Removal because he is an attorney," noting that, "indeed, one of the defendant's, Edel, has filed an affidavit stating that he *objects* to removal" (emphasis in original), *id.* at 326-327.

The court's holding in *Codapro Corp.* must be viewed in the context of its unique facts, where an individual *defendant* allegedly mailed to an attorney, who was a *pro se co-defendant* and the removing party, a letter purporting to provide the consent to removal of himself (the sender) as well as six other corporate co-defendants, but with no indication that the sending defendant was an officer of these companies or that he had authority to act on their behalf. *Id.* at 324. Further, another defendant actually filed an affidavit *objecting* to the removal. *Id.* at 324. 326-27. In the instant case, all Defendants provided a written letter expressing the Defendants' unambiguous joinder in, and consent to, the removal that was then provided to this Court in a timely fashion. The Court was not left to rely on any representation by Krafft-Murphy, alone, as to the joinder and consent of all Defendants to removal. More importantly, the veracity of the authenticity of these letters is not disputed in this case. Plaintiffs do not purport, as they should not, that Krafft-Murphy is the party who prepared these letters. As such, unlike the letters in *Codapro*, the consent letters in this case demonstrate all Defendants' valid, unambiguous and independent consent to removal.

   **2.  The "Consent Letters" do not Violate LCvR 5.1(e) and Consent for All Defendants was Valid Because Such Consent was Given by Individuals with the Ability to Bind Each Applicable Defendant to its Consent.**

Plaintiffs' arguments concerning alleged violations of LCvR 5.1(e) and the inability of counsel not barred in this Court to give consent for the purposes of removal are without merit.  First, LCvR 5.1(e) does not apply to consent letters drafted for the purposes of removal.  Second, irrespective of whether each attorney who signed the applicable consent letter for their client was barred in the U.S. District Court for the District of Columbia, their consent is valid for the purposes of removal because it binds their client to such consent.

   a.  <u>The "Consent Letters" do not violate LCvR 5.1(e).</u>

For the purposes of consenting to removal of this case, defense counsel was neither required to be a member of the U.S. District Court for the District of Columbia nor place his or her bar number on the correspondence granting joinder and consent. Indeed, the individual granting consent need not even be an attorney to grant consent to removal. *See* Discussion II(2)(b), *infra*.  Plaintiffs' argument regarding this issue is merely a red herring to confuse the court from the proper removal of this case.

   b.  <u>Consent for the purposes of removal can be given by any individual that has the authority to bind the Defendant to such consent.</u>

Consent for removal need not be given by an attorney barred in this Court.  Such consent can be given by any individual with the authority to bind the defendant to that consent.  *Foley v. Allied Interstate Inc.,* 312 F.Supp.2d 1279, 1283 (C.D.Cal.2004)("[F]ederal courts have agreed that a corporation's consent to remove an action may be signed by someone other than a corporation's counsel of record, provided that such person has authority to bind the corporation.") Notably absent

in Plaintiffs' Motion to Remand is any supporting case law advancing Plaintiffs' argument that only counsel of record, and a member of this Court's bar, can grant consent for removal. Indeed, "consent to removal by 'some timely filed written indication from each defendant, *or some person or entity purporting to formally act on its behalf in this respect and to have authority to do so*, that it has actually consented to such action.'" *Id. (*citing *Getty Oil Corp. v. Ins. Co. of N. Am.,* 841 F.2d 1254, 1262 n. 11 (5th Cir. 1988)(emphasis added).

In *Foley*, plaintiffs argued that the corporation's consent to remove given by the corporation's general counsel was invalid because it was made by someone other than the corporation's counsel of record. *Id.* at 1283. Rejecting this theory and denying the plaintiff's motion to remand in that case, the *Foley* court found that a corporation's general counsel has the authority to bind that corporation, and thus, for the purposes of removal, consent by someone other than the counsel of record is sufficient for the purposes of removal.[4] *Id.*

Like the defendant corporation's consent in *Foley*, consent for removal in this case was given by counsel with the authority to bind each of their Defendant corporations. While not all counsel who gave formal consent to removal are members of the United States District Court for the District of Columbia, they are all attorneys with the authority to consent for the purpose of removal[5]. Such consent was laid out in formal, written documentation. Accordingly, unambiguous consent has been given by all Defendants and such consent has been demonstrated in the documentation provided to

---

[4] Like the consenting defendant's general counsel in *Foley*, Steptoe & Johnson, LLP serves as National Counsel for Defendant Metropolitan Life Insurance Co. Accordingly, an attorney representing them has the authority to bind them to their consent to removal in this cases.

[5] While not required by any federal law regarding removal and the removal of unanimity, various defense counsel have executed affidavits indicating their clients' understanding that defense counsel not barred in the United States District Court for the District of Columbia had the authority to act on their client's behalf and consent to removal in this cases. **Exhibits 12-14.**

this Court. *See* Notice of Removal, Exhibit 3.

      **3.**    **Any Pleadings or Other Documents Filed in the Superior Court for the District of Columbia After the Filing of the Notice of Removal Do Not Show Ambivalence Towards Removal or Otherwise Invalidate Consent to Removal.**

The filing of a pleading, or other document, in state court after the filing of a notice of removal has been filed does not demonstrate a defendant's ambivalence to removal or invalidate that defendant's consent to removal. Thus, Plaintiffs' unfounded argument that the filing of an Answer by Defendant A.W. Chesterton and the Entry of Appearance by Counsel for Metropolitan Life Insurance Co. in the Superior Court for the District of Columbia has waived those Defendants' consent to removal is without merit. Again, notably absent from Plaintiffs' argument is any case law dealing directly with this issue.  In fact, as other courts have found, nothing short of an adjudication on the merits can result in waiver of removal.  *See Foley v. Allied Interstate, Inc.*, *supra*, 312 F. Supp.2d at 1284.  In *Foley*, Plaintiff asserted that Defendant Allied waived its right of removal by filing an answer and serving various discovery.  *Id.*  In denying the plaintiff's motion to remand in that case, the court found that actions [in state court] short of proceeding to an adjudication on the merits will not result in waiver. *Id.* (citing *Resolution Trust Corp. v. Bayside Developers,* 43 F.3d 1230, 1240 (9th Cir. 1994)(quoting *Beighley v. Fed. Deposit Ins. Corp.*, 868 F.2d 776, 782 (5th Cir. 1989))).  Accordingly, neither Defendant A.W. Chesterton or Defendant Metropolitan Life Insurance Co. have waived their consent to removal.

**B.  THE NOTICE OF REMOVAL SUFFICIENTLY DEMONSTRATES THAT PLAINTIFF SAMMARTINO WORKED ON NUMEROUS FEDERAL ENCLAVES WHERE EXPOSURE TO ASBESTOS-CONTAINING PRODUCTS IS AT ISSUE.**

Plaintiffs' Work History Chart, as supported through Plaintiffs' Deposition Testimony, indicates that potential asbestos exposure resulting in Plaintiff Sammartino's alleged injury is at issue in connection with numerous federal enclave sites, including: The Veterans' Affairs Medical Center, Walter Reed Army Medical Center, Ronald Reagan Washington National Airport, Capitol Power Plant, Smithsonian Institution, The White House and Soldier's Home (n/k/a Armed Forces Retirement Home). *See* **Exhibit 3.**  Whether federal enclave jurisdiction exists is a complex question, "resting on such factors as whether the federal government exercises exclusive, concurrent or proprietorial jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation." *Celli v. Shoell,* 995 F. Supp 1337, 1341 (D. Utah 1998).

The Notice of Removal clearly presents a colorable claim that this action is removable, describing its bases for removal and the enclave status of particular locations far beyond that which is minimally required.  Despite this showing, Plaintiffs still claim that the Notice of Removal failed to sufficiently demonstrate enclave status for particular locations.  This contention is unfounded. However, in response to Plaintiffs' assertion that the Notice of Removal does not prove sufficient information outlining the federal enclave status of particular sites, Defendant submit the following summaries further demonstrating that various sites at which Plaintiff Sammartino was allegedly exposed to asbestos were federal enclave sites.

16

1.     **Veterans' Affairs Medical Center  (VA Hospital)**

During the May 30, 2008 portion of his discovery deposition, Plaintiff Sammartino recalled working at the VA Hospital, but he could not recall when he worked at that site.  *See* **Exhibit 2** at 61-62.[6]  However, Plaintiffs' Work History Chart states that Plaintiff Sammartino worked at the VA Hospital sometime between 1964-1969. **Exhibit 3.**

The VA Hospital in Washington, D.C., known as Washington, D.C. Veterans Affairs Medical Center (hereinafter VA Hospital), is a federal enclave.   The Veterans Health Administration of the U.S. Department of Veterans Affairs provides medical care for veterans through various VA Medical Centers, including the VA Medical Center in Washington, D.C.  38 U.S.C. §7301 et seq..  Under 38 U.S.C. § 8112, the federal government relinquished part of their legislative jurisdiction for medical facilities and properties under the Veterans Affairs and created concurrent jurisdiction on those medical facilities.  Specifically 38 U.S.C. § 8112 provides:

> The Secretary, on behalf of the United States, may relinquish to the State in which any lands or interests therein under the supervision or control of the Secretary are situated, such measure of legislative jurisdiction over such lands or interests as is necessary to establish concurrent jurisdiction between the Federal Government and the State concerned Such partial relinquishment of legislative jurisdiction shall be initiated by filing a notice thereof with the Governor of the State concerned, or in such other manner as may be prescribed by the laws of such State, and shall take effect upon acceptance by such State.

However, this relinquishment did not apply to facilities constructed prior to 1979. *Id.*  Accordingly,

---

[6]  Like the majority of sites Mr. Sammartino discussed at his May 30, 2008 deposition, Plaintiff Sammartino testified that he has know way of knowing whether he was exposed to asbestos-containing products at this job site. *See* Exhibit 2 at 67. *See* discussion, *infra,* regarding Plaintiffs' use of coworker testimony in asbestos-related cases.

the federal government retains exclusive jurisdiction over facilities constructed prior to 1979, including the VA Hospital facility at which Plaintiff Sammartino allegedly worked.

2.   **Walter Reed Army Medical Center:**

The Walter Reed Army Medical Center is an exclusive federal enclave. In a public report entitled, *Inventory Report on Jurisdictional Status of Federal Areas Within the States As of June 30, 1962* (hereinafter "*Inventory Report*"), the General Services Administration ("GSA") compiled an inventory of all federal lands located within the states.[7] The information contained in the Inventory Report was authenticated in a 2001 affidavit signed by Carol S. Anadale, Program Expert in the Office of Real Property of the GSA. **Exhibit 4.**  This *Inventory Report* demonstrates that several sites at which Plaintiff Sammartino worked, and allegedly may have been exposed to asbestos, which allegedly resulted in his disease, are federal enclaves.

An excerpt of the *Inventory Report,* attached hereto as **Exhibit 5,** indicates that Walter Reed (listed as "Reed Walter") is a federal property. The Inventory Report further indicates that Walter Reed is a federal property over which the Federal Government exercises exclusive legislative jurisdiction, that the Federal Government acquired the property between 1942 and 1943, and denotes the legislative authority granting the Federal Government exclusive legislative jurisdiction over Walter Reed. Additionally, the Inventory Report indicates that the Federal Government accepted jurisdiction over the land on April 22, 1943.

---

[7] Excerpts of relevant pages from the *Inventory Report* are provided as exhibits to the relevant job sites herein.

### 3.  Ronald Reagan Washington National Airport

The Ronald Reagan Washington National Airport ["National"] is a federal enclave. An excerpt of the *Inventory Report,* attached hereto as **Exhibit 6,** indicates that National Airport  is a federal property located in Arlington, Virginia. The *Inventory Report* further indicates that National is a federal property over which the Federal Government exercises exclusive legislative jurisdiction, that the Federal Government acquired the property between 1938 and 1953, and that the legislative authority granting the Federal Government exclusive legislative jurisdiction over National is at Federal Law Volume 59, page 53. However, because the land at National was acquired both before and after the Federal Government adopted 40 U.S.C. § 255 in 1940, the Federal Government acquired exclusive jurisdiction over those lands acquired between 1935 and 1940 as of the date acquired, and exclusive jurisdiction over the remainder in 1953. *See, e.g.,* 63 Md. Op Att. Gen. 332, 1978 WL 33745 (Md.A.G.).

### 4.  Capitol Power Plant

The Capitol Power Plant is part of the federal enclave site known as the United States Capitol Complex.  The United States Capitol Complex is comprised of various federal government buildings including the "Capitol, the House and Senate Office Buildings, the U.S. Botanic Garden, the Capitol Grounds, the Library of Congress buildings, the Supreme Court Building, the Capitol Power Plant and various support facilities." *See* **Exhibit 7,** www.aoc.gov/cc/index.cfm  (last visited May 28, 2008).  In 1904, the construction of the Capitol Power Plant was authorized by Congress. Id.  See also 2 U.S.C. §2162.  Authorization of the construction of the Capitol Power Plant and miscellaneous management and operational guidelines are set forth under 2 U.S.C. §2162.  As such,

the Capitol Power Plant is a federal enclave controlled by the U.S. Congress.

### 5.  Smithsonian Institution

The Smithsonian Institution is a federal enclave. James Smithson established the Smithsonian

Institution, situated in Washington, D.C., as a result of a bequest in 1826. Smithson, a British

citizen and scientist, who died in 1829, named his nephew as beneficiary in his last Will and

testament. He stipulated that if the nephew would die without heirs (as he did in 1835), the estate

should go to the United States of America for the following purpose:

> to found at Washington, under the
> name of the Smithsonian Institution,
> an establishment for the increase and
> diffusion of knowledge among men.

Six years after Smithson's death, President Andrew Jackson announced the bequest to

Congress. On July 1, 1836, Congress accepted the legacy bequeathed to the nation. In September,

1838, it was determined that Smithson's legacy, consisting of gold sovereign's re-coined at the

Philadelphia mint to U.S. currency, was worth over $500,000.

Eight years later, an Act of Congress, signed by President Polk on August 10, 1846,

established the Smithsonian Institution as a trust to be administered by a Board of Regents and a

Secretary of the Smithsonian. 20 U.S.C. §41. Ch.178, Sec.1, 9 Stat. 102. **Exhibit 8,**

http://www.si.edu (last visited May 28, 2008).   The General Service Administration lists the Old

Smithsonian building among those facilities on its building inventory. **Exhibit 9**,

http://www.iolp.gsa.gov (last visited May 28, 2008).

Certain rules and regulations concerning the operation and security of the Smithsonian Institution are codified at 40 U.S.C.A. §6301, et seq. Unlawful activities on museum grounds are proscribed by statute, including the unauthorized sale of any article, the unauthorized displaying of any sign, placard or other form of advertisement or the unlawful soliciting of alms, subscriptions or contributions. 40 U.S.C.A. §6303. Regarding building security, certain Smithsonian officials may also designate certain employees as special police for their respective specified buildings and grounds, who will wear uniforms and have certain powers. 40 U.S.C.A. §6306.

**6.     White House**

Undeniably, the White House is one of the most widely recognized federal enclaves. "For two hundred years, the White House has stood as a symbol of the Presidency, the United States government, and the American people." **Exhibit 10**, www.whitehouse.gov (last visited June 2, 2008). In accordance with it's historical and governmental significance, the White House is an exclusive federal enclave. In December 1790, President George Washington signed an Act of Congress declaring that the federal government would reside in a district "not exceeding ten miles square...on the river Potomac." President Washington and city planner Pierre L'Enfant, chose the site for the "President's House." Construction of the White House began in 1792 but it was not completed until approximately 1800. President Theodore Roosevelt officially gave the White House its current name in 1901. Pursuant to 3 U.S.C. §102, the President is entitled to "the use of the furniture and other effects belonging to the United States and kept in the Executive Residence at the White House." 3 U.S.C. §102.

**7.    Soldier's Home**

Referred to on Plaintiffs' Work History Chart as "Soldier's Home," this federal enclave is now known as the Armed Forces Retirement Home (f/k/a Soldiers' and Airmen's Home). The Old Soldiers' Home, now known as the U.S. Soldiers' and Airmen's Home (hereinafter Soldiers' Home), is an exclusive federal enclave located in Washington, D.C.  In 1851, the land which forms the core of Soldiers' Home was purchased by the U.S. Government to establish an "asylum for old and disabled veterans." **Exhibit 11,** www.defenselink.mil. (last visited June 2, 2008). Two of the buildings on this site, Quarters 1 and Anderson Cottage, served as the summer White House for several U.S. Presidents.  During the Civil War, President Abraham Lincoln lived at Soldiers' Home in what is now called Anderson Cottage. It was here that President Lincoln  wrote the last draft of the Emancipation Proclamation.  Today, this 320 acre facility is home to nearly 1,300 veterans and is a perfect example of "The Military Taking Care of Its Own."  Id.

**B.    THE WORK HISTORY DOCUMENT DOES NOT RUN AFOUL OF THE "WELL-PLEADED COMPLAINT" RULE AND SUFFICIENTLY  DEMONSTRATES THE NECESSITY OF REMOVAL.**

Plaintiffs argue that application of the "well-pleaded" complaint rule precludes removal jurisdiction in this action based on their contention that the "four corners" of the complaint does not make a claim under federal law. (P.'s Memo 11-12). This argument is fundamentally incorrect, as it misstates the "well-pleaded complaint rule," and then misapplies it to the facts of this case.

**1.    Legal Background Regarding the "Well-Pleaded Complaint" Rule and the "Artful Pleading" Doctrine.**

22

In assessing whether federal courts have original jurisdiction over matters involving a federal question under 28 U.S.C. § 1331, the presence or absence of jurisdiction is normally governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *California v. United States, 215* F.3d 1005, 1014 (9th Cir. 2000).

However, the "artful pleading doctrine" is an established corollary to the well-pleaded complaint rule. This doctrine states that a plaintiff may not defeat removal by fraudulent means or by artfully failing to plead essential federal issues in a complaint. *See, e.g., Powers v. South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,* 719 F.2d 760 (C.A.Tex. 1983). Thus, while a plaintiff who has both federal and state causes of action may choose to ignore federal claims and pursue only state claims in state court, a defendant is entitled to have the case removed if the plaintiff is attempting to avoid having an essential federal claim adjudicated in a federal forum by artfully drafting the complaint in terms of state law. *People of State of Ill. v. Kerr-McGee Chemical Corp.,* 677 F.2d 671 (7th Cir. 1982), *cert. denied* 103 S.Ct. 469. Consequently, a plaintiff's failure to make specific reference in a complaint to an applicable source of federal law will not prevent removal. *Larsen v. Waddell,* 516 F.Supp. 1353 (W.D.Pa.1981).

In assessing a complaint for "artful pleading," federal courts are permitted to look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded the cause of action so as to couch a federal claim in terms of state law. *See, e.g., Gateway 2000, Inc. v. Cyrix Corp.,* 942 F.Supp. 985 (D.N.J. 1996); *Emerson Power Transmission Corp. v. Roller Bearing Co. of America, Inc.,* 922 F.Supp 1306 (N.D.Ind. 1996). "Artful pleading doctrine" analysis requires removal courts to evaluate, *inter alia,* whether federal jurisdiction exists on the face of the complaint, whether

23

federal preemption exists, and whether a remedy is provided by federal law. *Stokes v. Bechtel North American Power Corp.,* 614 F.Supp. 732 (N.D.Cal. 1985). If a court answers affirmatively to any of these inquiries, the complaint was artfully pled to defeat federal adjudication of the case, and federal courts properly have jurisdiction. *Id.*

> **2.      Plaintiffs' Complaint was Artfully Pled, as evidenced by its omission of several essential issues, such as Plaintiffs' Alleged Exposure on Federal Enclave Job Sites.**

As noted, *supra,* in order for federal courts to apply the well-pleaded complaint rule, it is necessary that they examine a properly pleaded complaint. *California v. United States,* 215 F.3d. at 1014. In the present matter, the Complaint itself does not list any specific job sites where Plaintiff Sammartino was allegedly exposed to asbestos, nor does it provide any specific time frames of alleged exposures at any particular location.  Instead, specific sites and an initial showing of potential exposure to asbestos-containing products alleged at those sites were provided only in Plaintiffs' Work History Chart.  As such, to the extent that such issues as location(s) of alleged exposure and time frame(s) during which Plaintiff was allegedly exposed to asbestos-containing products were not contained within Plaintiffs' Complaint, Defendant was not fairly put on notice of such allegations. As such, Plaintiffs' Complaint would constitute an improperly pleaded complaint.

In the District of Columbia, to establish proximate causation in an asbestos-related personal injury case, such as in the case at bar, the plaintiff must "show that the defendant's product was the cause of his or her injuries," *Bragg v. Owens-Corning FIBERGLASS Corp.*, 734 A.2d 643, 650 (D.C. 1999)(citing *Claytor v. Owens-Corning Fiber Glass Corp.*, 662 A.2d 1374, 1332 (D.C. 1995)), by proving that, at a minimum, "[the plaintiff] and the defendants' products were in the

24

same *place* at the same *time*." *Claytor*, *supra*, 662 A.2d at 1384-85 (*emphasis added*). To satisfy

this substantial factor standard, a plaintiff must prove, not only that he regularly worked with, or in

proximity to, the asbestos-containing products of a particular defendant, but also that this exposure

was a substantial factor in contributing to his or her injury. *Weakley v. Burnham Corporation, et al.*,

871 A.2d 1167, 1175, 2005 D.C. App. LEXIS 157, 177 (2005).

Therefore, in order for the plaintiff in a District of Columbia asbestos-related personal injury

case to satisfy the burden of proof as to the critical element of causation, the plaintiff must establish

having worked with or in close proximity to a product manufactured, distributed or sold by a

particular defendant, at a particular place and time. The location or "place" of the alleged injuries is

necessary for establishing proximity, while the "time" of the injuries is determinative of the

frequency and regularity of exposure. Thus time and place are central to establishing causation, and

notice of Plaintiffs' allegations of these elements is essential for Defendant to prepare a full and fair

defense in this matter.

In the case at bar, if Plaintiffs *had* served a "well-pleaded" complaint in this matter, that

Complaint necessarily should have included, at a minimum, specific representations made in the

Complaint itself addressing the specific work sites at which Mr. Sammartino was allegedly exposed

to asbestos, as well as the particular time frames of those exposures. Such a pleading would thus

have presented clear federal issues on its face - those of both federal enclave jurisdiction and 16

U.S.C. § 457 jurisdiction.


    **3.**      **The Work History Chart is Sufficient to Show That Alleged Exposure at Job Sites on Federal Enclaves is an Inextricable Issue in This Case.**

As Plaintiffs' Complaint was artfully pled, the Plaintiffs' Work History Chart serves as grounds for removal of this case, due to federal enclave jurisdiction and 15 U.S.C. § 457 jurisdiction. This document, as Plaintiffs indicate in their Memorandum, is a document that is typically furnished as part of Plaintiffs' Answers to Defendants Set Interrogatories. (P's Memo at 13). At the discovery deposition of Mr. Sammartino taken on May 30, 2008, Plaintiffs' Counsel confirmed that this document was part of Plaintiffs' Answers to Defendants' Set Interrogatories stating this document was furnished as "part of Mr. Sammartino's responses to interrogatories." *See* Exhibit 2 at 153. It is disingenuous, at best, for Plaintiffs to now argue that this document is not part of Plaintiffs' responses to Defendants' Set Interrogatories. Indeed, Plaintiffs admit that this document was prepared by Plaintiffs' Counsel as part of this litigation. As such, this Work History Chart is sufficient in demonstrating that alleged exposure to asbestos on federal enclave sites may be central to the issues involved in this case.

Each and every federal enclave site listed on the Work History Chart, and discussed during Plaintiff's deposition, in and of themselves, provide the basis for removal. Medical causation issues are an inextricable portion of litigation involving an asbestos-related claim. As Plaintiffs indicate in their Memorandum, "Plaintiffs in asbestos litigation generally argue that each and every exposure to asbestos substantially contributes to the development of the disease [while] Defendants in asbestos litigation generally...contest this argument." (P's Memo at 14-15). Accordingly, *any* potential asbestos exposure on any single federal enclave site is inextricable from this case because Plaintiffs, or Cross-Plaintiffs, may attempt to show that it was exposure at these sites that led to Plaintiff

26

Sammartino's injury.[8] As such even one federal enclave site where exposure to asbestos may be at issue serves as a basis for removal.

Such medical causation issues are important to remember in light of the fact that the job sites where alleged asbestos exposure may be at issue are not only those job sites on the Work History Chart in connection with which Plaintiffs specifically listed alleged asbestos-containing products or contractors, but *any* of the job sites listed on the Work History Chart.  As Plaintiffs emphasized in their Memorandum,

> "[a]t some these jobsites, Plaintiff (sic) expressly alleges exposure to asbestos – at others, he does not. At certain of the jobsites (sic), Plaintiff's counsel may be aware from representation of clients in other cases or through pre-filing investigation, that asbestos was utilized at a particular jobsite during the same time period that Plaintiff worked at that job." (P's Memo at 13).

Thus, this document expresses potential alleged asbestos exposure known at the time it is drafted.  Accordingly, just as notable as the listing of asbestos products at particular job sites is the lack of any indication that Plaintiffs' will <u>not</u> be alleging potential exposure to asbestos products at each site.  Such an indication is typically made by writing "no exposure alleged," or similar, on the

---

[8]  Plaintiffs argue that Defendants should be required to show medical causation evidence proving that potential exposure to asbestos-containing products at the federal enclave sites at issue caused Plaintiff Sammartino's disease. Not only does this argument run afoul of every legal principle surrounding the parties' burdens of proof but such a requirement is also premature.  Accordingly, at best, this argument is unfounded and not supported by any established legal principles.

Work History Chart.  Plaintiffs have left such potential identification of asbestos exposure open for the same reason alluded to in Plaintiffs' Memorandum – specifically, it is "Plaintiff's burden to prove up exposure to [asbestos-containing] products.  This is typically accomplished through deposition testimony where either Plaintiff (*or one of Plaintiff's coworkers*) identifies asbestos products to which Plaintiff was exposed." (P's Memo at 13)(*emphasis added*).  Accordingly, Plaintiffs are leaving open the possibility that even if Plaintiff Sammartino could not identify exposure to asbestos at one of the sites listed, a coworker witness may be able to do so.

Due to potential co-worker testimony in this case, the fact that Plaintiff, himself, may testify that he does not know whether he was exposed to asbestos at a particular job site is of little import. *See generally* **Exhibit 2.**  It is common practice for Plaintiffs' counsel to use the Plaintiff's testimony to place himself a particular job site, and then to use subsequent co-worker testimony in attempts to demonstrate potential exposure to asbestos-containing products.  As a result, despite Plaintiffs' arcontrary, Plaintiff Sammartino's deposition testimony taken on May 30, 2008 in no way undermines removal.  In fact, Plaintiff Sammartino's testimony supports removal by leaving open the potential for subsequent evidence of alleged asbestos exposure at these various federal enclave job sites.

Accordingly, as demonstrated, Plaintiffs' Work History Chart, as supported by his deposition testimony of May 30, 2008, provides grounds for removal in this case.  The Work History Chart was provided to Defendants by Plaintiffs' counsel as initial discovery, and was affirmed later by Plaintiffs' counsel as being a document provided in response to Defendants' Set Interrogatories in asbestos cases in the District of Columbia. This document thus serves as documentation of the necessity and propriety of removal of this case to federal court on the basis of

28

federal enclave jurisdiction. This is especially true in light of the medical causation issues

inextricable to this case, wherein each and every site of potential exposure could be alleged by

Plaintiffs and Cross-Plaintiffs as a substantial contributing factor to Plaintiff Sammartino's disease.

Accordingly, removal is appropriate and Plaintiffs' Motion to Remand should be denied.

### D.    REMOVAL IS APPROPRIATE IN CASES OF INDIVISIBLE ALLEGED TOXIC EXPOSURE ON FEDERAL ENCLAVE AND NON-FEDERAL ENCLAVE SITES

As outlined above, due to the medical causation issues essential to the litigation of an

asbestos-related claim, demonstrating that Plaintiff Sammartino was potentially exposed to asbestos

at even one federal enclave job site is sufficient grounds for removal. In this case, it is evident that

Plaintiff Sammartino worked on several federal enclave job sites where his potential asbestos-

exposure is at issue. The mere fact that there are other job sites at issue neither requires remand of

this case nor establishes the need to force Defendants to litigate these claims separately in this Court

as well as in the Superior Court for the District of Columbia.

Plaintiffs' analysis of other courts' holdings in cases involving a mixture of federal enclave

and non-federal enclave sites is wholly inaccurate. Plaintiffs' reliance on the court's granting of

plaintiff's motion to remand in *Anderson v. Crown Cork & Seal*, 93 F. Supp. 2d 697, 701 (E.D.Va

2000) is largely misplaced. In *Anderson*, the court's finding that plaintiff's exposure occurred both

on and off of the Norfolk Naval Shipyard was not the basis for the court's decision to remand the

case. Indeed, the court specifically distinguished the exposure of the plaintiffs in *Akin v. Big Three

Industries, Inc.*, 851 F. Supp 819 (E.D. Tex 1994)(denying a motion to remand based on the

plaintiff's exposure while working as an employee *on* Tinker Air Force Base, a federal enclave) and

*Reed v. Fina Oil & Chemical Company*, 995 F. Supp. 705 (E.D. Tex 1998)(denying a motion to

remand due to plaintiff's indivisible injury from exposure to toxic substance *on* the Plains

Butadiene Plant federal enclave site) from Anderson's exposure. *See Anderson,* 93 F. Supp 2d at

702. The *Anderson* court then remanded the case because Plaintiff Anderson worked solely

onboard a vessel, a non-federal enclave "site" while employed at Norfolk Naval Shipyard and was

never exposed to asbestos *on* the Norfolk Naval Shipyard federal enclave site. *Id.* at 702. The court

noted that had Anderson's exposure occurred as a result of his employment at the shipyard, the

result would have been to deny plaintiff's motion to remand. *Id.*

Like the plaintiffs in *Reed* and *Akin*, Plaintiff Sammartino worked *on* the federal enclave

sites at issue. As a result, the fact that his potentially indivisible exposure may have occurred

partially on and partially off of federal enclave sites is irrelevant. Due to the arguably indivisible

nature of exposure in asbestos cases such as this, removal was appropriate and Plaintiffs' Motion to

Remand should be denied.


## III.  <u>CONCLUSION</u>

The U.S. District Court has original jurisdiction over this action under both federal enclave

jurisdiction and 16 U.S.C. § 457 jurisdiction, and thus removal of this action is appropriate under 28

U.S.C. § 1441. Further, Defendants fully adhered to all removal procedural requirements set forth in

28 U.S.C. §§ 1441 and 1446. As such, the removal of this action was proper, and the Moving

Defendant Krafft-Murphy Company respectfully requests this Court deny Plaintiffs' Motion for

Remand.

WHEREFORE, Defendant Krafft-Murphy Company respectfully requests this Court for a

hearing on this matter.

Respectfully Submitted,

  /s/ Neil J. MacDonald_____
Neil J. MacDonald, Esquire
Bar No. 433699
HARTEL, KANE, DeSANTIS,
MacDONALD & HOWIE, LLP
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705
Phone: (301) 486-1200
Fax: (301) 486-0935

Attorneys for Defendant
KRAFFT-MURPHY COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of July, 2008, I caused a true and correct copy of
the foregoing to be electronically filed and served upon the following counsel of record.

 /s/ Neil J. MacDonald_____
  Neil J. Macdonald

_____

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

| | |
|---|---|
| ARMANDO A. SAMMARTINO and THERESE<br>SAMMARTINO, his wife<br>1604 Dennis Avenue,<br>Silver Spring, MD 20902 | :<br>:<br>:<br>: |
|         Plaintiffs, | :<br>:<br>: |
| v. | :<br>: |
| AC & R INSULATION CO., INC.<br>Serve: Geoffrey S. Gavett, Esq.<br>      Gavett & Datt<br>      15850 Crabbs Branch Way, #180<br>      Rockville, MD 20855 | : Civil Action No._____<br>:<br>:<br>:<br>:<br>: |
| A.W. CHESTERTON, CO.<br>Serve: President<br>      Rte. 93, Middlesex Industrial Park<br>      Stoneham, MA 02180 | :<br>:<br>:<br>:<br>: |
| BALTIMORE AIRCOIL COMPANY, INC.<br>Serve: The Corporation Trust, Inc.<br>      300 E. Lombard Street<br>      Baltimore, MD 21202 | :<br>:<br>:<br>:<br>: |
| CERTAINTEED CORP. (Individually and as successor<br>to Keasbey & Mattison Company's Asbestos Cement<br>Pipe Division)<br>Serve: President<br>      P.O. Box 860<br>      750 East Swedesford Road<br>      Valley Forge, PA 19482 | :<br>:<br>:<br>:<br>:<br>:<br>: |
| GARLOCK, INC.<br>Serve: President<br>      1666 Division Street<br>      Palmyra, NY 14522 | :<br>:<br>:<br>:<br>: |

DEFENDANT'S
EXHIBIT

1

KRAFFT-MURPHY COMPANY                                    :
(and as successor to National Asbestos Co.)             :
Serve: Neil MacDonald, Esq.                             :
      Hartel Kane Desantis & Howie, LLP       :
      Capital Office Park                      :
      6301 Ivy Lane , Suite 800               :
      Greenbelt, MD 20770                     :
                                              :
METROPOLITAN LIFE INSURANCE, CO.                        :
Serve: President/CEO                                    :
      1 Madison Ave.                          :
      New York, NY 10010                      :
                                              :
NOLAND CO.                                              :
Serve: Arthur P. Henderson, Jr.                         :
      2700 Warwick Boulevard                  :
      Newport News, VA 23607                  :
                                              :
OWENS ILLINOIS, INCORPORATED                            :
Serve: President/CEO                                    :
      One Seagate                             :
      Toledo, OH 43666                        :
                                              :
RAPID AMERICAN CORP.                                    :
Successor in interest to the                            :
 Phillip Carey Corp.                                 :
Serve: CSC                                              :
      2711 Centerville Road, Suite 400        :
      Wilmington, DE 19808                    :
                                              :
THOS. SOMERVILLE CO.                                    :
Serve: President                                        :
      Thos. Somerville Co.                    :
      4900 6th Street, N.E.                   :
      Washington, D.C. 20017                  :
                                              :
THE WALTER E. CAMPBELL COMPANY, INC.                    :
Serve: Michael C. Gibbons                               :
      361 Berkshire Drive                     :
      Riva, MD 21140                          :
                                              :
         Defendants.                       :

## COMPLAINT AND DEMAND FOR JURY TRIAL

### (Negligence, Strict Liability, Breach of Warranty,
### Punitive Damages, Aiding and Abetting
### and Civil Conspiracy, and Loss of Consortium)

1.    Jurisdiction of this Court is based on D.C. Code Ann. §11-921 (1981). Jurisdiction over the defendants rests on D.C. Code Ann. §13-423 (1981) based on their business activities in the District of Columbia and their acts or omissions causing injury to the male plaintiff within the District of Columbia.

2.    The male plaintiff, hereinafter referred to as "plaintiff", Armando A. Sammartino, was employed as a plumber from approximately 1948 to 1986, working primarily in and around the District of Columbia at jobsites where he was exposed to asbestos products. During this period of time, plaintiff frequently used and/or came into contact with asbestos and asbestos products designed, manufactured, specified, inspected, assembled, distributed, supplied and/or installed by the above-named defendants (hereinafter, individually and collectively "the defendants' asbestos products"). Because of this frequent contact with the defendants' asbestos products, plaintiff inhaled and ingested great quantities of asbestos fibers. As a result of this exposure, plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems.

### COUNT I
### (Negligence)

3.    The plaintiff hereby adopts by reference the preceding paragraphs of the complaint as if fully set forth herein and further alleges that plaintiff's development of mesothelioma, asbestos-induced pleural disease and other related pulmonary problems was a direct and proximate result of the negligence of the defendants named herein in their design, manufacture, inspection, production, testing, distribution, specification, supply and/or installation and labeling of asbestos-containing materials and products, including, but not limited to, negligence in:

      a.    failing to adequately warn the plaintiff of the hazards associated with the inhalation of asbestos fibers;

      b.    failing to adequately warn the plaintiff that protective equipment should be used at all times when working with products containing asbestos;

c.    failing to properly design and manufacture asbestos products for safe use under the conditions of use that were reasonably anticipated;

d.    failing to properly test the asbestos products for hazards prior to placing these goods in the stream of commerce;

e.    failing to provide adequate instructions for safe and proper use of asbestos products;

f.    failing to remove asbestos products from the stream of commerce even after the defendants knew, or in the exercise of reasonable care, should have known, that these products were unsafe for use by consumers or workers under reasonably anticipated circumstances and/or any circumstances; and

g.    failing to specify the use of non-asbestos containing substitute products.

4.    As a direct and proximate result of the negligence of the defendants named herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems. Such potentially fatal injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish. Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

5.    As a further direct and proximate result of the negligence of the defendants herein, the plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, the plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT II
### (Strict Liability)

6.    Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages which he suffered were a direct and proximate result of the design, manufacture, specification, inspection, sale, supply and/or distribution of asbestos-containing products, by the defendants named herein, which were defective and/or unreasonably dangerous to the user and/or consumer.  The asbestos-containing products were defective and/or unreasonably dangerous in that they contained deleterious, toxic and carcinogenic asbestos fibers and because the products lacked any or adequate warnings about the hazards they posed.  The asbestos-containing products were further designed as defective and/or unreasonably dangerous in that their intended use and maintenance contemplated that the asbestos materials would be disturbed, releasing inhalable asbestos fibers, and the product manuals or specification data specified replacement, from time to time, of worn out or damaged asbestos materials.  The defendants named above are now or have been engaged in the business of designing, manufacturing, selling, inspecting, specifying in use and/or distributing asbestos-containing products.  The asbestos products that caused injury to plaintiff reached him without substantial change in the condition in which they were sold.  Plaintiff was unaware of the dangerous propensities of the asbestos products which rendered them unsafe and unfit for their intended use, and at the time he used these products, such use was anticipated by or should reasonably have been anticipated by the defendants.

7.    As a direct and proximate result of the strict liability of the defendants herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems.  Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish.  Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

8.    As a further direct and proximate result of the strict liability of the defendants herein, the male plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT III
### (Breach of Warranty)

9.      Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages from which he suffers are a direct and proximate result of the breach of express warranties made by the defendants herein, in that the asbestos products used by the plaintiff were expressly warranted as safe, and the plaintiff relied upon these express warranties of the defendants. However, the asbestos products as designed, manufactured, specified, inspected and distributed by the defendants herein were not safe for use by the plaintiff, but rather caused the disabling and potentially fatal injuries from which he now suffers.

10.     The illness, injury, and damages from which the plaintiff now suffers are a direct and proximate result of the breach of the implied warranty of fitness made by the defendants herein, in that the asbestos products used by the plaintiff were impliedly warranted by the defendants to be fit for their intended purposes and uses, and the plaintiff relied upon the defendants' skill and judgment and the implied warranties made by the defendants. However, the asbestos products as designed, manufactured, and distributed by the defendants herein were not fit for use of their intended purposes, but rather caused the disabling and potentially fatal injuries from which plaintiff now suffers.

11.     The illness, injury, and damages from which the plaintiff now suffers are a direct and proximate result of the breach of the implied warranty of merchantability made by the defendants named herein, in that the asbestos products used by the plaintiff were impliedly warranted by the defendants to be of merchantable quality, fit, safe, and in proper condition for the ordinary use for which asbestos products are designed and used, and the plaintiff relied upon the defendants' skill and judgment and the implied warranty of merchantability made by the defendants. However, the asbestos products as designed, manufactured, specified, inspected and distributed by the defendants named herein were unfit, unsafe, and unusable for the purposes for which they were intended, but rather caused the disabling and potentially fatal injuries suffered by the plaintiff.

12.     As a direct and proximate result of the breaches of warranty of the defendants named herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related

pulmonary problems. Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish. Moreover, as a result of the debilitating injuries, the plaintiff may incur substantial expenses for medical care and treatment.

13.     As a further direct and proximate result of the breach of warranty of the defendants herein, the plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, the plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

**COUNT IV**
**(Punitive Damages)**

14.     Plaintiff hereby adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages which he suffered were a direct and proximate result of the conduct of the defendants named herein, either by clear and convincing acts of commission or omission, which were intentional and/or so reckless, willful, and wanton in nature as to rise to the level of intentional action by the defendants, exhibiting reckless indifference to the health and well-being of the plaintiff and other similarly situated workers, and in reckless disregard for the consequences the defendants knew or should have known would result from their actions.

15.     The illness, injury, and damages suffered by the plaintiff were a direct result of the conduct on the part of the defendants that amounted to fraudulent representation concerning the safety of working in an environment containing asbestos fibers, such representation having been made despite defendants' knowledge that these products and this work environment were wholly unsafe, dangerous, and hazardous to the health of the plaintiff and/or similarly-situated workers.

WHEREFORE, plaintiff demands judgment for punitive damages against all defendants, jointly and severally, in the full and just amount of Thirty Million Dollars ($30,000,000.00), plus interest and costs.

### COUNT V
### (Aiding and Abetting and Civil Conspiracy
### as to Defendant Metropolitan Life Insurance Company)

16.     Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

17.     Metropolitan Life Insurance Company, by various means encouraged, aided and abetted, and knowingly provided substantial assistance to the tortfeasor manufacturers, sellers, distributors, suppliers (hereafter "the direct perpetrators") whose asbestos products were substantial contributing factors to the development of plaintiff's mesothelioma and/or other asbestos-related injuries, diseases and conditions.

18.     The defendants, each and all of them, by various means agreed between and among themselves to engage and participate in the tortious conduct described above in the preceding counts of this Complaint,

19.     Metropolitan Life Insurance Company encouraged, aided and abetted, and knowingly provided substantial assistance to the direct perpetrators of the tortious conduct described herein, with knowledge of their role in that tortious conduct, in the following and other ways:  in the concealment, alteration, manipulation and suppression of knowledge and information about the dangers and health hazards of asbestos; in the publication of misleading, fraudulent and incorrect statements about the lack of any connection between asbestos exposure and various diseases; in the publication, use and dissemination of fake, misleading, fraudulent and incorrect statements about asbestos-containing products being "non-toxic," safe, not dangerous, not hazardous, contributing to the well-being of workers; in the decisions made by various direct perpetrators of the injuries to plaintiff not to test, study, research or investigate the dangers and health hazards of their asbestos-containing products; in deciding not to publicize, disclose, make public or otherwise warn about the dangers and health hazards of asbestos-containing products; in efforts to prevent the United States government and its employees, agencies, departments and organizations from taking steps to do research and publish on the dangers of asbestos and to restrict, ban, reduce, eliminate or regulate the use of asbestos-containing products.

20.     Metropolitan Life Insurance Company agreed and conspired in furtherance of a common scheme in the following and other ways:  in the concealment, alteration, manipulation and

suppression of knowledge and information about the dangers and health hazards of asbestos; in the publication of misleading, fraudulent and incorrect statements about the lack of any connection between asbestos exposure and various diseases; in the publication, use and dissemination of fake, misleading, fraudulent and incorrect statements about asbestos-containing products being "non-toxic," safe, not dangerous, not hazardous, contributing to the well-being of workers; in the decisions made by various direct perpetrators of the injuries to plaintiff not to test, study, research or investigate the dangers and health hazards of their asbestos-containing products; in deciding not to publicize, disclose, make public or otherwise warn about the dangers and health hazards of asbestos-containing products; in efforts to prevent the United States government and its employees, agencies, departments and organizations from taking steps to do research and publish on the dangers of asbestos and to restrict, ban, reduce, eliminate or regulate the use of asbestos-containing products.

21.    As a direct and proximate result of the unlawful and tortious conduct engaged in by the direct perpetrators and Metropolitan Life Insurance Company, plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems.  Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish.  Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

22.    As a further direct and proximate result of the tortious conduct of the direct perpetrators and Metropolitan Life Insurance Company herein, the male plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, the plaintiff demands judgment against Metropolitan Life Insurance Company in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT VI
### (Loss of Consortium)

23.    The female plaintiff, Therese Sammartino, adopts by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further asserts that she is the wife of the male plaintiff.

24.     As a direct and proximate result of the negligence, strict liability, breaches of warranty of the defendants herein, the female plaintiff has incurred and/or may incur substantial expenses for the medical care and treatment of her husband, and has suffered and will continue to suffer the loss of consortium, society, and companionship of her husband.

WHEREFORE, the female plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

Respectfully submitted,

_____

Daniel A. Brown (Bar No. 444772)

BROWN & GOULD, LLP
7700 Old Georgetown Road, Suite 500
Bethesda, Maryland 20814
(301) 718-4548
Attorney for Plaintiff

JURY TRIAL REQUESTED:

_____

Daniel A. Brown

VOLUME III

IN THE SUPERIOR COURT

OF THE DISTRICT OF COLUMBIA

----------------------------X

ARMANDO A. SAMMARTINO and    :

THERESE SAMMARTINO           :

      Plaintiffs          :    CIVIL ACTION NO.

v.                           :    2008-CA-003352-A

AC&R INSULATION CO., INC.,   :

et al.                       :

      Defendants          :

----------------------------X

VIDEOTAPE DEPOSITION OF ARMANDO SAMMARTINO

     The Videotape Deposition of ARMANDO

SAMMARTINO was taken in the above-captioned case on

Friday, May 30, 2008, commencing at 9:40 a.m. at

1604 Dennis Avenue, Silver Spring, Maryland, 20902,

reported by Linda Bahur, RPR.

EVANS REPORTING SERVICES
The Munsey Building, Suite 705
Seven North Calvert Street
Baltimore, Maryland  21202
410-727-7100    800-256-8410



DEFENDANT'S
EXHIBIT
2

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III  5/30/08

Page 2

1    A P P E A R A N C E S
2    DANIEL A. BROWN, ESQUIRE
        Brown & Gould, L.L.P.
3        On Behalf of the Plaintiffs
4
     HELYNA M. HAUSSLER, ESQUIRE
5        Hartel, Kane, DeSantis, MacDonald & Howie,
         L.L.P.
6        On Behalf of the Defendant, Krafft-Murphy
         Company and Baltimore Aircoil Co., Inc.
7
8    VINCENT PALMIOTTO, ESQUIRE
         Miles & Stockbridge, P.C.
9        On Behalf of the Defendant, CertainTeed
10
     GREGORY S. SAVAGE, ESQUIRE
11       Segal, McCambridge, Singer & Mahoney, Ltd.
         On Behalf of the Defendant, Garlock
12
13   KATHRYN KOZERO, ESQUIRE
         Gavett & Datt, P.C.
14       On Behalf of the Defendant, AC&R Insulation
         Company
15
16   RICHARD L. FLAX, ESQUIRE
         Law Offices of Richard L. Flax, L.L.C.
17       On Behalf of Walter E. Campbell Company, Inc.
18
     GERRY H. TOSTANOSKI, ESQUIRE
19       Tydings & Rosenberg
         On Behalf of Thomas Somerville Company
20
21

Page 3

1    SCOTT H. PHILLIPS, ESQUIRE
        Semmes, Bowen & Semmes, P.C.
2        On Behalf of Noland Company
3
     DAVID F. LUBY, ESQUIRE
4        Royston, Mueller, McLean & Reid, L.L.P.
         On Behalf of A.W. Chesterton
5
6    STEVEN A. LUXTON, ESQUIRE
         Morgan, Lewis & Bockius
7        On Behalf of Owens-Illinois
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 4

1         STIPULATIONS
2         It is stipulated by and between Counsel
3    for the respective parties that the reading and
4    signing of this deposition by the Deponent is not
5    waived.
6         It is also stipulated and agreed by and
7    between Counsel for the respective parties that the
8    filing of this deposition with the Clerk of Court is
9    hereby waived.
10        - - - - - - - - - -
11        THE VIDEOGRAPHER:  This videotape
12   deposition is being taken in accordance with
13   Maryland Rules on May 30, 2008 at 9:40 a.m. --
14        MR. BROWN:  D.C. Rules.
15        THE VIDEOGRAPHER:  Okay.  This deposition
16   is being taken in accordance with D.C. rules on May
17   30, 2008 at 9:40 a.m. at 1604 Dennis Avenue in
18   Silver Spring, Maryland.  Our court reporter is
19   Linda Bahur with Evans Reporting.  My name is Lisa
20   Bauer with Bauer Video Productions.
21        The caption of the case is Armando

Page 5

1    Sammartino versus AC&R Insulation.  Our attorneys
2    have been identified on the written record.  Our
3    witness today is Armando Sammartino and will now be
4    sworn in.  This is the continuation of the discovery
5    deposition.  Anybody that has a Blackberry on, I
6    need it turned off, please.
7         MS. HAUSSLER:  Okay.  Sir, you were, you
8    were sworn in --
9         MR. LUXTON:  I think they've got to swear
10   him in again, right?
11        MS. HAUSSLER:  Okay.  Under D.C. law?
12        MR. LUXTON:  Okay.
13   Whereupon --
14        ARMANDO SAMMARTINO
15   a Witness called for examination, having been first
16   duly sworn, was examined and testified as follows:
17   first duly sworn, was examined and testified as
18   follows:
19        EXAMINATION
20        BY MS. HAUSSLER:
21   Q   Hi, sir.  Helyna Haussler again.  The

Page 6

1 first question I have for you is -- well, first of
2 all, let me say if you need to take a break at any
3 point, you let me know. And I know you mentioned
4 that your hearing aid's broke, so you need me to
5 keep my voice up a little bit more than last time;
6 is that correct? Is this okay?
7    A  Yeah.
8    Q  Okay. Now, if you need a break at any
9 point, let me know. All right?
10    A  Okay.
11    Q  Now, first, are you taking any
12 medications today?
13    A  No.
14    Q  Okay. You haven't taken any medications
15 so far this morning?
16    A  No.
17    Q  All right. Since the last time we saw
18 you, since last Friday, have you started any new
19 medications?
20    A  Say that again.
21    Q  Since the last time we saw you a week

Page 7

1 ago, have you started any new medications?
2    A  I got a prescription filled but I haven't
3 started it yet.
4    Q  Okay. And what, what's that
5 prescription?
6    A  I don't know.
7    Q  Okay. And since the last time that we
8 saw each other, have you looked at any additional
9 documents?
10    A  No.
11    Q  Okay. Have you done anything in addition
12 to prepare for today's portion of the deposition?
13    A  No.
14    Q  Okay.
15       MR. BROWN: Sam, let me just interrupt
16 for one second.
17       MS. HAUSSLER: Sure.
18       MR. BROWN: Helyna, are you able to slide
19 forward and Sam slide backward?
20       THE WITNESS: She's on the rope.
21       MR. BROWN: Yeah.

Page 8

1       THE WITNESS: I'll slide forward.
2       MR. BROWN: Let's go off the record a
3 second. There's a problem because he's moved two
4 few feet forward the video camera, so let's go off
5 the record for a moment.
6       THE VIDEOGRAPHER: Sure. Off the record
7 at 9:43.
8       (Break taken.)
9       THE VIDEOGRAPHER: Okay. We're back on
10 the record at 9:44.
11       BY MS. HAUSSLER:
12    Q  Okay, sir. Now, again, if you need a
13 break at any point, just let me know. All right?
14    A  Okay.
15    Q  Can you hear me if I'm this close to
16 you?
17    A  Yes.
18    Q  Okay. Now, I apologize. Did you do
19 anything in addition to prepare for today's portion
20 of the deposition?
21    A  Just tried to get more rest.

Page 9

1    Q  Okay. And sir, when we left off last
2 time, we were talking about the first time that you
3 were employed with R.M. Thornton.
4       Now, at that point, last Friday, you
5 couldn't remember any of the job sites that you
6 worked at while you were working for R.M. Thornton
7 the first time. Can you recall any of those today?
8    A  No, I can't.
9    Q  Okay. Now, in between the times that you
10 worked for R.M. Thornton, do you recall who you
11 worked for in between the various points you worked
12 for R.M. Thornton the first and second time?
13    A  I can't recall who. I know I worked for
14 several people but can't recall any of them.
15    Q  Okay. Do you recall working for a
16 Maurice Colbert?
17    A  Who?
18    Q  Maurice Colbert?
19    A  Oh, yes.
20    Q  Okay. Do you know when you would have
21 worked for Maurice Colbert Company?

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III  5/30/08

| Page 10 | Page 12 |
|---|---|
| 1     A   I can't remember exactly. | 1     A   Yes. |
| 2     Q   Okay. | 2     Q   Do you recall what types of trades he |
| 3     A   I may have gone to work for him after, | 3   employed? |
| 4   after or during Thornton. | 4     A   Wait a minute.  I made a mistake. |
| 5     Q   Okay.  And do you recall how long you may | 5   Maurice Colbert was a separate -- I don't remember |
| 6   have worked for Maurice Colbert? | 6   what it was but he was not at the German Embassy. |
| 7     A   What Maurice Colbert? | 7   He never appeared there.  Never appeared at the |
| 8     Q   Do you recall how long you would have | 8   German Embassy. |
| 9   worked for them? | 9     Q   Okay.  Sir, if he didn't appear at the |
| 10     A   Well, at least a year. | 10   German Embassy, do you recall you yourself ever |
| 11     Q   And do you recall what your title was | 11   working at the German Embassy? |
| 12   while you were working for Maurice Colbert? | 12         MR. BROWN:  Objection.  Asked and |
| 13     A   No. | 13   answered. |
| 14     Q   Do you recall what your duties were while | 14     A   Say that again. |
| 15   you were working for Maurice Colbert? | 15     Q   Do you recall working at the German |
| 16     A   No. | 16   Embassy? |
| 17     Q   Was this a contractor, Maurice Colbert? | 17     A   Yes, I do. |
| 18     A   Yes. | 18     Q   Okay.  And if you don't believe it was |
| 19     Q   Okay.  Did you work at job sites for | 19   for Maurice Colbert, do you know who it would have |
| 20   Maurice Colbert or at a shop? | 20   been for? |
| 21     A   Job site. | 21     A   No. |

| Page 11 | Page 13 |
|---|---|
| 1     Q   Okay.  Do you recall what any of those | 1         MR. BROWN:  Objection. |
| 2   job sites were? | 2     Q   Okay.  And do you still believe you were |
| 3     A   The only one I can remember is the German | 3   at the German Embassy two to three years? |
| 4   Embassy. | 4         MR. BROWN:  Objection.  Asked and |
| 5     Q   Okay, sir.  And do you recall when you | 5   answered. |
| 6   would have started working at the German Embassy? | 6     A   Yes. |
| 7     A   No. | 7     Q   Okay.  Now, sir, do you recall what you |
| 8     Q   Okay.  Do you recall when you would have | 8   would have been doing at the German Embassy? |
| 9   left the German Embassy? | 9     A   Pipefitting. |
| 10     A   No. | 10     Q   You were pipefitting? |
| 11     Q   Do you recall how long you were at the | 11     A   Yeah. |
| 12   German Embassy? | 12     Q   Okay.  Sir, the company that you would |
| 13     A   Two or three years. | 13   have been working for at the German Embassy, do you |
| 14     Q   Okay.  And when you were at the German | 14   recall what that company did?  Was it a general |
| 15   Embassy, when you first arrived, do you recall what | 15   contractor or a subcontractor? |
| 16   stage of construction the building was in? | 16     A   General. |
| 17     A   We were just getting out of the ground. | 17     Q   Okay.  So it did, did it, did that company |
| 18     Q   And sir, what type of contractor was | 18   oversee various trades or just your plumbing trade |
| 19   Maurice Colbert? | 19   or pipefitting trade? |
| 20     A   I guess he was a general contractor. | 20     A   Various trades. |
| 21     Q   He was a general contractor? | 21     Q   Do you know what other trades it would |

Page 14

1  have employed?
2      A   No.
3      Q   Sir, I know you said that you, last time
4  that you wore glasses. Do you have those, those
5  nearby?
6      A   No.
7      Q   Okay. Well, I'm going to show you
8  something. Hopefully you can see it.
9      A   Just so it doesn't involve reading.
10     Q   I'm going to show you what was given to
11  us by your attorney. It's call your resume. Does
12  that document look at all familiar to you?
13     A   Yeah. That looks all right to me.
14     Q   Do you recall preparing this document?
15     A   No.
16     Q   Okay.
17     A   Because Redmond J. Riley was my
18  schooltime friend. He wouldn't have been involved
19  in any of my work.
20     Q   Okay. So you have no knowledge of how
21  this document was prepared?

Page 15

1      A   No, I don't.
2          MR. BROWN: Objection. Objection. If
3  you'd like for him to get his glasses, you know,
4  maybe we can do that at a different point.
5          MS. HAUSSLER: That's fine.
6          MR. BROWN: But right now, he doesn't
7  have them on.
8          MS. HAUSSLER: Well, right now, I mean
9  -- why don't we take a break and get him his
10  glasses?
11         MR. BROWN: Want to go off the record for
12  a second?
13         THE VIDEOGRAPHER: Off the record at
14  9:51.
15         (Break taken.)
16         THE VIDEOGRAPHER: Back on the record at
17  9:53.
18         BY MS. HAUSSLER:
19     Q   Okay, sir. I'm going to show you, now
20  that you have your glasses, I'm going to show you
21  the resume that I showed you earlier. Do you

Page 16

1  recognize this document?
2      A   Yes.
3      Q   Okay. Do you know what this document,
4  can you tell me what this document is?
5      A   Do I know what the document? Yes, it was
6  read to me and I understand it. It's just --
7      Q   Do you want to --
8          MR. BROWN: Sam, the question is what is
9  that document?
10         THE WITNESS: Why are you asking me?
11     Q   Sir, do you recall preparing that
12  document?
13     A   Yes, and giving this information. Yes.
14     Q   Now, what do you mean in giving this
15  information? Do you recall preparing this actual
16  document?
17     A   I did not prepare anything. I gave the
18  information to someone who took the information
19  down.
20     Q   Okay. Do you know who that person was?
21     A   Whoever was recording.

Page 17

1      Q   Do you recall when this document was
2  prepared?
3      A   No, I don't recall when.
4      Q   Do you recall about how long ago?
5      A   It's been a while.
6      Q   Okay. And how did you assist in
7  preparing the document?
8          MR. BROWN: Objection. Asked and
9  answered.
10     A   By verifying the names that were read to
11  me.
12     Q   Okay. When you say the names that were
13  read to you, are you referring to a couple minutes
14  ago when Mr. Brown read you the personal references
15  that are on this list?
16     A   Yes.
17     Q   Okay. But do you recall actually when
18  this document was prepared?
19     A   No.
20     Q   Okay. Now, it looks to be your resume.
21  At any point in your career, did you ever prepare a

5 (Pages 14 to 17)

Page 18

1  resume?
2      A   I think I did.
3      Q   Okay.  Do you know if this document is
4  that resume?  Do you want to take another look?
5      A   No.  I don't have to.
6      Q   Okay.
7      A   I don't know.
8      Q   You don't know?
9      A   No.
10         MS. HAUSSLER:  Okay.  Now, just for the
11  record, can we just have this marked as Exhibit 4?
12         (Whereupon, Sammartino Exhibit No. 4 was
13  marked for identification.)
14         MR. FLAX:  For what it's worth, I'll note
15  an objection to Exhibit 4, the foundation of the
16  exhibit and otherwise preserve.
17         BY MS. HAUSSLER:
18      Q   Now, sir, I'm going to show you again.
19  On this, it has some of your employers, your
20  previous employers written down, including Maurice
21  Colbert.  Okay?  It's right here.  Are you able to

Page 19

1  read what it says under Maurice Colbert?
2      A   Well, I remember Maurice Colbert and the
3  German Embassy but I don't remember his being in
4  charge of me.
5      Q   Okay.  And so, you noticed that it
6  mentions the German Embassy.  So you recall being
7  there but you don't know if it was while you were
8  working for Maurice Colbert?
9         MR. BROWN:  Objection.  Asked and
10  answered.  Go ahead.
11      Q   Is that correct?
12      A   I was called there because the foreman
13  died and I took over his job.
14      Q   And that was going to be my next
15  question.  It says on here after the German Embassy,
16  you were the foreman in charge of all mechanical
17  construction.
18      A   Yes.
19      Q   Do you recall that to be the case?
20      A   Yeah.
21      Q   Okay.  Now, when you began at the German

Page 20

1  Embassy, were you a foreman when you began at the
2  German Embassy?
3      A   They made me a foreman when I took the
4  job.
5      Q   Okay.  So when you arrived there on the
6  first day, was your title that of foreman to
7  mechanical contractors?
8      A   When I arrived on the first day what?
9      Q   Sir, when you arrived at the site, had
10  they already made you foreman on that job?
11      A   That would not be my privilege of
12  knowing.
13      Q   Okay.  Well, when you first arrived at
14  the site, what was your cite title?
15      A   I had no title.
16      Q   Okay.  When you arrived at the site, do
17  you recall what your duties were?  What your duties,
18  job duties were.  Do you recall what your job duties
19  were at the site?
20      A   I was told to take over the pipefitting.
21      Q   Okay.  And were you a foreman for the

Page 21

1  pipefitters?
2      A   That I don't know.
3      Q   Okay.  You mentioned that the foreman on
4  the job died.  Do you recall how long into the job
5  the foreman died and you took over?
6      A   I don't know when he died.  I just know
7  that he was not available and I took over the job.
8      Q   Okay.  Do you recall how long into the
9  job you took over as foreman?
10      A   The job had been going on, I guess,
11  almost a year because they were just coming up out
12  of the ground.
13      Q   Okay.  And you said that they were just
14  coming up out of the ground when you became foreman?
15  Is that correct?
16      A   You keep saying "when you became
17  foreman."  I don't know when they made me foreman.
18      Q   Okay.  I thought you just said it was
19  about a year into the job, to your estimate?
20      A   Right.
21      Q   Okay.  And the building was just coming

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  out of the ground at that point?
2      A    Yeah.
3      Q    Okay.  Now, prior to becoming foreman,
4  what were your job duties?
5      A    Same thing.  Same job duties.
6      Q    What were those job duties?
7      A    To oversee the pipe fabrication.
8      Q    Okay.  So your duties didn't change
9  before you were made officially a foreman?  Your
10  duties didn't change any once you became foreman?
11      A    No.
12      Q    Okay.
13      A    In fact, I don't know when they made me
14  foreman.
15      Q    So were you already unofficially acting
16  in a, I guess you would say a foreman-like fashion
17  before you became a foreman?
18      A    I don't know.
19      Q    You were already supervising pipefitters
20  at that point?
21      A    Yes.

**Page 23**

1      Q    Okay.  Now, sir, were there any other
2  trades that you oversaw other than pipefitters?
3      A    No.
4      Q    Okay.  Do you recall how many pipefitters
5  you oversaw?
6      A    A dozen or so.
7      Q    Okay.  Do you recall what shift you
8  worked?  Were there shifts, like daylight?  Was
9  there only a daylight shift?
10      A    Yeah.
11      Q    Okay.
12      A    There were.  Yeah, that's all.
13      Q    Okay.  And are you okay to continue, sir
14  or do you need a break?
15      A    Continue.
16      Q    Okay.  Sir, did you have any type of
17  trailer or anything that you worked out of?
18      A    Just an office trailer.
19      Q    An office trailer?  And what type of work
20  did you have to do in that office?
21      A    No work at all.

**Page 24**

1      Q    Okay.  What was the office for?
2      A    Have lunch.  Whoever is making notes,
3  make a few notes.
4      Q    And, sir, at this site when you were
5  foreman, were your duties supervisory only or did
6  you also work with tools?
7      A    No, they were not.  I worked with
8  whatever title I had.  I worked.
9      Q    Okay.  Sir, can you describe for me the
10  type of work you would perform as a pipefitter at
11  this site.
12      A    Various sizes, fitted the other pipes of
13  different sizes.
14      Q    Okay.  So you fitted various pipes of
15  various sizes to one another?
16      A    Yes.
17      Q    Sir, other than working with pipes, were
18  there any other materials you worked with other than
19  pipes?
20      A    No.
21      Q    Okay.  What type of tools would you have

**Page 25**

1  to use when using, when working with the pipes?
2      A    Type of what?
3      Q    Tools.
4      A    Pipecutters, welding machine, measuring
5  devices.  That's it.
6      Q    Okay.  Did you have to wear any
7  protective clothing when you were welding the pipes?
8      A    Gloves and mask.
9      Q    Okay.  Can you describe the gloves for
10  me?  Was it the same type --
11      A    No, I can't.  They were, they were the
12  same material as the gloves.  Did that answer your
13  question?
14      Q    Well, you had described -- I was just
15  going to ask you, you had described some gloves on a
16  previous day.  Were they similar to those gloves?
17      A    Yes.
18      Q    Okay.  Do you recall who manufactured
19  these gloves?
20      A    No.
21      Q    Now, throughout your career as a

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 26

```
1   pipefitter, when you were welding, did you have to
2   wear these gloves?
3       A   For my own protection, yes.
4       Q   Okay.  And do you recall the
5   manufacturers of any of those gloves?
6       A   No.
7       Q   Do you recall if those gloves gave off
8   any dust when you would be using them?
9       A   Repeat the question.
10      Q   Did the gloves give off any dust --
11      A   No.  No, no.
12      Q   -- that you noticed?
13      A   No.
14      Q   Do you know if those gloves contained
15  asbestos?
16      A   I don't know.
17      Q   Okay.  Now, sir, at the German Embassy,
18  do you believe that you personally used any
19  asbestos-containing products?
20      A   Of course, we don't.
21      Q   No, you don't know or no, you don't
```

Page 27

```
1   believe that you did?
2       A   I wouldn't be accountable for that.
3       Q   And by that, do you mean that you don't
4   know?
5           MR. BROWN:  Objection.
6       A   Okay.  I don't know.
7           MR. BROWN:  Objection.
8       Q   Sir, do you recall how many floors had
9   been built -- well, strike that.
10          Sir, do you recall how many floors
11  occupied what is now the, what became the German
12  Embassy?
13      A   I don't know.
14      Q   Okay.  Do you recall how large of a
15  building the German Embassy was?
16      A   How was the German Embassy?
17      Q   How large it was.  How, the size.
18      A   It was a huge building.  Large, very
19  large.
20      Q   Okay.  Did it occu -- did it become more
21  than one floor or is it a single story billing?
```

Page 28

```
1       A   More than one floor.
2       Q   Okay.  Now, sir, with 12 pipefitters, do
3   you recall, were you all working in close proximity
4   to one another or were you at various points in the
5   building?  Do you understand the question or do you
6   need me to rephrase it?
7       A   No.  Scattered throughout the building,
8   the various parts of the building.
9       Q   Okay.  So you worked in separate gangs of
10  sorts?
11      A   Separate what?
12      Q   Gangs.
13      A   Gangs?  Oh.  Crew, yeah.
14      Q   Crews?  Okay.  Do you know how many men
15  were in each crew?
16      A   No.
17      Q   Okay.  Sir, do you recall having to do
18  any piping in a boiler room?  Did your company
19  perform that work?
20      A   Yes, they did.
21      Q   Okay.  And as pipefitter, did you do
```

Page 29

```
1   anything with the boilers yourself or was that a
2   separate company who did that?
3       A   It was not a separate company.
4       Q   Do you recall your employer installing
5   the boilers at that site?
6       A   The boiler company installed their, put
7   the boilers in place, whoever supplied the boilers.
8       Q   Okay.  Do you recall --
9       A   Keep going.
10      Q   Do you recall the manufacturer of that
11  boiler?
12      A   No.
13      Q   Okay.  Do you recall the type of boiler?
14  Do you recall what type of boiler it was?  Was it,
15  did it operate off of steam or was it --
16      A   Steam boiler.
17      Q   Okay.  Do you recall having the pipe away
18  from that boiler?
19      A   We attached our pipe to the boiler.
20      Q   Do you recall, was this boiler insulated?
21      A   It was insulated later on.
```

8  (Pages 26 to 29)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III  5/30/08

Page 30

1    Q   Okay.  What about the piping, was that
2    insulated?
3    A   That, too, later on.
4    Q   Okay.  Now, in what stage of -- well,
5    strike that.
6        Sir, you said there were about a dozen
7    people working for your employer that you oversaw as
8    a pipefitter-foreman.  When you would be working,
9    you said you'd be scattered around the building, but
10   would you all be on the same floor or on different
11   floors?
12   A   At times different floors because as the
13   building goes up, pipe goes up, so that would put
14   men on different floors.
15   Q   Okay.  So you would lay the piping for
16   one floor and as that would be almost to completion,
17   some men would move to the next floor?  Does that
18   sound right?
19   A   Yes.
20   Q   Or incorrect?
21   A   Sounds great.

Page 31

1    Q   Okay.  Now, do you recall any trades
2    working around you while you were working at the
3    German Embassy?
4    A   No.
5    Q   And sir, do you recall who the supplier
6    of the pipefitting products that you used was for
7    your employer?
8    A   From various suppliers.  I only recall
9    one the last time and I haven't thought of any
10   other, but there were other suppliers.
11   Q   Okay.
12   A   One of the others was Noland Company as
13   well as Somerville.
14   Q   And sir, do you recall the names of any
15   of the men you oversaw at this site?
16   A   No.
17   Q   Sir, do you believe you were exposed to
18   asbestos at this site?
19   A   What I?
20   Q   Do you believe you were exposed to
21   asbestos at this site?

Page 32

1    A   Yeah, at some time or other.  Yes.
2    Q   Okay.  Can you explain in what manner you
3    were exposed to asbestos?
4    A   You want detail?
5    Q   That would be great.
6    A   I saw the men setting up the equipment.
7    I began a short conversation with the operator.  He
8    showed me how it worked.
9    Q   And what type of equipment was this, sir?
10   Do you recall what it was used for or what it was
11   going to be used for?
12   A   It was a mixing bin and the spray gun.
13   Q   And, sir, I believe this was, was this
14   the -- well, strike that.
15       And sir, how did he show you that, how
16   did he show you how it worked?
17   A   By putting the thing in action.
18   Q   And can you describe that action for me?
19   A   Aiming the gun and pulling the trigger.
20   Q   Okay.  And how long did this
21   demonstration last?

Page 33

1    A   How long?
2    Q   Was this a couple seconds that he sprayed
3    it for?
4        MR. BROWN:  Objection.
5    A   Yeah.
6    Q   And you just held out your hand.  Was
7    this the demonstration you spoke of before with your
8    hand?
9    A   My question was would it stick to a
10   vertical surface?  And that's when I held up my hand
11   and he sprayed it my hand.
12   Q   Okay.  Do you recall what this material
13   was used for, the spray?
14   A   What it was used for?
15   Q   Yes, sir.  What its purpose was.
16   A   Seal surface.
17   Q   Okay.  Do you know, was this a
18   soundproofing spray or what type, what was the
19   purpose of this spray for the building?  Do you
20   know?
21   A   It never was discussed with us.

9  (Pages 30 to 33)

Page 34

1    Q   Okay. Other than the demonstration, sir,
2  did you ever see this spray material used?
3    A   Did I ever see it?  Yeah, I saw it used.
4    Q   Okay. Do you recall who employed the man
5  that was spraying this material?
6    A   No, I don't recall.
7    Q   Do you recall how many times you saw this
8  material sprayed other than the one time that he
9  demonstrated it?
10   A   I don't recall how many times.
11  Throughout the building.  Wherever he was spraying
12  it.  He was in sight.  What else do you want?
13   Q   Okay.  I wasn't sure if you were done
14  with your answer.
15     Now, sir, do you recall how many sprayers
16  there were on this site?  Was there just the one?
17   A   All I know is one, one sprayer.
18   Q   Okay.  Do you recall how long that
19  sprayer was at the German Embassy?
20   A   No. I don't recall.
21   Q   Do you recall, did that sprayer have a

Page 35

1  uniform?  Was he wearing a uniform or any
2  identifying clothing?
3    A   No.
4    Q   Now, sir, when you saw this, did you ever
5  see the sprayer applying the material to the steel
6  surfaces?
7    A   Yes, I did.
8    Q   Okay.  Now, what were you doing at the
9  time that you saw him applying it to the steel
10  surfaces?  Were you doing the pipefitting work?
11   A   I was an observer doing my job.
12  Naturally, I could see them spraying.
13   Q   Okay.  Do you know about how far away he
14  would have been when he was spraying?
15   A   Twenty-five, 50 feet.
16   Q   Okay.  Do you recall what stage of
17  construction the building was in when you saw him
18  spraying?
19   A   No.  I can't recall.
20   Q   Sir, do you recall the name of the
21  product --

Page 36

1    A   No.
2    Q   -- that he was spraying?
3    A   No.
4    Q   Okay.  Do you believe this product
5  contained asbestos?
6    A   Can't answer that.
7    Q   Okay.  Sir, prior to the material being
8  dumped in this mixing machine you spoke of, do you
9  recall seeing the packaging to that product?
10   A   No.
11   Q   Sir, I apologize.  I can't recall if I
12  asked you this particular question but I'm sure your
13  counsel will pipe up if I did.  Do you recall how
14  long, for how long you saw this man at the German
15  Embassy?
16   A   Half an hour, 45 minutes.  I don't know.
17   Q   And, sir, when you left the site, what
18  stage was the building in, if you can recall?
19   A   It was almost completed.
20   Q   And when you say almost completed, is
21  that the entire building or just the pipefitting

Page 37

1  work?
2    A   I know my end of it was completed.
3    Q   Okay.  Do you recall if there were --
4  were they already starting the finishing work, such
5  as putting up the walls and the flooring?
6    A   Yeah.  Finishing work, yes.
7    Q   Okay.  Do you know how far into that work
8  they were when you left?
9    A   They were into that work.  How far into
10  it, I don't know.
11   Q   Okay.  And sir, did you ever work around
12  any of the trades performing that finishing work?
13   A   They were in the same building as we
14  were.
15   Q   Did you ever work on the same floors as
16  other trades performing finishing work?
17   A   Did I what?
18   Q   When you said you were in the same
19  building, were you ever, did you ever work on the
20  same floor?
21   A   Yes.

10  (Pages 34 to 37)

Page 38

1    Q    As someone performing finishing work?
2    A    Yes.
3    Q    Do you recall what type of finishing work
4    they were performing?
5    A    Washing windows, sweeping the floors,
6    any clean-up work that had to be done.
7    Q    Okay.  Do you recall what type of
8    material was on the floors that they had to sweep?
9    A    No.
10   Q    Sir, going back to the spray material for
11   just a moment.  When that material was sprayed on
12   your hand, was it wet to the touch?
13   A    To the touch.  It was damp, which
14   afforded the adhesion.
15   Q    Do you recall what color this material
16   was?
17   A    I don't know.
18   Q    Okay.  Sir, I think for the moment those
19   are all the questions I have for you for the German
20   Embassy.
21   A    Okay.

Page 39

1    Q    Okay?
2    A    Okay.
3    MS. HAUSSLER:  Does anyone else have any
4    questions?
5    MR. BROWN:  I do, but do you want to go
6    first?
7    MS. TOSTANOSKI:  Yes, I just have a
8    couple.
9    EXAMINATION
10   BY MS. TOSTANOSKI:
11   Q    Can you hear me okay if I stay here, Mr.
12   Sammartino?
13   A    Yeah.  Don't speak any faster than that
14   nightmare.
15   Q    Okay.  You mentioned that there was a
16   bunch of different suppliers that you got plumbing
17   supplies and pipe supplies from?
18   A    Yes.
19   Q    And one, last time you named, was Thomas
20   Somerville?
21   A    Right.

Page 40

1    Q    And one today was Noland?
2    A    Right.
3    Q    And you think there's some other ones,
4    too, but you just can't bring their names to mind
5    today?
6    A    Right.
7    Q    Last time when we talked, you told me
8    that you got pipe, copper tubing and some lead
9    products from Thomas Somerville.  Are you able to
10   recall any other products that you would have
11   purchased or were supplied to you from that
12   particular company?
13   A    I couldn't account for any other
14   material.
15   Q    Okay.  And would it be fair to say that
16   you recall the different supply companies but
17   sitting here today, it would be difficult for you to
18   say what particular job sites any company's products
19   went to?
20   A    Yeah.
21   Q    Is that fair?

Page 41

1    A    That's fair.
2    Q    Okay.  That's all I have.  Thank you,
3    sir.
4    A    In fact, I didn't order direct.  The
5    orders went to the shop first.
6    Q    Okay.  So your employer would order the
7    products.  You were just aware of some of the
8    different names of companies?
9    A    Where it came from and what it was.
10   MS. TOSTANOSKI:  Okay.  Thank you, sir.
11   THE WITNESS:  Okay.
12   MR. BROWN:  Sam, I've got a handful of
13   questions for you.
14   MS. HAUSSLER:  Dan, can --
15   MR. BROWN:  Oh, I'm sorry.  Mr. Phillips
16   has a couple questions.  I don't know how much reach
17   I have on this, Scott.  Good.  There, you go.
18   EXAMINATION
19   BY MR. PHILLIPS:
20   Q    Mr. Sammartino, can you hear me okay,
21   sir?  Just a couple questions.  My name is Scott

11  (Pages 38 to 41)

Armando Sammartino, Vol. III  5/30/08

Page 42

1   Phillips, sir. Nice to see you. I want to ask you
2   basically the same kind of questions.
3       A   Slow down a little bit.
4       Q   Sure. Ms. Tostanoski just asked you a
5   couple of questions about suppliers --
6       A   Okay.
7       Q   -- and Noland Company and Thomas
8   Somerville. My question with regard to Nolands
9   Company at the German Embassy site, did they supply
10  you that the various pipes that you talked about,
11  pipefitting earlier?
12      A   To my knowledge, yes.
13      Q   Okay. Do you remember what those pipes
14  were made of?
15      A   Steel.
16      Q   Okay. Can you recall any other products
17  that Noland Company would have supplied to the
18  German Embassy site?
19      A   No. I won't recall.
20          MR. PHILLIPS: Okay. Thanks very much,
21  sir.

Page 43

1          EXAMINATION
2   BY MR. BROWN:
3       Q   Sam, I have some questions for you.
4       A   Okay.
5       Q   Okay. You testified earlier that this
6   spray product arrived at the German Embassy in bags;
7   is that correct?
8          MS. HAUSSLER: Objection.
9       A   Yeah, I believe so. Yeah.
10      Q   Okay. Now, you said when it was sprayed
11  on your hand, it was damp to the touch for adhesion
12  purposes, correct?
13      A   Correct.
14      Q   When the material was in the bag, what
15  was its consistency?
16      A   Dry.
17      Q   Okay. And you described a mixer or
18  hopper the other day that the material was placed
19  into. Is that correct?
20      A   Yes.
21      Q   Did the gentlemen doing the spraying show

Page 44

1   you at any time how the material was placed into the
2   hopper?
3       A   Yes, he did.
4       Q   Did you ever have opportunity to be
5   around the hopper?
6       A   Oh, yeah, to be around it. Not directly
7   above it but in the vicinity.
8       Q   When the material was dumped into the
9   hopper, did that process create dust?
10      A   Yes, it did.
11      Q   Now, you testified just a little while
12  ago that you were with the spray gentleman, did you
13  say, for about a half or so?
14      A   Yeah. The operation took about half an
15  hour --
16      Q   Okay.
17      A   -- for him to dump it and mix it and
18  demonstrate the pressure, the hose.
19      Q   Did you ever have an opportunity to feel
20  the consistency of the material in those bags?
21      A   No, I didn't.

Page 45

1       Q   You just witnessed it being dumped?
2       A   Yeah.
3       Q   Okay. You described the embassy building
4   as having a number of floors.
5       A   Right.
6       Q   And you told us that they were spraying
7   the structural steel.
8       A   Yes.
9       Q   Were they spraying on various floors?
10      A   As they advanced to their required
11  amount, they sprayed on various floors but never
12  more than one floor at a time.
13      Q   When you say the whole demonstration, I
14  want to be, I want to make sure I understand this.
15  The process of dumping the bag in, mixing in the
16  hopper and then doing the spray work, okay, was that
17  something that you felt took about a half hour for
18  the man to demonstrate to you?
19          MS. HAUSSLER: Objection. Asked and
20  answered.
21      A   No. I believe he had helpers assisting

12  (Pages 42 to 45)

Page 46

1    in this operation, so he manned the gun manually.
2        Q    So the man who manned the gun wasn't
3    dumping the material in the hopper?
4        A    No, not after they got started. He had
5    the helper do it.
6        Q    Well, we know you talked with the spray
7    gun person.
8        A    Yeah.
9        Q    Did you ever talk with the helper as
10   well?
11       A    No.
12       Q    Do you have any idea how long it would
13   take the sprayer to complete an entire floor of the
14   embassy?
15       A    No idea.
16       Q    As foreman, you told us you were going
17   throughout the building and you also told us a
18   little bit earlier that you were situated at times
19   about 25 feet away from the spray operation. Would
20   you have occasion to walk in the general vicinity of
21   the spray, the spray material?

Page 47

1        MS. HAUSSLER: Objection.
2        A    Guess so. Yes.
3        Q    Did anybody other than the sprayer -- you
4    told us the sprayer told you that the material was
5    long-fibered asbestos; is that correct?
6        A    Yes.
7        MS. HAUSSLER: Objection.
8        Q    Did either the gentleman doing the
9    spraying or anybody warn you about the dangers of
10   being around the asbestos?
11       A    No.
12       Q    Did anybody tell you to wear a mask?
13       A    Nobody told me to wear one and I didn't
14   see a mask on the job.
15       Q    When you left the German Embassy, to your
16   recollection, had the spray people completed all of
17   their spraying of the structural steel?
18       A    I don't know.
19       Q    I think you used the phrase at an earlier
20   testimony that the building had been topped off at
21   the time that you left?

Page 48

1        A    (Nodding).
2        Q    The, that there were some trades who were
3    doing clean-up and finishing work when you left; is
4    that right?
5        A    Right.
6        Q    Now, you described someone who would have
7    been doing sweeping and people who would have been
8    cleaning windows, correct?
9        A    Yeah.
10       Q    When this spray material operation was
11   completed, on a given day, did it require clean-up
12   afterward?
13       A    I don't know about afterwards but it
14   required clean-up.
15       Q    Describe the clean-up.
16       MS. HAUSSLER: Objection.
17       A    Well, naturally, some of it stuck on the
18   windows. Had to be scraped off the windows. Swept
19   up off the floor.
20       Q    You didn't have to personally sweep the
21   material, did you?

Page 49

1        A    No. No, I didn't personally.
2        Q    You just watched somebody performing that
3    job?
4        A    Yeah.
5        Q    And you didn't personally have to scrape
6    the material off the window, did you?
7        A    No.
8        Q    Someone else would have done that?
9        A    Someone else, yes.
10       Q    And you witnessed it?
11       A    Right.
12       Q    You don't remember the name of the
13   gentleman who performed the demonstration for you,
14   did you?
15       A    Can't remember any, any of their names.
16       Q    And you don't remember the name of the
17   helper that he had --
18       A    No.
19       Q    -- dumping the material?
20       A    No.
21       Q    Did you ever have to dump the material in

13 (Pages 46 to 49)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 50

1  the hopper?
2      A   No.
3      Q   That wasn't your job?
4      A   That wasn't. If you want something to
5  compare it to, dumping that media in the hopper is
6  just like dumping a bag of cement. Done that.
7      Q   You described it created a bunch of dust.
8  Is that what you're suggesting?
9      A   Right.
10         MS. HAUSSLER: Objection.
11     Q   Do you believe you breathed that dust?
12     A   It was there and I was there. I believe,
13  yeah.
14         MR. BROWN: That's all the questions I
15  have.
16         THE VIDEOGRAPHER: Change the tape.
17         MR. BROWN: We need to take a break. We
18  need to change the tape.
19         THE WITNESS: Okay.
20         THE VIDEOGRAPHER: This ends tape number
21  one of the deposition of Mr. Sammartino. The time

Page 51

1  is 10:36.
2         (Break taken.)
3         THE VIDEOGRAPHER: This is tape number
4  two of the deposition of Mr. Sammartino. The time
5  is 10:39.
6         EXAMINATION
7  BY MS. HAUSSLER:
8      Q   Hi, Mr. Sammartino. I have a couple more
9  questions for you based on the questions that your
10  attorney asked you. When you were speaking with the
11  man -- well, strike that.
12         You said earlier in response to some of
13  Mr. Brown's questions, you said earlier that the man
14  who was spraying told you it was long-fibered
15  asbestos?
16     A   Yes.
17     Q   And you said that he never made any
18  mention to you --
19     A   No.
20     Q   -- about the hazards of asbestos?
21     A   No.

Page 52

1      Q   Is that correct? Okay. Do you have any
2  way of knowing whether that man also knew of the
3  hazards of asbestos?
4      A   I have no way of knowing what he knew.
5      Q   Okay. Do you have any way of knowing
6  whether his employer knew of the hazards of
7  asbestos?
8      A   I have no way of knowing that.
9      Q   Okay. Now, sir, you said that you saw
10  him, him, or, I'm sorry, you saw his helper dump the
11  material into the hopper. Where were you when you
12  saw this material dumped into the hopper?
13     A   On the same floor, the same existing
14  building.
15     Q   Okay.
16     A   About 25, 50 feet away.
17     Q   Okay. And what about when you saw the
18  material scraped when it was being cleaned up, do
19  you recall how far away you were?
20     A   Twenty-five, 30 feet.
21     Q   Okay. And what about when it was swept

Page 53

1  up?
2      A   Same.
3      Q   Okay. Do you recall a time when you were
4  working on one floor and the sprayers may have not
5  been working on that same floor? They would have
6  been working on one of the other floors?
7      A   I don't know. I didn't keep up that
8  close track of them.
9      Q   Okay. So you only knew if they were
10  working at the site, if and when they were working
11  on the same floor as you?
12         MR. BROWN: Objection.
13     A   Repeat that, please.
14     Q   So you only knew that the sprayers were
15  at the site if and when they were on the same floor
16  that you were working on?
17         MR. BROWN: Objection.
18     A   Yeah. If I happened to be on the floor
19  that they were on, then I was aware.
20     Q   Okay.
21     A   But since I was free to travel the

14  (Pages 50 to 53)

Armando Sammartino, Vol. III  5/30/08

Page 54

1   building, I wouldn't stay on the same floor all day
2   long.
3        Q    Okay.  And do you know, you mentioned
4   that you occasionally walked into an area when they
5   were spraying.  Do you recall how many times you
6   would have done that?
7        A    No.
8        Q    I apologize, sir.  I just don't want to
9   ask you questions you've already been asked.  Okay,
10  sir.  Those are all the questions I have for you for
11  the German Embassy.
12           Now, this employer that you worked for
13  for the German Embassy, this -- you worked at the
14  German Embassy between the times that you were
15  working for Thornton, correct?  The first time and
16  the second time; is that correct?
17       A    I can't account for the times.  As long
18  as I was at the embassy, I was of the impression
19  Thornton is the only company I worked for.
20       Q    Okay.  So you, at this time, you don't
21  recall the names of any other employers that you

Page 55

1   worked for other than Thornton?
2           MR. BROWN:  Objection.
3        A    I don't know.
4        Q    Okay.  Sir, do you recall if you worked
5   at any other job sites?  Well, strike that.
6        A    No, no other job site.
7        Q    Well, sir, earlier you recalled working
8   for Thornton on more than one occasion.  Do you
9   recall that testimony?
10       A    No.
11       Q    Okay.
12       A    Don't recall.
13       Q    Should we take a break for a moment?
14  Sir, do you want a break for a few moments?
15       A    No.  Keep going on.  Get it done.
16       Q    All right.  Sir -- sir, if I represent to
17  you that you may have been working for Maurice
18  Colbert while you were working at the German
19  Embassy, do you know if that is a correct statement
20  or do you have no way of knowing?
21           MR. BROWN:  Objection.

Page 56

1        A    I have no way of knowing.
2        Q    Okay.  Do you know if you were working
3   for Colbert or another employer other than Thornton
4   -- well, strike that.
5           Sir, do you recall ever being laid off
6   from Thornton?  Do you recall working for Thornton
7   consecutively through a number of years or was there
8   a time when there was a break in your employment?
9        A    I worked for them for a number of years.
10  I don't recall how many.
11       Q    Okay.  Do you recall if there was ever a
12  break in between years?
13       A    No breaks.  No breaks.
14       Q    Okay.  Do you recall whether you were
15  working for Thornton, what decade you were working
16  for Thornton?
17       A    I don't know.  I don't know.
18       Q    Okay.  Do you recall how many years you
19  would have been working for Thornton?
20           MR. BROWN:  Objection.
21       A    Two or three.

Page 57

1        Q    Two or three?
2        A    (Nodding).
3        Q    Okay.  And other than those, do you
4   recall the job sites that you would have been
5   working on --
6        A    No.
7        Q    -- when you were working for Thornton?
8        A    No.
9        Q    Sir, I'm going to show you what's been
10  marked as Exhibit 4 again.  Under this first
11  paragraph, can you read that okay under the name
12  Thornton?
13       A    Okay.  I read the first paragraph.
14       Q    Okay.  Now, under that first paragraph,
15  I'll read into the record, it says, "VA Hospital,
16  National Academy of Science, American Pharmaceutical
17  Company, Smithsonian Institution and Soldiers Home."
18  Do those sound like, do those job sites sound
19  familiar as places that you may have worked?
20       A    They sound familiar but I can't, can't
21  describe any of them.

15  (Pages 54 to 57)

Armando Sammartino, Vol. III  5/30/08

Page 58

1    Q   Okay.  Do you have any way of knowing
2 whether you worked at those sites?
3    A   I guess I did work at those sites but as
4 I said, I can't identify anything.
5    Q   Okay.  Do you have any way of knowing
6 what your trade was at those sites?
7    A   Did I what?
8    Q   Were you a pipefitter at those sites or
9 were you another trade?
10   A   Pipefitter.
11   Q   Okay.  Do you know if you would have been
12 a foreman at those sites?
13   A   Can you repeat the question?
14   Q   Do you know if you would have been a
15 foreman or a supervisor at those sites?
16       MR. BROWN:  Objection.
17   A   No.  There was no --
18   Q   Okay.
19   A   -- no title.
20   Q   Okay.  Do you recall any details about
21 your work at any of those sites?

Page 59

1    A   I can't answer any of those questions.  I
2 didn't have a title.  I just did, did the work.
3    Q   Okay, sir.  Do you recall if you
4 personally -- do you believe that you may have
5 personally used any asbestos-containing products at
6 any of those sites?
7    A   No.
8    Q   No, you don't know or, I'm sorry.  No,
9 you don't believe you did or no, you don't know?
10   A   I don't know.
11   Q   Okay.  Sir, do you have any way of
12 knowing whether any -- well, strike that.
13       Do you recall whether there were any
14 other trades working at any of those job sites while
15 you were working there?
16   A   Electricians.
17   Q   All right, sir.  Where do you recall
18 electricians working?
19   A   Where do I recall what?
20   Q   Sir, of those job sites, do you recall
21 the job sites that I listed --

Page 60

1    A   Yes.
2    Q   -- for you a few minutes ago?
3    A   Yeah.
4    Q   Do you recall at what, at which job site
5 you recall electricians working?
6        MR. BROWN:  Objection.
7    A   I think it was the offices.
8    Q   Which offices would those be, sir?
9    A   The people occupying the building.
10   Q   Okay.  Do you recall renovation work?  Is
11 that what you're describing?
12   A   It was new construction.
13   Q   It was new construction?  Do you recall
14 what was being constructed?
15   A   What again?
16   Q   Sir, do you recall what was being
17 constructed?
18   A   They were installing electrical wiring
19 throughout the building.
20   Q   Okay, sir.  And do you recall what
21 building that was?

Page 61

1    A   It was the office section.
2    Q   Okay.  The office section of what
3 building?  What job site?
4        MR. BROWN:  Objection.  You asked him
5 about each of the job sites.
6        MS. HAUSSLER:  No.  I asked him at which
7 building he recalls seeing electricians.
8        MR. BROWN:  I think it's confusing at
9 bay.  You threw out about eight job sites.
10       MS. HAUSSLER:  I can do a job site by job
11 site.  I'm just trying to -- all right.
12       BY MS. HAUSSLER:
13   Q   Sir, do you recall working at the VA
14 Hospital?
15   A   Yes.
16   Q   Okay.  Do you recall when you worked at
17 the VA Hospital?
18   A   No.
19   Q   Was this the VA Hospital in Washington,
20 D.C.?
21   A   Yes.

16  (Pages 58 to 61)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 62

1    Q   Okay.  Do you recall working for Thornton
2    when you worked at the VA Hospital?
3    A   I don't know who I worked for.
4    Q   Do you recall your job title at the VA
5    Hospital?
6    A   No, I don't recall.
7    Q   Okay.  And was construction of this
8    hospital new construction?
9    A   New construction.
10    Q   Okay.  Do you recall what stage of
11    construction the VA Hospital was in when it was
12    constructed, when you first arrived?
13    A   What was the question again?
14    Q   Sure.  When you first arrived at the
15    site, do you recall what stage of construction the
16    building was in?
17    A   It was all under roof.
18    Q   Okay.  Do you recall how many floors were
19    in the VA Hospital?
20    A   Question again.
21    Q   Sure.  The number of floors, do you

Page 63

1    recall how many floors it had?
2    A   To my knowledge, just two floors.
3    Q   Okay.  Do you recall the approximate
4    width --
5    A   No.
6    Q   -- as far as city blocks?
7    A   No.
8    Q   Okay.  Now, you said it was under roof,
9    under roof when you arrived.  Do you recall what
10    stage of construction it was in when you left the
11    site?
12    A   Repeat it.
13    Q   Sure.  When you left the site, do you
14    recall what stage of construction it was in?
15    A   Oh.  I believe it was completed.
16    Q   Okay.  And can you describe your duties
17    at this site, what type of work you performed.
18    A   Pipefitting.
19    Q   Okay.  And did you have to do the welding
20    work that you described before?
21    A   No.  This is all copper pipe.

Page 64

1    Q   Okay.
2    A   Solder and lead pipe.
3    Q   Other than copper piping, did you have to
4    use any, did you personally use any other products
5    other than copper piping?
6    A   We did not purchase products.
7    Q   Were they supplied for your company?
8    A   Company ordered them.
9    Q   Okay.  The company ordered the products.
10    Do you recall what products you were using other
11    than copper piping, if any?
12         MS. TOSTANOSKI:  He said lead.  He said
13    copper and lead.
14    Q   Oh, sorry.  Sir, other than the lead and
15    copper piping, do you recall using any other
16    products?
17    A   The products that come along with piping
18    copper were all ordered.
19    Q   Okay.  Do you recall what types of
20    products those were?
21    A   No.  Pipe flux.  That's it.

Page 65

1    Q   Okay.  There was nothing else other than
2    pipe flux?
3    A   Nothing else.
4    Q   Okay.  Do you recall where the company
5    ordered their products?
6    A   No.  Don't recall.
7    Q   And I apologize if I asked you this, sir.
8    Do you recall how long you were at this job site?
9    A   Maybe six months.
10    Q   Okay.  And, sir, did you work on each
11    floor of the VA Hospital or only specific floors?
12    A   Now we're at the VA Hospital?
13    Q   Yes, sir.
14    A   Worked all the floors.
15    Q   Okay.
16    A   Which ones, I don't know, but I know it
17    was several floors.
18    Q   Do you recall working in the boiler room
19    of the facility?
20    A   Now, we're out of the hospital again.
21    Q   Sir, all of my questions right now relate

17  (Pages 62 to 65)

Court Reporting in
Baltimore/Washington                    Evans Reporting Service
                                          800-256-8410                    Over 20 years of
                                                                     award-winning service

Page 66

1  to the hospital.  Were some of your answers
2  referring to a different site other than the
3  hospital?
4      A  I was not in the boiler room at the VA
5  Hospital.
6      Q  Okay.  Now, again as to the VA Hospital,
7  do you recall any other trades working around you at
8  the VA Hospital?
9      A  No.
10     Q  Okay.  So only pipefitters were working
11 at the VA Hospital?
12         MR. BROWN:  Objection.
13     A  Right.
14     Q  Okay.  Now, sir, do you recall if your
15 company employed any other -- well, strike that.
16 Sir, do you need a break?
17     A  No.
18     Q  Okay.
19     A  I need a break from this.  Okay.  Go on.
20     Q  Okay.  Sir, do you recall any of your
21 co-workers at the VA Hospital?

Page 67

1      A  No.
2      Q  Okay.  Do you recall how many pipefitters
3  were working with you at the VA Hospital?
4      A  I think there were three or four.
5      Q  Sir, do you have any way of knowing
6  whether you were exposed to asbestos at the VA
7  Hospital?
8      A  I have no way of knowing.
9      Q  Okay.
10         MS. HAUSSLER:  Does anyone happen to have
11 any questions of the VA Hospital?
12         (No response)
13         BY MS. HAUSSLER:
14     Q  Sir, another site on that list was the
15 Smithsonian.  Do you recall working at the
16 Smithsonian?
17     A  I may have worked there.  I don't
18 remember.
19     Q  Do you recall when you would have worked
20 at the Smithsonian?
21     A  Don't recall.

Page 68

1      Q  Do you recall what building of the
2  Smithsonian you were working on?
3      A  Don't recall.
4      Q  Okay.
5      A  I can't recall anything, anything about
6  the Smithsonian.
7      Q  Okay.  So do you have any way of knowing
8  whether you were exposed to asbestos at the
9  Smithsonian?
10         MR. BROWN:  Objection.
11     A  No.
12     Q  Now, sir, even though you can't at this
13 time recall details about the Smithsonian, do you
14 recall working at the Smithsonian?
15         MR. BROWN:  Objection.  Asked and
16 answered.
17     A  No.  Oh, wait a minute.  Yeah.  Yes, I
18 do.  I remember crawling around underground at the
19 Smithsonian repairing damaged waste lines.
20     Q  And do you recall what type of work you
21 did to repair those waste lines?

Page 69

1      A  At the Smithsonian?
2      Q  Yes, sir, when you were crawling around.
3      A  Repairing damaged water pipe leakage.
4      Q  And do you recall what these pipes were
5  made of?
6      A  Cast iron.
7      Q  Do you recall how long you would have
8  been working at the Smithsonian?
9      A  No.
10     Q  Okay.  Do you recall if anyone worked
11 with you at the Smithsonian?
12     A  The last question?
13     Q  Did anyone work with you at the
14 Smithsonian?
15     A  Yes, one man.
16     Q  Do you remember his name?
17     A  Yeah.  Charlie Goth.
18     Q  Do you know if that's spelled G-O-T-H?
19     A  I think it is.
20     Q  Okay.
21     A  Deceased.

18  (Pages 66 to 69)

Armando Sammartino, Vol. III  5/30/08

| Page 70 | Page 72 |
|---|---|

**Page 70**

1   Q   He's deceased?

2   A   Okay.

3   Q   Are you okay?

4   A   Okay.

5   Q   Sir, other than the cast iron pipe, do

6 you recall working with any other products at the

7 Smithsonian?

8   A   No. Probably water, copper pipe.

9   Q   Sir, do you recall, were there any other

10 trades working around you when you were working at

11 the Smithsonian?

12   A   No.

13   Q   And other than this repair work, did you

14 have any other occasion to work at the Smithsonian?

15   A   No.

16   Q   And other than the area underground, did

17 you work in any other area of the Smithsonian?

18   A   Not that I can recall. I don't remember.

19   Q   Okay. And sir, that list also said the

20 National Academy of Science. Do you recall working

21 at that site?

**Page 71**

1   A   I remember a discussion about the

2 National Academy of Science but I don't remember

3 doing any work there.

4   Q   Sir, do you recall if you ever worked at

5 the American Pharmaceutical Company?

6   A   Same as --

7   Q   At that site?

8   A   Same as the Academy of Science. I

9 remember being there but I don't remember doing

10 work.

11   Q   So, sir, you do recall that you did work

12 at the National Academy of Science site?

13   A   I remember being there but I don't

14 remember any work that was done.

15   Q   Okay. Do you recall when you worked

16 there?

17   A   Don't remember that either.

18   Q   Okay. Now, you said that you don't

19 recall any of the work done?

20   A   No.

21   Q   Do you have any idea of what trades were

**Page 72**

1 present at the site?

2   A   Don't recall any of them.

3   Q   Okay. Do you have any reason to believe

4 that you may have been exposed to asbestos at that

5 site?

6   A   No.

7   Q   No, you don't believe you were or no, you

8 don't know?

9   A   Was not.

10   Q   Sir, do you recall when you worked at the

11 American Pharmaceutical Company?

12   A   I think I indicated I don't remember

13 doing any work there but I remember being there.

14   Q   Okay. So you recall working there but

15 you don't recall what work was being done?

16   A   Right.

17   Q   Okay. Do you recall when you recall

18 being there, what year?

19   A   No, I can't. I can't recall any of it.

20   Q   Okay. Can you even recall, is it new

21 construction or repair work?

**Page 73**

1   A   It was repair work.

2   Q   And the National Academy, was that also

3 repair work or was that new construction? If you

4 can recall.

5   A   Don't remember.

6   Q   Okay. Sir, do you have any reason to

7 believe you were exposed to asbestos at the American

8 Pharmaceutical Company?

9   A   No.

10   Q   No, you do not believe that you were or

11 no, you don't know?

12   A   I don't remember.

13   Q   Are you okay, sir? Do you need a break?

14 We've been going for --

15   A   Keep going.

16   Q   -- almost two hours.

17   A   What? I want to get it over with.

18   Q   I know you do, sir. Are you okay to

19 continue right now or do you need a break?

20   A   Yes, yes, yes.

21   Q   Okay. Sir, do you recall working at the

19  (Pages 70 to 73)

Armando Sammartino, Vol. III 5/30/08

Page 74

1  Soldiers Home?
2      A   Yeah, I recall working at the Soldiers
3  Home.
4      Q   Do you recall when you worked at the
5  Soldiers Home?
6      A   No.
7      Q   Do you recall how long you worked at the
8  Soldiers Home?
9      A   No.
10     Q   Was this new construction or repair work?
11     A   New construction.
12     Q   And did Soldiers Home actually consist of
13  more than one building or was it just one building?
14     A   Several buildings.
15     Q   Do you recall what building was being
16  built?
17     A   No, I can't recall.
18     Q   Do you recall how many stories this
19  building was?
20     A   Mainly one-story building.
21     Q   Do you recall what type of work you were

Page 75

1  performing?
2      A   Various maintenance trades.
3      Q   Sir, do you mean that various maintenance
4  trades were present or that you were doing various
5  maintenance work?
6      A   Trades necessary to keep the hospital
7  going.  Maintaining the yard equipment.  They even
8  had a blacksmith show up.
9      Q   Sir, do you recall the work that you were
10  personally performing at this site?
11     A   I guess the same as usual, pipefitting.
12     Q   Now, do you specifically recall doing
13  pipefitting work at this site?
14     A   Recall what?
15     Q   You said that you guess it was the same
16  type of work.
17     A   Yes.
18     Q   But do you have a specific recollection
19  of doing --
20     A   No.
21     Q   -- pipefitting work?

Page 76

1      A   No.
2      Q   Okay.  Do you recall if you were a
3  supervisor at this site?
4      A   I don't know.
5      Q   Do you recall if any trades were working
6  around you at this site?
7      A   Any what?
8      Q   Were any other trades working around you
9  at this site?
10     A   People with the same skills.
11     Q   And by that, do you mean others in the
12  plumbing trade?
13     A   No, I don't mean that.
14     Q   Okay.  Can you explain what you mean by
15  that, then?
16     A   People doing the same work that I was
17  doing.  That's, that's what was there.
18     Q   Okay.  So were there any other trades
19  other than pipefitters present?
20     A   No.
21     Q   Sir, do you have any way of knowing

Page 77

1  whether you were personally using any
2  asbestos-containing products at this site?
3      A   No, not to my knowledge.
4      Q   And sir, do you have any way of knowing
5  whether anyone around you was using any
6  asbestos-containing products?
7      A   I have no way of knowing.
8      Q   Sir, do you recall what stage of
9  construction the building was in when you arrived?
10     A   I think earlier I said it was under roof.
11     Q   Okay.  When you said the VA Hospital was
12  under roof, was this also under roof?
13     A   That's part of the VA.
14     Q   Soldiers Home is part of VA?
15     A   (Nodding).
16     Q   Do you recall a separate instance of
17  working at the Soldiers Home than when you worked at
18  the VA?
19     A   Well, when you refer to Soldiers Home and
20  VA, to me, that's one.
21     Q   Okay.

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III 5/30/08

Page 78

1    A    But for the new construction, the
2    Soldiers Home portion had to do with the maintenance
3    buildings.
4    Q    Okay. And do you recall what was going
5    to be housed in those maintenance buildings?
6    A    Recall what?
7    Q    Do you recall what was going to be
8    enclosed in those maintenance buildings?
9    A    No, I don't know.
10    Q    Okay. Was there any type of machinery
11    that was going to be in those maintenance buildings?
12    A    No.
13    Q    What about a boiler, were those buildings
14    going to contain any boilers?
15    A    No boilers.
16    Q    And sir, specifically talking about these
17    maintenance buildings. When you arrived at the site
18    in which you were working on the maintenance buildings,
19    do you remember what stage of construction those
20    maintenance buildings were in when you arrived?
21    A    They were about all the same stage of

Page 79

1    construction. All under roof.
2    Q    Sir, do you recall what stage of
3    construction the maintenance buildings were in when
4    you left the site?
5    A    Near completion.
6    Q    Now, you were just referring to these
7    maintenance buildings. Do you recall any other
8    trades being present while you were working at these
9    maintenance buildings?
10    A    No, I don't recall any other trades.
11    Q    Sir, do you recall any of your co-workers
12    from this site from when you were working on the
13    maintenance buildings?
14    A    Coworkers?
15    Q    Yes, sir.
16    A    What?
17    Q    Co-workers that were working with you at
18    this site.
19    A    I don't remember.
20    Q    Okay. No, sir, I know you're tired. I
21    just don't want you to guess at any of my questions.

Page 80

1    So if you need a break at any point, you let me
2    know. Okay?
3    A    Yes.
4    Q    Sir, do you recall what areas, or strike
5    that. Just referring to the maintenance buildings,
6    were these the one-story buildings you were
7    referring to earlier?
8    A    Yes.
9    Q    Okay. Did you work in a specific area of
10    these buildings or all over?
11    A    All over.
12    Q    Sir, do you recall who the plumbing
13    supply company would have been --
14    A    No.
15    Q    -- for this job site?
16    A    No. I can't recall the plumbing
17    supplier.
18    Q    Sir, do you recall who the general
19    contractor of this job was?
20    A    I guess, I don't know. Don't remember.
21         MS. HAUSSLER: Okay. Does anyone have

Page 81

1    any additional questions on Soldiers Home before I
2    go on?
3         (No response)
4         BY MS. HAUSSLER:
5    Q    Sir, I'm going onto several other job
6    sites. Did you want to take a break before I go
7    onto any other sites?
8    A    No.
9    Q    Okay. I thought this had to do with the
10    German Embassy. I'm sorry.
11    A    I thought this had to do with the German
12    Embassy.
13    Q    No, sir. Several sites on your --
14    A    Okay. Let's get on with it.
15         MS. HAUSSLER: Okay. Can we go off the
16    record?
17         MR. BROWN: Sure.
18         MS. HAUSSLER: Can I talk to you?
19         THE VIDEOGRAPHER: Off the record at
20    11:23.
21         (Break taken.)

21  (Pages 78 to 81)

Page 82

1      THE VIDEOGRAPHER:  This is tape number
2   three of the video deposition of Armando Sammartino.
3   The time is 11:32.  We ended tape number two at
4   11:23.
5      BY MS. HAUSSLER:
6      Q   Okay, sir.  We're still on your time with
7   R.M. Thornton.  Okay.  Do you recall any other job
8   sites that you would have worked at while you were
9   working for R.M. Thornton?
10     A   No, I don't recall.
11     Q   Okay.  Do you recall working at a site
12   called 19th and T, Holly House?
13     A   Yes.  Stewart Bainum.
14     Q   That was a Stewart Bainum job site?
15     A   His construction company.
16        MR. BROWN:  We covered this site.
17     Q   Well -- so this is the site that you
18   recall on Florida Avenue, 19th and T that we talked
19   about earlier?
20     A   Yes.
21     Q   Okay.  So there wasn't a separate time

Page 83

1   that you were at that, at or near that location that
2   you worked, while you were working for R.M.
3   Thornton?
4      A   I was still working for -- oh, that's a
5   multi-question, multi-answer.  I was working for
6   Stewart Bainum.  He owned the company.  And what was
7   the other part of it?
8      Q   Well, did you ever work the 19th and T
9   building that, remember that we spoke of when you
10   were working for Stewart Bainum?
11     A   Yeah.
12     Q   Was there ever a building near that
13   location at the same intersection that you worked at
14   while you were working for R.M. Thornton?
15     A   No.  No.  There was no buildings.
16     Q   Okay.  So the only time you worked at
17   19th and T was when you were working for Stewart
18   Bainum?
19     A   When that building that was being
20   erected.
21     Q   Okay.  And that's the building that we

Page 84

1   talked about the other day, correct?
2      A   Yes.
3      Q   Okay.  Sir, do you recall working at the
4   Children's Hospital?
5      A   Yes.
6      Q   Do you recall when that was?
7      A   Don't recall.
8      Q   Do you recall what decade that would have
9   been in?
10     A   What was the last question?
11     Q   Do you recall what decade that would have
12   been in?
13     A   No.
14     Q   Do you recall how long you worked at that
15   site?
16     A   About a year.
17     Q   And do you recall if you were working for
18   Thornton at that time?
19     A   Yes.
20     Q   Do you recall what your title was at that
21   site?

Page 85

1      A   No title.
2      Q   Okay.  Do you recall if you were a
3   supervisor or superintendent at that site?
4      A   No title.
5      Q   Okay.  Do you recall what your duties
6   were or what work you performed at that site?
7      A   Insulation.
8      Q   And other than insulation, did you
9   perform any other work at that site?
10     A   No.
11     Q   Okay.  Did you work with others that were
12   also insulating?
13     A   No.
14     Q   So you were just working by yourself?
15     A   Almost.  Yes.  Nobody working by my side.
16     Q   Okay.  So there was no one else working
17   for R.M. Thornton while you were working at the
18   site.  It was just you?
19     A   Not to my knowledge.
20     Q   Okay.  Can you describe for me the type
21   of work you would have to perform while doing this

22  (Pages 82 to 85)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III 5/30/08

Page 86

1   insulation work? What a typical day would be like?
2       MR. BROWN: Objection.
3       A   Installing med gas supplies.
4       Q   And I'm sorry, sir. I'm not familiar
5   with that. What purpose does that have with the
6   building?
7       A   Small copper tubing and oxygen vacuum and
8   whatever med gas they used at the station.
9       Q   Okay. So was this new construction of
10  the building or was this repair work? Or strike
11  that. Was the building already existing when you
12  went in?
13      A   Renovation of the building.
14      Q   Okay. Do you recall what portion of the
15  Children's Hospital was being renovated?
16      A   What was the question?
17      Q   Do you recall what portion of the
18  Children's Hospital was being renovated?
19      A   All the rooms, all the floors.
20      Q   Do you recall how many floors you worked
21  on at the building?

Page 87

1       A   I can recall two. I don't know how many
2   floors there were.
3       Q   And do you recall if Children's Home
4   occupies more than one building?
5       A   I believe so.
6       Q   Okay. Did you just work in one of those
7   buildings or more than one?
8       A   More. Any building that required med
9   gas, we worked in.
10      Q   Okay. Sir, your job only involved the
11  med gas lines?
12      A   At this time, yes.
13      Q   Okay. Were you at the Children's Home
14  site on more than one occasion?
15      MR. BROWN: Children's Hospital.
16      MS. HAUSSLER: I'm sorry, what did I
17  say?
18      MR. BROWN: Children's Home.
19      MS. HAUSSLER: Oh. Thank you. Getting
20  the last site and this site combined.
21      BY MS. HAUSSLER:

Page 88

1       Q   Sir, Children's Hospital, were you at
2   that site on more than one occasion?
3       A   Yes, but I can't recall how many.
4       Q   Okay. Other than the time that you were
5   at the site installing the med gas lines, do you
6   recall when you were there what type of work you
7   were performing and when you were there on one of
8   these other occasions?
9       A   No, I don't recall.
10      Q   Okay. Now, before, you had mentioned
11  insulation work. Would that been, would you have
12  performed that work at the same time you were
13  performing the med, the work on the med gas lines?
14  Or was that a separate instance?
15      A   It's a same project.
16      Q   Okay. So what were you insulating?
17      A   We weren't insulating anything.
18      Q   Okay. You had referred to it as
19  insulation so why did you --
20      A   Installation.
21      Q   Installation. Okay. So you were

Page 89

1   installing those med gas lines?
2       A   (Nodding).
3       Q   Other than I believe you said it was
4   copper piping, do you recall using any other
5   products other than that copper piping?
6       A   The equipment supplied by the med gas
7   people.
8       Q   Do you recall who supplied the equipment?
9       A   What ends the apparatus, whatever we had
10  to attach to the walls.
11      Q   Do you recall who supplied those
12  products?
13      A   Don't remember.
14      Q   And the piping materials that you used,
15  was that supplied by your company?
16      A   The copper tubing, yes. Wait a minute.
17  No, it wasn't because it had to be washed and dried
18  thoroughly before installation. They supplied
19  everything.
20      Q   The med gas line company or the company
21  that supplied the med gas?

23  (Pages 86 to 89)

Court Reporting in
Baltimore/Washington                    Evans Reporting Service
                                        800-256-8410                    Over 20 years of
                                                                        award-winning service

Page 90

1    A    Right.
2    Q    Supplies? Okay. And sir, other than the
3    -- well, strike that. Sir, I apologize. Did you
4    say you were working by yourself on this project?
5    A    Yes. On this, each installation I worked
6    by myself but I had other men in the building.
7    Q    Okay. So each, each individual worked by
8    themselves but there were more than one individual
9    working for Thornton at this site. Is that what
10    you're saying?
11    A    Yes.
12    Q    Okay. Do you recall how many men were
13    employed by Thornton at this site?
14    A    Including myself, three.
15    Q    Do you recall the names of the other two
16    individuals? Do you recall the names of the other
17    two people?
18    A    No names.
19    Q    Sir, was anything else other than the med
20    gas lines being renovated at this site when you were
21    working there?

Page 91

1    A    No.
2    Q    Sir, do you believe that you personally
3    worked with any asbestos-containing products at this
4    site?
5    A    No asbestos.
6    Q    Do you have any way of knowing whether
7    you were working around any products in your
8    vicinity that may have contained asbestos?
9    A    I have no way of knowing what the
10    products contained.
11    Q    Okay. Now, while you were working in
12    each -- strike that.
13    While you were working each individual
14    room, I know that you were by yourself, but was
15    there other work going on in the hospital,
16    construction work, other than the work you were
17    performing?
18    A    I have no way of knowing that.
19    Q    Okay. So you don't recall seeing any
20    other trades present?
21    A    No. I have no way of knowing what other

Page 92

1    trades were going on in the building.
2    Q    Okay. Now, sir, you said that you worked
3    at Children's Hospital on more than one occasion.
4    Do you recall how much time was in between each
5    instance?
6    A    No, no way of knowing.
7    Q    Okay. And you said it was more than one
8    time but you couldn't give me a number. Do you know
9    if it was more --
10    A    I can't give you a number either.
11    Q    Okay.
12    A    I don't remember any of this stuff. I'm
13    answering the best of my ability.
14    Q    Okay. And that's all I can ask of you,
15    sir. That's all any us can ask of you.
16    Do you recall the other instances when
17    you visited or when you worked at Children's
18    Hospital, do you recall what decade that was?
19    A    No.
20    Q    No? Okay. And do you recall in any of
21    those other instances, do you recall if any other

Page 93

1    trades were working around you during those times?
2    A    No. Can't recall any other trades.
3    Q    Okay. Do you know if in any of those
4    other instances you would have been personally using
5    any asbestos-containing products?
6    A    No, not to my knowledge.
7    Q    Okay. And do you know, to your
8    knowledge, when you've been performing pipefitting
9    work on these instances or some other type of work,
10    if you can recall?
11    A    No. Which instances are you talking
12    about?
13    Q    Well, you said that you were there other
14    than the med gas, the time when you were working on
15    the med gas line, you said that there's at least one
16    other time when you were there at Children's
17    Hospital, correct?
18    A    Yeah.
19    Q    Do you have any recollection of the type
20    of work you were doing?
21    A    A fire line even though it was not our

Court Reporting in                Evans Reporting Service                Over 20 years of
Baltimore/Washington              800-256-8410                          award-winning service

Page 94

1  responsibility.  A fire line had been pinched and l
2  straightened that out for them.
3      Q   Okay.  So this was repair work?
4      A   (Nodding).
5      Q   Do you recall how long were on the site
6  at that time?
7      A   Half an hour.
8      Q   Okay.  Do you recall any other instances?
9      A   Did you have a question?
10     Q   Do you recall any other times that you
11  were at Children's Hospital?
12     A   No.
13     Q   Okay.  Now, sir, when you repaired the
14  fire line, you were you working for Thornton at that
15  time?
16     A   It was a signal line.  It wasn't on a
17  fire line.
18     Q   It was a single line?
19     A   Signal line.
20     Q   Okay.  When you worked on this signal
21  line, do you recall if you were working for Thornton

Page 95

1  at that time?
2      A   Yes.
3      Q   Okay.  Did Thornton also perform service
4  calls?  Is that why you were there?
5      A   When his men are on the job, anything
6  that's affected by our job, we take care of them.
7      Q   Okay.  So you or other Thornton employees
8  were already onsite when you were called to repair
9  this signal line?
10     A   We were already onsite.  Thornton was not
11  called.  We were made aware of it and we repaired
12  it.
13     Q   Okay.  Sir, do you recall working at
14  Columbia Women's Hospital?
15     A   Yeah.  I don't remember any dates or what
16  I did, but I remember working there.  Oh, it was
17  repair work.  Heat lines.
18     Q   And do you recall, is Columbia Women's
19  Hospital made up of more than one building?
20     A   One building, several floors.
21     Q   Do you recall how many of the floors you

Page 96

1  had to personally work on in order to perform your
2  work?
3      A   Three or four.
4      Q   Okay.  Do you recall what you had to do
5  in order to repair these heat lines?
6      A   Cut out the old and install the new.
7      Q   Do you recall how long you were at the
8  site repairing these lines?
9      A   Couple weeks.
10     Q   Sir, when you were repairing this, these
11  heat lines, do you recall if there were any other
12  trades working around you?
13     A   No other trade.  They were in the
14  building but they weren't working around me.
15     Q   Okay.  The old lines that you had to
16  replace, when you got to the site, were these lines
17  insulated?
18     A   No.
19     Q   Do you recall what the old lines were
20  made of?
21     A   Steel pipe.

Page 97

1      Q   Steel piping?  And sir, you said that
2  these were heat lines.  Was there steam running
3  through this pipe?
4      A   Originally.
5      Q   Okay.  Originally?  You said originally?
6      A   Originally, yes.
7      Q   Okay.  What then -- begin.
8      A   Steam was turned off so we could cut them
9  out.
10     Q   Okay.  Did this work require you to
11  perform work in the boiler room of the facility?
12     A   Our work did not extend to the boiler
13  room.
14     Q   Okay.  Sir, what was the new piping made
15  of?  Do you recall?
16     A   Same thing, steel.
17     Q   Steel?  Other than the steel piping, did
18  you have to use any other products in your work?
19     A   No.
20     Q   Do you believe you personally or do you
21  have -- strike that.  Do you have any way of knowing

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 98

1  if you personally handled any asbestos-containing
2  products when you were doing this repair work?
3      A    I have no way of knowing.
4      Q    Sir, did you have to weld these pipes?
5  Or how did you install these pipes?
6      A    They had to be welded in place, placing
7  hangers to give them support.
8      Q    Okay.  And did you wear those same gloves
9  that you referred to earlier?
10     A    No.
11     Q    Okay.
12     A    I didn't refer to gloves for this type
13  work.
14     Q    Okay.  So for this type of welding work,
15  you did not have to wear --
16     A    No.
17     Q    -- gloves?  Did you have to wear any
18  type of protective clothing?
19     A    No.
20     Q    Sir, the repair work that was going on,
21  what prompted the repair work?  In other words, were

Page 99

1  you troubleshooting a problem or was it renovation
2  work?
3      A    Going too far back.  Can't remember.
4      Q    Okay.  Do you recall if these heat lines
5  were behind existing wall structures?
6      A    Yes, they were.
7      Q    And how would you go about getting to the
8  piping?
9      A    Had to break, break a hole in the wall
10  and crawl in it.
11     Q    Do you recall what the walls were made
12  of?
13     A    Brick and mortar.
14     Q    Do you remember the appearance of the
15  brick?
16     A    No.
17     Q    Okay.  What about the mortar, do you
18  recall anything about the appearance of the
19  mortar?
20     A    No.
21     Q    When you would break into the brick and

Page 100

1  the mortar in order to get to the piping, did that
2  create dust?
3      A    Dust?
4      Q    Yes, sir.
5      A    Yeah.  You get dust.
6      Q    Okay.  Do you have any way of knowing if
7  that dust contained asbestos?
8      A    Oh, Jesus.  I have no way of knowing.
9      Q    Okay.  And after you were done working on
10  the pipe, sir, did the walls then have to be
11  rebuilt?
12     A    Yes, they did.
13     Q    Okay.  Did you and your co-workers do
14  that or did another trade do that?
15     A    Had a bricklayer come in and do that.
16     Q    Okay.  Do you recall who employed the
17  bricklayer?  Do you know who employed that
18  bricklayer?
19     A    Whoever the general contractor was.
20     Q    Sir, so, to your knowledge, do you recall
21  this job being large enough to require a general

Page 101

1  contractor?
2      A    Yes, it was.
3      Q    Okay.  Other than the bricklayer and the
4  pipefitters that you worked with, do you recall any
5  other trades working at the building when you were
6  there?
7      A    No.
8      Q    When the bricklayer was installing the
9  new brick, did he have to mix mortar in order to
10  apply the brick or construct --
11         MR. BROWN:  Objection.
12     Q    -- the brick walls?
13         MR. BROWN:  Objection.
14     A    Yes.  He had to mix the mortar and
15  install it.
16     Q    Okay.  Were you in his presence when he
17  mixed the mortar?
18     A    I was not there.
19     Q    Okay.  Then how do you know that he had
20  to mix the mortar?
21         MR. BROWN:  Objection.

26 (Pages 98 to 101)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III 5/30/08

Page 102

1     A    Because it doesn't come in ready-mix form
2  and they were mixing it outside.
3     Q    Okay. Sir, do you recall who supplied
4  any of the plumbing products for this site?
5     A    No.
6     Q    Or the piping products for this site?
7     A    I don't recall.
8     Q    Okay. Do you recall if Thornton would
9  have been the company that purchased the piping
10 supplies for this site or would it have been the
11 general contractor? If you can recall.
12    A    I don't, I can't recall.
13        MS. HAUSSLER: Okay. Does anyone else
14 have any questions regarding Children's Hospital?
15 Or, I'm sorry, Columbia Women's Hospital?
16        (No response)
17        BY MS. HAUSSLER:
18    Q    Actually, sir, I have one more question
19 regarding this site. Have you ever heard of a
20 product called Eagle-Picher cement?
21    A    Never heard of that.

Page 103

1     Q    Okay. Sir, do you recall working at the
2  Mayflower Hotel?
3     A    Yes, I recall being there but don't
4  recall what we did.
5     Q    Okay. Do you have any recollection of
6  when you would have worked there?
7     A    No.
8     Q    Okay. Do you have any recollection of
9  whether it would have been new construction or
10 renovation work?
11    A    Renovation.
12    Q    Do you recall what portion of the hotel
13 was being renovated?
14    A    I think it was on the street floor.
15    Q    And was it the entire street level or
16 only a portion of it?
17    A    As far as I'm concerned, it was street
18 level.
19    Q    Okay. Other than the street level
20 renovation, was any other renovation taking place?
21    A    Not to my knowledge.

Page 104

1     Q    Okay. Sir, I apologize if I asked this
2  already. Do you recall how long you worked at this
3  site?
4     A    I don't know, remember how long.
5     Q    Okay. Were you working for Thornton at
6  this site? Was Thornton your employer at this site?
7     A    I don't know.
8     Q    Okay. Do you recall whether you were a
9  pipefitter at this site?
10    A    Yeah.
11    Q    Okay. Do you recall what type of
12 pipefitting work you would have been performing at
13 this site?
14    A    Speaking of the hotel?
15    Q    As far as the Mayflower Hotel, yes, sir.
16    A    I don't remember installing any pipe at
17 all. I don't know what else I did. I don't
18 remember any, doing anything out there.
19    Q    Okay. Do you recall, did you have any
20 co-workers at that site?
21    A    Any what?

Page 105

1     Q    Co-workers at that site?
2     A    Yeah, but I don't know who they are or
3  what they did either.
4     Q    Okay. Do you recall if there were other
5  trades present at this site while you were working
6  at this site?
7     A    I don't recall.
8     Q    Okay. Sir, do you know if you were
9  exposed to asbestos while you were working at this
10 site?
11    A    I don't know.
12    Q    Do you recall what type of work was being
13 performed in the street level renovation?
14    A    I said I didn't remember. I don't
15 remember.
16    Q    Okay. So you don't recall whether it was
17 lobby work or work to a restaurant or anything like
18 that?
19    A    I don't recall.
20    Q    Okay. Do you recall the name of the
21 general contractor at this site?

Court Reporting in
Baltimore/Washington                Evans Reporting Service
                                    800-256-8410                Over 20 years of
                                                                award-winning service

Armando Sammartino, Vol. III  5/30/08

| Page 106 |
|---|
| 1     A   Yes.  It must have been a general |
| 2   contractor but I don't know who he was or anything |
| 3   about him. |
| 4     Q   Okay.  Sir, do you recall working at the |
| 5   National Airport? |
| 6     A   Yeah, I remember working at the National. |
| 7     Q   Okay.  Do you know who your employer was |
| 8   at the National Airport? |
| 9     A   Thornton. |
| 10    Q   Do you recall when you worked, around |
| 11  what year you worked, started working at the |
| 12  National Airport? |
| 13    A   No, I don't remember what year. |
| 14    Q   Do you recall how long you stayed at, |
| 15  working at the National Airport? |
| 16    A   I can't remember that either. |
| 17    Q   Okay.  Do you recall what decade you |
| 18  would have worked at the National Airport? |
| 19    A   Can't recall. |
| 20    Q   Do you recall whether this was new |
| 21  construction of a portion of the airport? |

| Page 107 |
|---|
| 1     A   Installation of equipment. |
| 2     Q   And was this part of -- |
| 3     A   New work. |
| 4     Q   It was part of new work?  Okay.  Do you |
| 5   recall what type of equipment you were installing? |
| 6     A   Heat pumps. |
| 7     Q   Do you recall in what area of the airport |
| 8   you were working? |
| 9     A   I can't pinpoint it.  The heat pumps were |
| 10  installed out on the roof. |
| 11    Q   Do you recall who manufactured those heat |
| 12  pumps? |
| 13    A   No. |
| 14    Q   Can you describe for me the process of |
| 15  installing the heat pumps? |
| 16    A   Had to lift them with a crane off of the |
| 17  ground, place them in the proper position on the |
| 18  roof ready to be piped. |
| 19    Q   Once they were in place, did you then |
| 20  perform the piping work from the pumps? |
| 21    A   Yes. |

| Page 108 |
|---|
| 1     Q   Sir, do you recall if these pumps had to |
| 2   be insulated? |
| 3     A   Insulators probably came in later. |
| 4     Q   Okay.  So when you were installing the |
| 5   pumps, they were not insulated? |
| 6     A   No. |
| 7     Q   Okay.  What about the pipes that ran from |
| 8   the pumps, did those have to be insulated? |
| 9     A   That's the insulator's project. |
| 10    Q   Do you recall if they were insulated? |
| 11    A   They were not insulated, to my knowledge. |
| 12    Q   Okay.  Sir, do you recall how long you |
| 13  worked at National Airport installing these heat |
| 14  pumps? |
| 15    A   I have no idea. |
| 16    Q   Do you recall whether you performed any |
| 17  other work at National Airport other than installing |
| 18  these heat pumps? |
| 19    A   No. |
| 20    Q   Okay.  Did you have co-workers that were |
| 21  working with you at this job site? |

| Page 109 |
|---|
| 1     A   Yes. |
| 2     Q   Do you recall how many? |
| 3     A   No names.  I can't recall any names. |
| 4     Q   Do you recall how many men it took to |
| 5   install these heat pumps, how many pipefitters? |
| 6     A   I guess six or seven, including the men |
| 7   on the ground. |
| 8     Q   Do you know who supplied the heat pumps |
| 9   that you installed? |
| 10    A   Don't know who supplied them. |
| 11    Q   Okay.  Sir, do you know if you -- do you |
| 12  have any way of knowing whether you personally |
| 13  handled any asbestos-containing products while |
| 14  installing the heat pumps? |
| 15    A   No. |
| 16    Q   No, you have -- no, you don't know? |
| 17    A   I don't know. |
| 18    Q   Okay.  Sir, do you know who employed the |
| 19  insulators that would have insulated the heat pumps? |
| 20      MR. LUXTON:  Objection. |
| 21    A   Rephrase that question. |

28  (Pages 106 to 109)

Armando Sammartino, Vol. III  5/30/08

Page 110

1    Q   Sure. Do you know -- the insulators that
2  you spoke of who insulated the heat pump after you
3  were done installing it, do you know who --
4    A   No.
5    Q   -- employed the insulators?
6    A   No.
7    Q   Okay. Do you know if they were employed
8  by the same company that employed you?
9    A   I have no idea.
10   Q   Okay. Sir, when the heat pumps arrived
11 at the site, do you recall how large they were?
12   A   They were quite large, too large to be
13 manhandled. That's why we had to have a crane to
14 lift them.
15   Q   Okay. Do you recall if they came in any
16 type of packaging?
17   A   Protective package, protective
18 boarding.
19   Q   Okay. Do you recall any writing on that
20 board, on that boarding?
21   A   Don't recall any of that.

Page 111

1    Q   Okay. Do you recall any, if there were
2  any logos or anything?
3    A   No.
4    Q   Okay. Do you recall, were the heat pumps
5  delivered to the site by trucks?
6    A   I guess they had to come in by truck.
7    Q   Do you recall whether you saw these heat
8  pumps being offloaded from those trucks? Was that a
9  no, sir? Did you not see the heat pumps being
10 offloaded from the trucks?
11   A   That's the ground work. I was on the
12 roof.
13       MS. HAUSSLER: Okay. Okay, sir. I think
14 that's all the questions I have for you about
15 National Airport. Does anyone else have any
16 questions?
17       (No response)
18       BY MS. HAUSSLER:
19   Q   Okay. Sir, do you recall working at
20 Prince George's County Hospital?
21   A   Yes.

Page 112

1    Q   Do you recall when you would have worked
2  at that hospital?
3    A   No.
4    Q   Do you recall whether this was new
5  construction or renovation of a building?
6    A   Repair work.
7    Q   And was this repair work as a result of a
8  renovation or troubleshooting?
9    A   I have no idea.
10   Q   Okay. Do you recall what was being
11 repaired?
12   A   I know I personally had to repair a
13 three-inch water line.
14   Q   Do you recall what building this
15 three-inch water line was located?
16   A   I have no idea.
17   Q   Do you recall how long you were at the
18 site? Did you perform any other repairs other than
19 to this three-inch water line?
20   A   No. I can't remember.
21   Q   Okay. Can you describe the repairs that

Page 113

1  you had to perform to the three-inch water line?
2    A   No, I can't.
3    Q   Do you recall if you had any co-workers
4  working at this site with you?
5    A   Co-workers?
6    Q   Yes, sir.
7    A   I can't recall.
8    Q   Okay. Do you recall if this repair work
9  was in the main building or a separate building of
10 the hospital?
11   A   I don't know what building we were
12 working in.
13   Q   Okay. Do you recall the size of the
14 building?
15   A   No. I have no idea.
16   Q   Okay. Do you recall if there were any
17 other trades working around you at this building?
18   A   I can't recall.
19   Q   Okay. And sir, do you recall if you were
20 working for Thornton at this job site? Does that
21 sound correct?

29 (Pages 110 to 113)

Court Reporting in
Baltimore/Washington                Evans Reporting Service
                                    800-256-8410                Over 20 years of
                                                                award-winning service

Page 114

1     A   Think so.
2     Q   Sir, when you were repairing the
3  three-inch water line, do you have any way of
4  knowing whether that work would have involved
5  handling asbestos-containing products?
6     A   The particular job I was doing did not
7  involve any asbestos.
8     Q   And other than this time that you were
9  working on the three-inch water line, did you ever
10  do any other work at P.G. County Hospital, or Prince
11  George's County Hospital?
12     A   I don't think so.
13     Q   Okay. Sir, do you recall when Thornton
14  would have purchased their plumbing supply products
15  for this particular job site?
16     A   Yes. He would, he would have purchased
17  them.
18     Q   Do you recall where he would have
19  purchased them from?
20     A   I have no idea.
21     Q   Okay. Sir, do you recall working at

Page 115

1  Walter Reed Army Medical Center?
2     A   Yes.
3     Q   Do you recall when you would have worked
4  there?
5     A   No.
6     Q   Do you recall if you were working for
7  Thornton at the time?
8     A   Yes.
9     Q   Do you recall whether this was new
10  construction of a building or renovation?
11     A   I don't even remember the job.
12     Q   Okay. So if I understand you correctly,
13  you recall working at Walter Reed but you don't
14  recall what the job entailed?
15     A   Right.
16     Q   Okay. Sir, in general, throughout your
17  time working for Thornton, can you give to me a list
18  of any of your co-workers during the time you worked
19  for Thornton?
20     A   No, I can't. Can't recall one.
21     Q   Other than Charlie Goth, who I believe

Page 116

1  worked with you at a site, at the Smithsonian while
2  you were working for Thornton?
3     A   No. He wasn't there. He was not there.
4     Q   He was not working with you at the
5  Smithsonian.
6     A   Right.
7        MR. BROWN:  No. Objection. I think he
8  means he was not working with him at Prince George's
9  County.
10        MS. HAUSSLER:  Oh, okay. Okay.
11        MS. TOSTANOSKI:  Which I thought was
12  Walter Reed.
13        MR. BROWN:  I'm sorry, Walter Reed. I
14  misspoke. Walter Reed.
15        BY MS. HAUSSLER:
16     Q   Sir, now not referring to any particular
17  job site in particular, do you recall working, any
18  of your co-workers other than Charlie Goth from the
19  time when you were working at Thornton?
20     A   No, I can't recall anything.
21     Q   Okay. Do you recall anyone who would

Page 117

1  have worked as your supervisor while you were
2  working for Thornton?
3     A   No. Can't recall anything.
4     Q   Okay. And sir, since you can't
5  specifically recall the Walter Reed, what your work
6  entailed at the Walter Reed job site, do you have
7  any way to know whether you were exposed to any
8  asbestos-containing products at the Walter Reed job
9  site?
10     A   I have no way of knowing.
11     Q   Okay. Sir, do you recall working at the
12  White House?
13     A   At the grounds. On the grounds, yes.
14     Q   You worked on the grounds at the White
15  House? Do you recall what work you performed on the
16  grounds at the White House?
17     A   It involved what we referred to
18  installation of the cooling tower. We had to go on
19  the grounds of the White House to dig up unexcavated
20  pipe.
21     Q   Okay. So you were digging up pipe from

30  (Pages 114 to 117)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 118

1   the ground and replacing it?
2      A   I remember having dug it up but I don't
3   remember replacing it.
4      Q   Okay.  And I don't want to make the same
5   mistake as before.  This involved the installation
6   of the cooling tower at the White House?
7      A   Pertaining to, not at the White House.
8   On the grounds.
9      Q   Okay.  So you were not inside the White
10  House but you were on the grounds?
11     A   Right.
12     Q   Right.  Do you know, the piping that you
13  were digging up, what type of piping was this?
14     A   I believe it was steel piping.
15     Q   Was this piping covered with any
16  material?
17     A   Dirt.
18     Q   Okay.  Sir, do you recall any other work
19  being performed while you were at the White House
20  other than -- strike that.
21        Do you recall performing any other work

Page 119

1   other than digging up this piping?
2      A   Yes.  It all refers back to the same
3   thing.  We removed the pipe.  We had to reinstall it
4   and cover it with earth and it involves -- there's
5   is a long story that goes with this.
6        The White House used to get its water
7   from the Potomac for the cooling power.  We did away
8   with that subterranean ditch and used their new
9   source of water which is I don't know.  So we
10  didn't use that piping anymore.
11     Q   Okay.  So you were redirecting the piping
12  to another source?
13     A   Yeah.
14     Q   Okay.  The piping that you were
15  installing, what type of piping was that?
16     A   It was steel pipe.
17     Q   Okay.  And sir, did any of your work
18  involve those cooling towers that you mentioned?
19     A   The piping to the cooling tower.
20     Q   Okay.  I apologize.  I thought you were
21  done with your answer.  So your job involved the

Page 120

1   piping and the ground?
2      A   It's in the ground and above ground.  All
3   of the, wherever pipe may be needed.
4      Q   Okay.  At this site in particular, sir,
5   other than the ground, other than the piping that
6   you unearthed and then dug up and then reinstalled,
7   do you recall any other piping at this site other
8   than the piping in the ground?
9      A   No, I don't recall.
10     Q   Okay.  Do you have any way of knowing
11  whether you personally used any asbestos-containing
12  products?
13     A   I did not use any asbestos on this
14  project.
15     Q   Okay.
16        THE VIDEOGRAPHER:  Can we stop and change
17  the tape, please?
18        MR. BROWN:  Okay.
19        THE VIDEOGRAPHER:  This ends tape number
20  three of the deposition of Mr. Sammartino.  The time
21  is 12:27.

Page 121

1        (Break taken.)
2        (Whereupon, Sammartino Exhibit No. 5 was
3   marked for identification.)
4        THE VIDEOGRAPHER:  This is tape number
5   four of the video deposition of Armando Sammartino.
6   The time is 12:32.
7        BY MS. HAUSSLER:
8      Q   Sir, almost done with the White House
9   site.  Do you recall working with a Lenore Bradford?
10     A   (Shaking head.)
11     Q   What about a James Wallace?
12     A   Don't recall.
13     Q   Okay.  Do you have any recollection of,
14  other than piping, did your work at the White House
15  involve the use of any other products?
16     A   No.
17     Q   Okay.  Sir, have you ever heard of a man
18  named John Kutsos?
19     A   John who?
20     Q   Kutsos, K-U-T-S-O-S?
21     A   No.

31  (Pages 118 to 121)

Armando Sammartino, Vol. III  5/30/08

Page 122

1    Q    What about Arthur Anderson?
2    A    He may have worked down in the
3    architect's office, but I don't remember him.
4    Q    Okay.
5    A    Or ever having talked to him.
6    Q    Okay.  What about an Elmer Gibson?
7    A    Don't know.
8    Q    Okay.  Sir, do you recall how long you
9    worked at the White House for?
10   A    Can't recall.
11   Q    Okay.  Do you recall the names of any of
12   your co-workers at the White House?
13         MR. BROWN:  Objection.
14   A    No.
15   Q    Sir, did you ever work for Nash Love
16   Associates?
17   A    Yeah.
18   Q    Do you recall when you began working for
19   Nash Love?
20   A    No.
21   Q    Do you recall any of the job sites that

Page 123

1    you may have worked at which you were employed --
2    A    No.
3    Q    -- by Nash Love?
4    A    No.
5    Q    Just sir, let --
6    A    I don't recall any of the job sites.
7    Q    Sir, I know you're, I know you want to
8    get this done with, but just so that the written
9    record is clear, can you just wait until I'm done
10   with my question?  And, and I know that I've cut you
11   off a couple of times.  I'll try to do the same for
12   you and your answer.  Okay?
13   A    Okay.
14   Q    And I'll try to speed it along as quickly
15   as I can.  Okay?
16         EXAMINATION
17   BY MR. FLAX:
18   Q    Before we go onto that site, can you hear
19   me, Mr. Sammartino?
20   A    I can hear you.
21   Q    Back to the White House before we move

Page 124

1    on, back to the White House.  You worked outside,
2    under the sky?
3    A    Right.
4    Q    And when you worked at the White House,
5    did any other trade work around you?
6    A    I think they were preparing to put in
7    that belt they needed, one of our ex-presidents
8    had.
9    Q    And who was doing that preparation?
10   A    What about the preparation?
11   Q    What trade?  What other trade, if any,
12   were present?
13   A    Oh, oh, stone mason.  Cutting of stone,
14   placing of stone.  Getting ready to put up the
15   structure for the building.
16         MR. FLAX:  Thank you.
17         MS. HAUSSLER:  Anyone else with the White
18   House?
19         (No response)
20         EXAMINATION
21   BY MS. HAUSSLER:

Page 125

1    Q    Sir, do you recall any of your co-workers
2    that may have worked with you while you were working
3    for Nash Love?
4    A    Can't remember.  There was one, one
5    fellow that would go out and prepare documents,
6    measurements, but I remember, can't remember his
7    name.
8    Q    Okay.  And do you recall the names of any
9    of your supervisors that you may have had?
10   A    No, I can't recall.
11   Q    Okay.  Sir, when you were working for
12   Nash Love Associates, do you recall ever working at
13   the Riggs National Bank on M Street?
14   A    Yes.
15   Q    Do you recall when you would have worked
16   there?
17   A    Can't recall.
18   Q    Do you recall whether this was new
19   construction or renovation?
20   A    Installation of an electric boiler.
21   Q    Do you recall how long you worked at this

Court Reporting in                Evans Reporting Service              Over 20 years of
Baltimore/Washington                 800-256-8410                     award-winning service

Page 126

1  site?
2      A   Can't recall.
3      Q   And what work did you perform in the
4  installation of the electric boiler, if you can
5  recall?
6      A   Rigging of the boiler and getting it
7  inside and placing it.
8      Q   Are you okay, sir, or do you need a quick
9  brick there?
10     A   Go on.  Continue.
11     Q   Okay.  Other than the installation of the
12  electric boiler, did you perform any other work at
13  Riggs Bank?
14     A   No.
15     Q   When you were assisting in the
16  installation of this boiler, did you have to hook it
17  up to the piping?
18     A   No.
19     Q   Okay.  Other -- I'm sorry.
20     A   Somebody else did that.
21     Q   Okay.  So you assisted with rigging of

Page 127

1  the boiler?
2      A   There's no other way to get it in the
3  building.  We had to go through abandoned coal
4  chute.
5      Q   Okay.
6      A   We got it in there.
7      Q   Okay.  Were there any electricians that
8  were assisting you with installing this boiler?
9      A   Came in later.
10     Q   Okay.  Were you still working at this
11  site when the electricians were --
12     A   No.
13     Q   -- assisting and installing the boiler?
14     A   I was not working at the site when the
15  electricians came in.
16     Q   Okay.  Sir, were there any other trades
17  working around you while you were rigging and
18  installing the boiler?
19     A   No.
20     Q   Sir, how many men did it take to rig this
21  boiler?

Page 128

1      A   Four or five to get it in.  It had to be
2  raised with a crane.
3      Q   Sir, do you have any way of knowing
4  whether you used any personal, whether you
5  personally used any asbestos-containing products
6  while you were rigging this boiler?
7      A   No way of knowing.
8      Q   Do you know who manufactured the boiler?
9      A   No, don't know the manufacturer of the
10  boiler.
11     Q   Okay.  Do you know where the boiler was
12  purchased -- or strike that.  Do you know who
13  supplied the boiler to the site?
14     A   No, I don't know.
15         THE VIDEOGRAPHER:  Off the record at
16  12:42.
17         (Break taken.)
18         THE VIDEOGRAPHER:  Back on the record at
19  12:48.
20         MS. HAUSSLER:  All right, sir.  First,
21  does anyone have any questions regarding Riggs Bank?

Page 129

1          (No response)
2          BY MS. HAUSSLER:
3      Q   All right, sir.  Moving on.  Do you
4  recall working at the WMAL Radio and T.V. Studio?
5      A   No, I don't recognize anything that you
6  mentioned.
7      Q   Okay.  And this would have been while you
8  were working for Nash Love.  You don't recall that
9  site?
10     A   Oh.  What was the radio station?
11     Q   WMAL.
12     A   Oh.  I think we went over that before.  I
13  went in and I reviewed the site.  I diagnosed the
14  problem and that was it.  I didn't do any work.
15     Q   Okay.  Do you recall what the problem
16  was?
17     A   Exhaust fan imbalance.
18     Q   So you didn't perform any of the actual
19  work at this site other than inspection?
20     A   No.  Didn't do any outdoor work.
21     Q   And were there any trades present when

33  (Pages 126 to 129)

Armando Sammartino, Vol. III  5/30/08

Page 130

1  you were doing this inspection work?
2      A    No, no other trades.
3      Q    Okay.  Do you believe that, do you have
4  any reason to believe that you were exposed to
5  asbestos while working there?  Inspections?
6      A    There were no asbestos --
7      Q    Okay.
8      A    -- problems.
9      Q    Sir, do you recall working at the
10  National Gallery of Art?
11      A    Yes, but I don't remember what was done.
12      Q    Do you have any recollection of whether
13  this was new construction versus renovation work?
14      A    Remodeling.
15      Q    Do you recall what portion of the
16  National Gallery was being remodeled?
17      A    I think it was the second floor.
18      Q    Do you recall how long you worked at this
19  site?
20      A    No, I don't recall.
21      Q    Do you recall when you would have worked

Page 131

1  at this site?
2      A    No.
3      Q    Do you recall what work you would have
4  been performing as part of this remodeling work?
5      A    I don't know.  I have no idea.
6      Q    Okay.  But did this work involve
7  pipefitting of some form or another?
8      A    I don't think so.
9      Q    You don't think it did?
10      A    No.  Right.
11      Q    Do you recall if any other trades were
12  working around you during this remodeling?
13      A    No other trades.
14      Q    And do you have any way of knowing
15  whether you were exposed to asbestos at this site?
16      A    We were not exposed to any asbestos at
17  this, that site.
18      Q    Well, sir, you don't recall the work you
19  were doing at this site, correct?
20      A    We didn't -- that's correct.
21      Q    Okay.  So is it fair to say that you

Page 132

1  don't know whether or not you were exposed to
2  asbestos at this site?
3          MS. TOSTANOSKI:  Objection.
4      A    I said we didn't do any work at the site.
5  How could we --
6      Q    Okay.  So you didn't work, you didn't do
7  any work at this site?
8      A    Right.
9      Q    Okay.  I apologize.  I misheard you, I
10  suppose.  Do you recall working at this site at all?
11      A    Yeah, I recall being there.
12      Q    But you don't recall performing any
13  work?
14      A    No.
15      Q    All right, then.  Do you recall working
16  at Paul Mellon's residence?
17      A    I remember being inside the home and
18  seeing a few pictures.  That's it.  I didn't do any
19  work there.
20      Q    Okay.  Sir, do you recall working at the
21  International Monetary Fund building?

Page 133

1      A    Don't recall.
2      Q    You don't recall working at that
3  building?
4      A    (Shaking head).
5      Q    This would have been while you were
6  working for Nash Love.
7      A    I don't recall working at that building.
8      Q    Do you recall working at the Army Times
9  facility?  Army Times?
10      A    Don't recall that either.  Don't recall
11  being there.
12      Q    Sir, do you recall any of your, do you
13  recall working at Westchester Apartments?
14      A    Yes.
15      Q    Do you recall what work you performed, if
16  any, at Westchester Apartments?
17      A    We would recover that.  We went over
18  that.
19      Q    I don't recall going over any apartment
20  buildings, sir.
21      A    Westchester.

34  (Pages 130 to 133)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 134

1    Q   Who were you employed with when you, when
2  you worked at Westchester?  Do you recall?
3    A   Taking out old pipe and replacing with
4  new.
5      MR. BROWN:  And again, I'm just going to
6  note for the record, unlike the second installment
7  of the deposition where Mr. Sammartino's hearing aid
8  was functioning properly, as we noted at the outset
9  -- I don't recall if it was off the record or on the
10 record -- he doesn't have the benefit of the hearing
11 said so we all have to speak up clearly, and I think
12 we're doing a pretty good job on balancing that.
13     BY MS. HAUSSLER:
14   Q   So, sir, do you recall, do you recall if
15 Nash Love was your employer while you were working
16 at Westchester apartments?
17   A   I don't, I don't know who my employer was
18 at that time.
19   Q   Okay.  Do you recall when you would have
20 worked at that site?
21   A   Don't recall.

Page 135

1    Q   Okay.  Do you recall how long you would
2  have worked at that site?
3    A   About a year.
4    Q   Sir, do you recall where these apartments
5  are located?
6    A   All I can remember is Cathedral Avenue
7  but that's not the exact location.
8    Q   And do you recall, was this a highrise or
9  were these garden apartments?  What form apartments
10 were these?
11   A   It was multi-floor but I wouldn't call it
12 a highrise.
13   Q   Okay.  Do you recall how many floors
14 occupied this apartment building?
15   A   I can guess about four.
16   Q   Okay.  And sir, you said earlier that it
17 involved taking out old pipe and replacing it with
18 new pipe.  So I take it that this was renovation
19 work you were performing?
20   A   (Nodding).
21   Q   Okay.  Where in the building did you work

Page 136

1  at Westchester apartments?
2    A   All the floors that required supplying
3  heat to.
4    Q   So were all of the pipes that you were
5  working with in this building heat pipes as opposed
6  to water pipes?
7    A   Yes.
8    Q   Okay.  Did any of your work involve work
9  in the boiler room of the facility?
10   A   No.
11   Q   And sir, your -- well, strike that.  The,
12 how did you access the heat pipes that ran
13 throughout this building that you had to tear out?
14   A   Well, visual inspection.
15   Q   Okay.  Were these heat pipes behind
16 existing wall structures?
17   A   Yes, they were behind the wall
18 structures.
19   Q   Okay.  Do you recall how you accessed the
20 pipes that were behind these structures?
21   A   They were partially exposed and we had to

Page 137

1  do, remove a few bricks to get to the old pipe.
2    Q   Okay.  So these walls were constructed of
3  brick?
4    A   Yes.
5    Q   Okay.  Do you recall if there was --
6  strike that.
7      Sir, the heat pipes you were tearing out,
8  were they insulated?
9    A   Yes, they were.
10   Q   Can you describe that insulation for me?
11   A   It was foam type and hardened immediately
12 and expanded.
13   Q   Well, now, I'm only referring for the
14 moment on the insulation that you removed.  Do you
15 recall what color that insulation was?
16   A   Cream colored.
17   Q   When you tore out this insulation, was
18 this a dusty process?
19   A   No, dry.
20   Q   Okay.  Did the dry material create any
21 dust that was visible?

35  (Pages 134 to 137)

Armando Sammartino, Vol. III 5/30/08

Page 138

1     A    To my knowledge, there was no dust
2  created.
3     Q    Okay.  Did you wear any type of
4  respiratory --
5     A    No.
6     Q    -- protection?
7     A    We did not wear any respiratory
8  protection.
9     Q    Okay.  Do you recall how long it took you
10  -- well, strike that.
11         When you were repairing the pipe
12  throughout the building, sir, would you work
13  section-to-section or would you tear out all of the
14  piping and then go through the entire building?
15     A    Worked section-to-section.
16     Q    Okay.  How large of a section would you
17  work on at one time?
18     A    I can't recall.
19     Q    Okay.  Do you recall how long it took to
20  tear out a particular section of piping?
21     A    No.

Page 139

1     Q    Okay.  The new piping that you installed,
2  was that insulated?
3     A    If it wasn't, we, our insulation people,
4  installation, they did it.
5     Q    Okay.  Did Nash Love employ their own
6  insulators?
7     A    I don't know.
8     Q    Okay.  Do you know who the insulators
9  were --
10     A    I have no idea.
11     Q    Okay.  Let me just finish my question
12  real quick.  Do you know who the insulators were
13  employed by?
14     A    Were the insulators what?
15     Q    Do you know who employed the insulators?
16     A    No, I have no idea.
17     Q    Okay.  When you were installing and
18  tearing out this pipe, were there any other trades
19  working on that renovation work at the Westchester
20  apartments?
21     A    No.

Page 140

1     Q    There were no other trades working?
2     A    (Shaking head).
3     Q    Okay.  So it was only Nash Love employees
4  that were present at that site?
5     A    That's right.
6     Q    Okay.  Do you recall -- strike that.
7  Sir, do you recall seeing the pipes insulated after
8  you installed them?
9     A    Yeah.
10     Q    Okay.  Do you recall what that insulation
11  material looked like?
12     A    The same yellow foam that was cut out was
13  replaced.
14     Q    Do you know who manufactured this
15  product?
16     A    Have no idea.
17     Q    Do you know who supplied the product?
18     A    No.
19     Q    Do you recall seeing the packaging for
20  the product?
21     A    What about the packaging?

Page 141

1     Q    Do you recall seeing the packaging that
2  the product came in?
3     A    Yeah, I saw it but I don't remember
4  anything about it.
5     Q    Okay.  Sir, do you recall how many
6  co-workers you had at this site?
7     A    I can't account for it.
8         THE REPORTER:  I'm sorry?
9         MR. BROWN:  He can't account for it.
10         BY MS. HAUSSLER:
11     Q    Sir, where would you be working when the
12  insulators were installing the insulation?
13     A    Now you're -- okay.  About five to ten
14  feet.
15         MS. HAUSSLER:  Okay.  Okay, sir.  I think
16  that's all I have for that job site.  Does
17  anyone else on that job site?
18         (No response)
19     Q    Sir, there's one more job site that I
20  have to cover that I realize I didn't cover earlier.
21  Do you recall working at the U.S. Capitol Power

36  (Pages 138 to 141)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 142

1    Plant?
2        A    Yes.
3        Q    And sir, do you recall who your employer
4    was while you were working at the U.S. Capitol Power
5    Plant?
6        A    No, I can't.  Not right now.
7        Q    Okay.  Do you know if you were working
8    for Maurice Colbert, Colbert Company?
9        A    Colbert.
10       Q    Colbert?  Okay.  Do you know if you were
11   working -- do you have any way of knowing if you
12   were working for them at the time you worked there?
13       A    I, I think since you mentioned it, I
14   think maybe it was Colbert.
15       Q    Okay.  And do you recall what type of
16   work was being performed at the power plant when you
17   were working there?  Was this new construction?
18       A    It was work adjoining the cooling tower.
19       Q    Okay.  And do you recall what type of
20   work you were performing?
21       A    This involved pipe that needed to be lift

Page 143

1    by a crane because it was about 30-inch diameter.
2        Q    The pipe was 30 inches in diameter?
3        A    Thirty inches.
4        Q    And this piping that you were working on,
5    where was it in relation to these cooling towers
6    that you spoke of?
7        A    Where was it?
8        Q    Yes, sir.  Where was the pipe located
9    that you were installing?
10       A    It was scattered throughout the field.
11       Q    So this was, this was outside in open
12   air?
13       A    Outside.
14       Q    Okay.  And when you say it was located in
15   the field, I assume that this was ground level pipe
16   that you were installing?
17       A    Yes.
18            MR. BROWN:  Objection.
19       Q    Sir, how large of an area was this pipe
20   being installed in?
21       A    Couple a hundred yards each way.

Page 144

1        Q    Okay.  And is this piping that was going
2    underground or above ground?
3        A    Partially above and partially below
4    ground.
5        Q    Okay.
6        A    The large cast iron piping was below
7    ground.
8        Q    And do you know what was going to be
9    running through this piping?  Do you know what the
10   piping was going to be used for?
11       A    I guess supply water to the cooling
12   tower.
13       Q    Okay.  Sir, you mentioned the cooling
14   tower.  How far away was this piping from the
15   cooling tower?
16       A    After being assembled, it had to be moved
17   about a hundred yards.
18       Q    Was the piping a hundred yards away from
19   the cooling tower?
20            MR. BROWN:  Objection.  Go ahead.
21       A    What's the question again?

Page 145

1        Q    Sure.  How far away was this, or strike
2    that.  Where was this piping in relation to the
3    location of the cooling towers?
4        A    The piping is assembled in this area big
5    enough to accommodate it, then it had to be moved to
6    the cooling tower site and had to be replaced.
7        Q    Okay.  So it was installed, it was
8    assembled offsite of where it was eventually going
9    to be installed?
10       A    Right.
11       Q    Okay.  How long did it take to install
12   the pipe once you brought it onsite to where it
13   would be installed?
14       A    Couple days.
15       Q    Do you recall how many men you had
16   working with you?
17       A    No.
18       Q    Do you recall any of their names?
19       A    No.
20       Q    Do you recall if there were any other
21   trades working around you at this site?

37  (Pages 142 to 145)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 146

1     A    Not around me but other trades on the
2  job.
3     Q    Do you recall what those trades were?
4     A    Electrician.
5     Q    Sir, other than this 30-inch piping, did
6  you use any other materials at this site?
7     A    Didn't use any other materials --
8     Q    Okay.
9     A    -- at that site.
10    Q    And other than installing this piping,
11 did you perform any other work at that site other
12 than installing this piping?
13    A    No other work.
14    Q    Okay. Did your work directly involve the
15 cooling towers that you spoke of?
16    A    Yes.
17    Q    Okay. What, what work was involved with
18 those cooling towers?
19    A    Involved placing the pipe, drilling holes
20 in pipe so we get the proper spray in there.
21    Q    Okay. So your work involved the piping

Page 147

1  that would be associated with the cooling tower?
2     A    Yes.
3     Q    Okay. But you didn't actually work on
4  the cooling tower itself?
5        MR. BROWN: Objection.
6     A    I wouldn't say that. Everything involved
7  the cooling tower. Associated with the cooling
8  tower.
9     Q    Okay. Other than -- well, let me phrase
10 it this way. Other than the piping, did you do any
11 other work that was associated with the cooling
12 tower?
13    A    All the piping that I did was associated
14 with the cooling tower.
15    Q    Okay. And is that the only work that you
16 performed that was associated with the cooling
17 towers, the piping?
18    A    Yeah. Yes, yes.
19    Q    Okay. Sir, do you know who manufactured
20 the cooling towers that you spoke of?
21    A    I mentioned it one time but I can't

Page 148

1  recall now.
2     Q    Okay. Do you recall who supplied the
3  cooling towers to the site?
4     A    Can't recall now.
5     Q    Okay.
6     A    I mentioned it earlier on.
7     Q    Today you mentioned it?
8     A    No. Sometime during this investigation,
9  you asked me who supplied the cooling tower and I
10 was able to tell you then.
11    Q    Okay.
12    A    But I can't now.
13    Q    Okay. Sir, do you recall who supplied
14 the piping to the site?
15    A    Yeah. We provided the piping to the
16 site.
17    Q    Okay. The company that you were working
18 for, Maurice Colbert?
19    A    Yes.
20    Q    Do you know where they purchased the
21 piping products from?

Page 149

1     A    Have no idea.
2     Q    Okay. Sir -- sir, do you recall seeing
3  any writing on the cooling towers?
4     A    No.
5     Q    Okay. Sir, do you have any way of
6  knowing if you've personally worked with any
7  asbestos products at this site?
8     A    I have no way of knowing.
9     Q    Okay. Do you believe you worked around
10 any asbestos-containing products at this site?
11    A    Asbestos products?
12    Q    Yes, sir. Other than anything that you
13 might have been handling, do you believe you worked
14 around any asbestos-containing products?
15    A    No.
16    Q    No, you don't believe you were or no, you
17 don't?
18    A    I don't believe that there were any
19 products included.
20       MS. HAUSSLER: Okay, sir. I think those
21 are all the questions I have for you regarding the

38  (Pages 146 to 149)

Page 150

1  U.S. Capitol Power Plant. I think we're done, sir.
2       THE WITNESS: Oh.
3       MS. HAUSSLER: We can go off the record.
4  Oh, actually --
5       MR. BROWN: Go off the record?
6       MS. HAUSSLER: No. Okay.
7       THE VIDEOGRAPHER: Off the record at
8  1:19.
9       (Break taken.)
10      THE WITNESS: Starting over with a clean
11 sheet?
12      THE VIDEOGRAPHER: Back on the record at
13 1:20.
14      BY MS. HAUSSLER:
15   Q   Sir, just a couple more questions. Do
16 you recall working for Vallmer Associates?
17   A   Vallmer. Yeah. He was one of Thornton's
18 supervisors.
19   Q   Do you recall what you did while you were
20 employed by Vallmer Associates?
21   A   He had an overview on all the jobs that

Page 151

1  all, that Thornton did whether he approved or
2  disapproved. That was his job.
3    Q   Okay. Do you have a recollection of
4  actually working directly for Vallmer Associates?
5    A   In conjunction with, not directly working
6  with.
7        (Phone ringing)
8    A   It's all right. Therese will get it
9  downstairs.
10   Q   And was that when you were working for
11 Thornton or is that on a separate occasion?
12   A   I think that was when I was with
13 Thornton.
14   Q   Okay.
15   A   I said amen too soon.
16   Q   Sir, I'm going to show you what's been
17 marked as Exhibit 5 and it says at the top, Armando
18 Sammartino Work History. Have you ever seen that
19 document before?
20   A   These are past employers, people I worked
21 for.

Page 152

1       MR. FLAX: Counsel, I'm going to object
2  to Exhibit 5 so I'm not interrupting you.
3       MS. HAUSSLER: That's fine.
4       MR. FLAX: Can I have a continuing
5  objection to any reference or utterance regarding
6  Exhibit 5?
7       MS. HAUSSLER: Sure. I fully expected
8  there would be.
9       MR. LUXTON: I'm going to join in that.
10      THE WITNESS: I may have worked with some
11 or all of those people a long time ago.
12      BY MS. HAUSSLER:
13   Q   Okay. Well, did you, do you recall
14 preparing that document or -- strike that.
15       Do you recall ever seeing that document
16 before, this exact document?
17   A   Looks good.
18   Q   Okay. Well, hold onto it for just a
19 moment. That was, that was given to us by, by your
20 attorney. And as you mentioned, it's got some of
21 the employers that you recall working on. And then

Page 153

1  are those some of the job sites that we talked about
2  today that you recall working at?
3    A   What about it?
4    Q   Those are -- are those some of the job
5  sites again that you recalled working at that we've
6  been discussing over the last couple of days?
7    A   Yeah.
8    Q   Okay. Now, sir, if you just look --
9    A   This?
10   Q   Yes. Just if you look at -- well, no.
11 Wait. Just if you can just read through it yourself
12 and just look through the sites and just look it
13 over as far as the products, see how, towards the
14 right?
15       MR. BROWN: I'm going to, I'm going to
16 make an objection to this line of inquiry. This
17 Exhibit 5 is a product of my office, which is part
18 of the responses to Mr. Sammartino's
19 interrogatories. There is information on the work
20 history, just as there is in the interrogatories
21 that comes from the benefit of Mr. Sammartino and

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 154

1   other information that comes from information that
2   my office has compiled.
3           MR. LUXTON: I'll join in that, too.
4           MS. HAUSSLER: So you wanted to make a
5   statement, right? Okay. That's fine.
6           MR. FLAX: I think it's more an
7   objection. Counsel is once again joining.
8           MS. HAUSSLER: That's fine.
9           THE WITNESS: See, now, the question you
10  asked --
11          MS. HAUSSLER: That's fine.
12          MR. BROWN: I'm, I'm, yeah, I'm making an
13  objection to --
14          MS. HAUSSLER: That's fine.
15          MR. BROWN: -- to any inquiry into the --
16  if you're going to get into specific products,
17  that's not something --
18          MS. HAUSSLER: I'm not going --
19          MR. BROWN: Okay.
20          MS. HAUSSLER: -- to mention the product
21  specifically listed on there.

Page 155

1           MR. BROWN: Okay. Okay.
2           MS. HAUSSLER: I have one question and
3   whoever wants to object to it, when they, when,
4   after I say it is free to. Sir --
5           THE WITNESS: The question you asked me a
6   while ago about who supplied the cooling tower, here
7   it is, right here. Baltimore Aircoil.
8           BY MS. HAUSSLER:
9       Q   Okay. Now, sir, I just want to mention
10  generally, all of the products that are listed on
11  that sheet, if you look at those products, are those
12  products that generally you believe you may have at
13  some point been exposed to throughout your career?
14          MS. TOSTANOSKI: Objection to the
15  compound nature of the question --
16          MR. LUXTON: Objection.
17          MR. BROWN: Objection.
18          MS. TOSTANOSKI: -- lack of foundation
19  and the document statement that Mr. Brown said --
20          THE WITNESS: Those products exposed,
21  what?

Page 156

1           MR. LUXTON: Calls for a response based
2   on hearsay.
3           BY MS. HAUSSLER:
4       Q   If you look at the products that are
5   listed on this sheet --
6       A   Products over here?
7       Q   Yes, sir.
8       A   All right.
9       Q   Do you believe that those are products
10  that you may have been exposed to potentially
11  throughout your career or at some point in your
12  career --
13          MS. TOSTANOSKI: Same objection.
14      Q   -- that may have contained asbestos?
15          MR. LUXTON: Objection.
16          MS. TOSTANOSKI: Objection.
17      A   I can't refer to any of these having
18  asbestos.
19      Q   Okay.
20      A   The VA Hospital, Academy of Science.
21          MS. HAUSSLER: Okay. Thank you, sir.

Page 157

1   And just for the record, I'm going to get a clean
2   copy of Exhibit 5 to the court reporter. Dan, did
3   you want to --
4           EXAMINATION
5           BY MR. BROWN:
6       Q   Sam, do you recall working at the
7   Harrington Hotel?
8       A   Yeah. Yes.
9       Q   Do you know what you did at the
10  Harrington Hotel?
11      A   We installed another one of Baltimore
12  cooling towers.
13      Q   Another Baltimore Aircool cooling tower?
14          MS. HAUSSLER: And to the extent these
15  are answers to interrogatory provided in answers to
16  interrogatories, I'm going to object to the extent
17  that it's not listed on this sheet that is,
18  according to counsel, part of plaintiff's answers to
19  interrogatories.
20          MR. BROWN: Okay. This is, this is
21  supplementing it.

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 158

1    BY MR. BROWN:
2    Q   And did the work that you did at the --
3    MS. HAUSSLER: Objection.
4    Q   -- Harrington Hotel, was that in similar
5    nature to the work that you performed at the U.S.
6    Capitol that you described earlier?
7    A   Very small in comparison.
8    Q   It was a much smaller scale project?
9    A   Yeah.
10   Q   Okay. You were handling the piping work
11   attendant to the cooling tower?
12   A   Right.
13   Q   Leading away from and into the tower?
14   A   Right.
15   Q   Okay.
16       EXAMINATION
17   BY MS. HAUSSLER:
18   Q   And sir, so again, this was piping work
19   that you were performing?
20   A   Yes.
21   Q   And it was similar to the work that you

Page 159

1    performed at the U.S. Capitol power plant?
2    A   It sounds different coming from two
3    different sources.
4    MS. TOSTANOSKI: He said it was similar
5    but smaller in scope.
6    Q   Okay.
7    A   No. No similarity whatsoever.
8    Q   But the work itself that you performed
9    was similar. It was the scale of the job that was
10   different and the scale of the piping?
11   MR. LUXTON: Objection.
12   A   To scale, no.
13   Q   Okay. Sir, do you recall when you worked
14   at the Harrington Hotel?
15   A   Can't recall.
16   Q   Okay. Do you recall, do you believe that
17   you were exposed to any asbestos-containing
18   products?
19   A   No, none whatsoever.
20   MS. HAUSSLER: Okay, sir. Thank you.
21   THE VIDEOGRAPHER: Does it conclude for

Page 160

1    today?
2    MR. BROWN: Yes.
3    THE VIDEOGRAPHER: This ends our taped
4    deposition for today of Mr. Sammartino. The time is
5    1:28 p.m.
6    (Examination concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 161

1        CONTENTS
2    EXAMINATION OF ARMANDO SAMMARTINO       PAGE
3    by Ms. Haussler           5
4    by Ms. Tostanoski        39
5    by Mr. Phillips          41
6    by Mr. Brown             43
7    by Ms. Haussler          51
8    by Mr. Flax             123
9    by Ms. Haussler         124
10   by Mr. Brown            157
11   by Ms. Haussler         158
12
13
14
15       EXHIBITS
16   EXHIBIT              PAGE
17   4    Resume of Armando Sammartino    18
18   5    List of Work History      121
19
20
21

Page 162

1  STATE OF MARYLAND )    SS:
2  COUNTY OF HARFORD )
3       I, Linda Bahur, a Notary Public of the
4  State of Maryland, do hereby certify that the
5  above-captioned proceeding took place before me at
6  the time and place herein set out.
7       I further certify that the proceeding was
8  recorded stenographically by me and this transcript
9  is a true record of the proceedings.
10      I further certify that I am not of counsel
11  to any of the parties, nor an employee of counsel,
12  nor related to any of the parties, nor in any way
13  interested in the outcome of this action.
14      As witness my hand and notarial seal this
15  5th day of June, 2008.
16
17      _____
18      Linda Bahur
19      My commission expires
20      8/22/2011
21

Page 163

1  ERRATA AND SIGNATURE SHEET
2       I, ARMANDO SAMMARTINO, have read the
3  aforegoing and verify the same to be
4  stenographically accurate with the exception of the
5  following changes (if any):
6  Page  Line   Reads        Should Read
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  ( ) I have no corrections.
20  _____
21  Signature of Deponent

42 (Pages 162 to 163)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

## ARMANDO SAMMARTINO – WORK HISTORY

| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|---|---|---|---|---|---|
| 1941-1943 | Dunny Welding, Youngstown, OH | Certified welder | | | |
| 1943-1946 | U.S. Army/Military Service | | | | |
| 1946-1948 | Self-employed | Auto repairman, motor and body work | | | |
| 1948-1958 | Stewart Bainum Co., Washington, DC | Mechanical contractor: apprentice, journeyman, foreman | | | |
| 1958-1961 | R.M. Thornton, Inc., Washington, DC | Mechanical contractor: assistant project manager | | | |
| 1961-1964 | Maurice R. Colbert Co., Inc., Washington, DC | Mechanical contractor: superintendent | U.S. Capitol Power Plant | Baltimore Aircoil Cooling Tower - installed new cooling tower | |
| | | | German Embassy | Sprayed Limpet asbestos | |
| 1964-1969 | R.M. Thornton, Inc. Washington, DC | Mechanical contractor: project superintendent | VA Hospital, Washington, DC | | |
| | | | Nat'l Academy of Science | | |
| | | | American Pharmaceutical Co. | | |
| | | | Smithsonian | | |
| | | | Soldiers' Home (entire maintenance section, including a substation for electrical power) | | |
| 1958-1961 or 1964-1969 | R.M. Thornton, Inc. Washington, DC | Mechanical contractor: Assistant project mgr or project superintendent | 19th & T Holly House | | |
| | | | Children's Hospital | Canadian Asbestos Eagle Picher 66 Eagle Picher One-Coat Owens-Corning Kaylo Vermont Asbestos Contractor: AC&R | Elmer Gibson |

DEFENDANT'S EXHIBIT 3

tabbies

| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|---|---|---|---|---|---|
| | | | Columbia Women's Hospital | Eagle Picher Cement<br>JM Blue Mud<br>Owens-Corning Kaylo Block<br>Owens-Corning Kaylo P/covering<br>Contractor: AC&R | Arthur Anderson |
| | | | Mayflower Hotel | Carey Mud<br>JM Blue Mud<br>Contractor: AC&R | John Kutsos |
| | | | National Airport | Carey Mud<br>JM Blue Mud<br>Eagle Picher One Coat<br>Owens-Corning Kaylo<br>Rubecoid Calcilite<br>Contractor: AC&R | John Kutsos |
| | | | Prince George's County Hosp. | | |
| | | | Walter Reed | | |
| | | | White House | Carey Woolfelt<br>JM 352 Cement<br>JM Magnesia Pipecovering<br>Contractor: AC&R | Lenoir Bradford |
| | | | | Eagle Picher Mud<br>Owens-Corning Kaylo<br>Contractor: Walter E. Campbell | James Wallace |
| 9/1969–10/1970 | Nash M. Love Associates Washington, DC | Mechanical contractor: Project manager | Riggs National Bank, M Street, Washington, DC (mechanical and electrical renovation) | | |
| | | | WMAL Radio & TV Studio | | |
| | | | National Gallery of Art | | |
| | | | Paul Melton's private residence | | |
| | | | Int'l Monetary Fund | | |

| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|------|----------|------------------|-------|----------|-----------|
| | | | Army Times | | |
| | | | Westchester Apartments | | |
| 10/1970-1971 | Vallmer Associates Washington, DC | Mechanical estimator | | | |

THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

MOORE C. LINKENHOKER, et al.,         *
                                         *    Civil Action:  AMD-003717

      Plaintiffs                  *
                                         *    (Circuit Court for Baltimore City

v.                                      *     Case No. 24-X-00001426)
                                         *

ACandS, INC., et al.,                  *
                                         *

      Defendants                *
               * * * * * * * * * *

### AFFIDAVIT OF CAROL ANADALE

WASHINGTON, DISTRICT OF COLUMBIA, to wit:

      The undersigned Affiant, Carol Anadale, hereby deposes and states:

      1.     I, Carol Anadale, am a Program Expert in the Office of Real Property of the
United States General Services Administration.

      2.     I am over twenty-one (21) years of age and am competent to testify in
administrative and judicial proceedings in the State of Maryland, as well as in the above-
captioned judicial proceedings.

      3.     One function of the General Services Administration's Office of Real Property is
to maintain and provide information and data regarding real property owned by the Federal
Government.  In the course of my aforesaid employment, I have obtained familiarity with
records of the General Services Administration and the government of the United States
regarding real property interests of the United States.



4.    In the course of my aforesaid employment, I have become familiar with a document titled "Inventory Report on Jurisdictional Status of Federal Areas Within the States as of June 30, 1962" compiled by the General Services Administration (hereinafter "the Inventory Report"). Attached hereto as Exhibit A is a four-page excerpt from the Inventory Report. I hereby certify that this excerpt from the Inventory Report is a true copy of four pages of an authentic document prepared and used by the General Services Administration.

5.    The Inventory Report states that in 1906 the United States acquired 65 acres of land used as the U.S. Coast Guard Yard at Baltimore, Maryland ("the Coast Guard Yard"). The Coast Guard Yard is located at Curtis Bay, Maryland. The Inventory Report's attribution of Jurisdictional Code 1 to the Coast Guard Yard identifies the Coast Guard Yard as an area of "Exclusive Legislative Jurisdiction" and states:

> Exclusive Legislative Jurisdiction. This term is applied when the Federal Government possesses, by whichever method acquired, all of the authority of the State, and in which the State concerned has not reserved to itself the right to exercise any of the authority concurrently with the United States except the right to serve civil or criminal process in the area for activities which occurred outside the area.

6.    The Inventory Report states that the Maryland statutory basis for the Federal Government's aforesaid exclusive jurisdiction with respect to the Coast Guard Yard is a 1906 statutory enactment found at Chapter 0743, page 1254. The Inventory Report confirms further that the Federal Government acquired title to the Coast Guard Yard in that year.

7.    I hereby affirm under the penalties of perjury that, to the best of my knowledge, information and belief the statements made in this Affidavit are true.

(Signature and notary acknowledgement on following page)

2

Affiant:

Date: 2-28-2001

*Carol S. Anadale*

Carol Anadale

WASHINGTON, DISTRICT OF COLUMBIA, to wit:

I HEREBY CERTIFY that on this 28th day of February, 2001, before me, a Notary Public of the District of Columbia, personally appeared Carol Anadale, known to me (or satisfactorily proven) to be the person whose name is subscribed to this Affidavit, and acknowledged that she executed the same for the purposes stated therein.

WITNESS my hand and Notarial Seal

Notary Public

Dimitria M Lomax
Notary Public
District Of Columbia

My Commission Expires: Nov. 14, 2002

3

# INVENTORY REPORT
# ON
# JURISDICTIONAL STATUS
# OF FEDERAL AREAS WITHIN
# THE STATES

As of June 30, 1962



Compiled by
**GENERAL SERVICES ADMINISTRATION**

## FOR OFFICIAL USE ONLY

DEFENDANT'S
EXHIBIT
5

LEGISLATIVE JURISDICTION OVER FEDERAL AREAS WITHIN THE STATES

CODES USED IN TYPE OF JURISDICTION AND CITATION TO LEGISLATIVE AUTHORITY COLUMNS

| CODE | TYPE OF LEGISLATIVE JURISDICTION | CITATION TO LEGISLATIVE AUTHORITY |
|---|---|---|
| 1 | Exclusive Legislative Jurisdiction. This term is applied when the Federal Government possesses, by whichever method acquired, all of the authority of the State, and in which the State concerned has not reserved to itself the right to exercise any of the authority concurrently with the United States except the right to serve civil or criminal process in the area for activities which occurred outside the area. | For land areas reported under "Exclusive," "Concurrent," or "Partial" legislative jurisdiction, a general or specific State statute or Federal law (Statutes-at-Law) is cited.

State Statute.
Citations to State laws are in terms of session statutes regardless of whether or not they have been codified. Each citation shows: (1) the year of enactment of the cited statute; (2) the page number of the volume of State laws; and (3) the chapter (or equivalent) number of the State law. |
| 2 | Concurrent Legislative Jurisdiction. This term is applied in those instances wherein in granting to the United States authority which would otherwise amount to exclusive legislative jurisdiction over an area, the State concerned has reserved to itself the right to exercise, concurrently with the United States, all of the same authority. | Federal Law (Statutes-At-Large)
Citations to Federal laws are shown in cases where legislative jurisdiction was obtained by a reservation in the enabling act authorizing Statehood. These citations show volumes and page numbers of the Statutes at Large. |
| 3 | Partial Legislative Jurisdiction. This term is applied in those instances wherein the Federal Government has been granted for exercise by it over an area in a State certain of the State's authority, but where the State concerned has reserved to itself the right to exercise, by itself or concurrently with the United States, other authority constituting more than merely the right to serve civil or criminal process in the area (e.g., the right to tax private property). | Acceptance or Recordation Date.
This date represents the month, day, and year on which the Federal Government accepted legislative jurisdiction. This date is called for in the case of any acquisition after January 31, 1940. (Section 355, Revised Statutes U.S., as amended) as well as acquisitions prior thereto where recordation or other affirmative act was required by the applicable State Statute. |
| 4 | Proprietorial Interest Only. This term is applied to those instances wherein the Federal Government has acquired some right or title to an area in a State, but has not obtained any measure of the State's authority over the area. In applying this definition, recognition should be given to the fact that the United States, by virtue of its functions and authority under various provisions of the Constitution, has many powers and immunities not possessed by ordinary landholders with respect to areas in which it acquires an interest, and of the further fact that all its properties and functions are held or performed in a governmental rather than a proprietary capacity. | ADDITIONAL INFORMATION FOUND IN THE DETAILED LISTING

N (negligible)    An "N" shown in the Land Area columns indicates less than one tenth (0.1) of an acre.

R (reference)    An "R" shown in the State Statute columns indicates that additional unpublished data is on file in the Central Office of GSA.

X    An "X" shown in the Jurisdictional Code columns and/or the Federal Law columns indicates that the propriety of the code and/or the law cited is considered doubtful by the reporting agency. |
| 5 | Unknown. Land will be reported under this category when there is no data or record to guide the reporting holding agency.

EXPLANATION:
The number (1 through 5) appearing in the Jurisdictional Code column indicates the legislative jurisdiction of the acreage listed on the same line in the Land columns. For example, a number 1 indicates exclusive jurisdiction by the Federal Government over the area shown in the Land columns on the same line. | These listings have been carefully prepared and checked, but perfection cannot be assured. Users are asked to call to the attention of the Office of Finance and Administration, General Services Administration, Washington 25, D.C., necessary corrections as well as suggestions for alteration in the content or format of the list. |

# GENERAL SERVICES ADMINISTRATION



*Washington 25, D.C.*

SEP 3 1964

The President
The White House

Dear Mr. President:

General Services Administration has completed the second
comprehensive inventory of the jurisdictional status of
Federal areas within the States.  The compilation of this
inventory reflects the interest which GSA, together with
the Bureau of the Budget and the Department of Justice,
have in the progress being made by all Federal agencies
in adjusting the legislative status of their properties.

This inventory, which is enclosed herewith, directly com-
plements the Inventory Report on Real Property Owned by
the United States Throughout the World, as of June 30, 1962,
which was also published by GSA.

The inventory will be made available to Federal agencies and
State Governments for use as a ready reference to assist in
the solution of jurisdictional status problems and in the
development of appropriate remedial legislation.  S. 815 and
H. R. 4433 pending before Congress would facilitate the
adjustment of legislative jurisdiction over Federal areas
within the States.

Respectfully yours,

BERNARD L. BOUTIN
Administrator

Enclosure

## COUNTY CODES

| NAME | CODES | |
|---|---|---|
| | STATE | COUNTY |
| MARYLAND | 19 | |
| INDEPENDENT CITY | | 000 |
| ALLEGANY | | 001 |
| ANNE ARUNDEL | | 003 |
| BALTIMORE | | 005 |
| CALVERT | | 009 |
| CAROLINE | | 011 |
| CARROLL | | 013 |
| CECIL | | 015 |
| CHARLES | | 017 |
| DORCHESTER | | 019 |
| FREDERICK | | 021 |
| GARRETT | | 023 |
| HARFORD | | 025 |
| HOWARD | | 027 |
| KENT | | 029 |
| MONTGOMERY | | 031 |
| PRINCE GEORGES | | 033 |
| QUEEN ANNES | | 035 |
| ST MARYS | | 037 |
| SOMERSET | | 039 |
| TALBOT | | 041 |
| WASHINGTON | | 043 |
| WICOMICO | | 045 |
| WORCESTER | | 047 |

## JURISDICTIONAL STATUS OF FEDERAL LAND AREAS

| GSA CONTROL NO. | LOCATION | | | | DESCRIPTION | | NOTES ACQUIRED | | LAND AREA | CITATION TO LEGISLATIVE AUTHORITY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | FROM | TO | ACRES - TO NEAREST TENTH | STATE STATUTE | | | FEDERAL LEGISLATIVE/STATUTORY AUTH. | | ACCEPTANCE OF STATUTORY AUTH. | | | |
| | | | | | | | | | | YEAR OF ENACTMT | PAGE NO. | STATUTE NO. | PRIVATE PN. | PAGE NO. | MO. | DAY | YEAR | |
| | | | | | ARMY | | | | | | | | | | | | | |
| | | | | | POST OFFICE | | | | | | | | | | | | | |
| | | | | | BUREAU OF FACILITIES | | | | | | | | | | | | | |
| 1800 | 04018 | 19 | 0310 | 029 | POST OFFICE SPRING ST | 1 | 1935 | 1936 | .5 | 1924 | CODE | | | | | | | |
| | | | | | DEFENSE | | | | | | | | | | | | | |
| | | | | | ARMY | | | | | | | | | | | | | |
| 2100 | 21456 | 19 | 9999 | 029 | NIKE WASH BALTO SITE 30 | 4 | 1955 | | 57.0 | | | | | | | | | |
| | 2 | | | | | 3 | | | 57.5* | | | | | | | | | |
| | | | | | MONTGOMERY | | | | | | | | | | | | | |
| | | | | | COMMERCE | | | | | | | | | | | | | |
| | | | | | COAST AND GEODETIC SURV | | | | | | | | | | | | | |
| 130T | 05029 | 19 | 0630 | 031 | VARIATION OF LAT OBSERV DESELUM AVE & JAMES ST | 3 | 1899 | | 2.3 | 1902 | 0384 | 0263 | | | | | | |
| | | | | | BUREAU OF PUBLIC ROADS | | | | | | | | | | | | | |
| 1319 | 14628 | 19 | 9999 | 031 | WM C BOWLES TRACT NO 1 | 4 | 1953 | | 1.3 | | | | | | | | | |
| | | | | | DEFENSE | | | | | | | | | | | | | |
| | | | | | NAVY | | | | | | | | | | | | | |
| 1700 | 23450 | 19 | 0130 | 031 | MEDICAL CENTER | 1 | 1938 | 1939 | 241.0 | 1906 | 1254 | 0743 | | | | | | |
| 1700 | 23895 | 19 | 0242 | 031 | LABORATORY BUSHIPS | 1 | 1937 | 1943 | 159.0 | 1906 | 1254 | 0743 | | | 06 | 14 | 1943 | |
| 1700 | 23895 | 19 | 0242 | 031 | | 4 | 1946 | | 26.0 | | | | | | | | | |
| | | | | | POST OFFICE | | | | | | | | | | | | | |
| | | | | | BUREAU OF FACILITIES | | | | | | | | | | | | | |
| 1800 | 03973 | 19 | 0130 | 031 | PO BRANCH OF WASH D C 7400 WISCONSIN N W | 1 | 1937 | | .2 | 1924 | CODE | | | | | | | |
| 1800 | 04028 | 19 | 1450 | 031 | POST OFFICE 8412 GEORGIA AVE | 1 | 1936 | | .4 | 1924 | CODE | | | | | | | |
| 1800 | 04029 | 19 | 1360 | 031 | POST OFFICE WASHINGTON ST | 1 | 1938 | | .6 | 1924 | CODE | | | | | | | |
| | | | | | DEFENSE | | | | | | | | | | | | | |
| | | | | | ARMY | | | | | | | | | | | | | |
| 2100 | 20037 | 19 | 9999 | 031 | ARMY MAP SERVICE | 2 | 1945 | | 33.0 | 1943 | 0759 | 0687 | | | 07 | 24 | 1945 | |
| 2100 | 20037 | 19 | 9999 | 031 | | 4 | 1946 | | 7.0 | | | | | | | | | |
| 2100 | 20364 | 19 | 1450 | 031 | REED WALTER AMC GLENHAV | 4 | 1947 | | 20.0 | | | | | | | | | |
| 2100 | 20743 | 19 | 0566 | 031 | REED WALTER AMC FOREST | 1 | 1942 | 1943 | 182.0 | 1906 | 1254 | 0743 | | | 04 | 22 | 1943 | |
| 2100 | 21351 | 19 | 9999 | 031 | NIKE WASH BALTO SITE 92 | 4 | 1955 | | 24.0 | | | | | | | | | |
| 2100 | 21352 | 19 | 9999 | 031 | NIKE WASH BALTO SITE 93 | 4 | 1955 | | 33.0 | | | | | | | | | |
| 2100 | 21528 | 19 | 9999 | 031 | NIKE WASH BALTO SITE 94 | 4 | 1956 | | 35.0 | | | | | | | | | |
| 2100 | 21827 | 19 | 1360 | 031 | USAR CTR ROCKVILLE | 4 | 1957 | | 4.0 | | | | | | | | | |
| | | | | | GENERAL SERVICES ADMIN | | | | | | | | | | | | | |
| | | | | | CENTRAL OFFICE | | | | | | | | | | | | | |
| 4700 | 12659 | 19 | 0630 | 031 | BUR OF STANDARDS SITE | 4 | 1956 | | 555.0 | | | | | | | | | |
| | | | | | REGION # 3 WASHINGTON | | | | | | | | | | | | | |
| 4703 | 04142 | 19 | 0130 | 031 | P H S SITE 9000 WISC AVE | 1 | 1950 | | 1.8 | 1953 | CODE | 0158 | | | 09 | 25 | 1953 | |
| | | | | | HEALTH ED AND WELFARE | | | | | | | | | | | | | |
| | | | | | PUBLIC HEALTH SERVICE | | | | | | | | | | | | | |
| 7511 | 04099 | 19 | 0130 | 031 | NATL INSTS OF HEALTH | 1 | 1935 | 1942 | 229.6 | 1953 | | 0158 | | | 09 | 23 | 1955 | |

343

# INVENTORY REPORT

# ON

# JURISDICTIONAL STATUS

# OF FEDERAL AREAS WITHIN

# THE STATES

## As of June 30, 1962



Compiled by

### GENERAL SERVICES ADMINISTRATION

## FOR OFFICIAL USE ONLY

DEFENDANT'S
EXHIBIT

6

LEGISLATIVE JURISDICTION OVER FEDERAL AREAS WITHIN THE STATES

CODES USED IN TYPE OF JURISDICTION AND CITATION TO LEGISLATIVE AUTHORITY COLUMNS

| CODE | TYPE OF LEGISLATIVE JURISDICTION | CITATION TO LEGISLATIVE AUTHORITY |
|---|---|---|
| 1 | **Exclusive Legislative Jurisdiction.** This term is applied when the Federal Government possesses, by whichever method acquired, all of the authority of the State, and in which the State concerned has not reserved to itself the right to exercise any of the authority concurrently with the United States except the right to serve civil or criminal process in the area for activities which occurred outside the area. | For land areas reported under "Exclusive," "Concurrent," or "Partial" legislative jurisdiction, a general or specific State statute or Federal law (Statutes-at-Law) is cited.<br><br>**State Statute.**<br>Citations to State laws are in terms of session statutes regardless of whether or not they have been codified. Each citation shows: (1) the year of enactment of the cited statute, (2) the page number of the volume of State laws; and (3) the chapter (or equivalent) number of the State law. |
| 2 | **Concurrent Legislative Jurisdiction.** This term is applied in those instances wherein in granting to the United States authority which would otherwise amount to exclusive legislative jurisdiction over an area, the State concerned has reserved to itself the right to exercise, concurrently with the United States, all of the same authority. | **Federal Law (Statutes-At-Large)**<br>Citations to Federal laws are shown in cases where legislative jurisdiction was obtained by a reservation in the enabling act authorizing Statehood. These citations show volumes and page numbers of the Statutes at Large. |
| 3 | **Partial Legislative Jurisdiction.** This term is applied in those instances wherein the Federal Government has been granted for exercise by it over an area in a State certain of the State's authority, but where the State concerned has reserved to itself the right to exercise, by itself or concurrently with the United States, other authority constituting more than merely the right to serve civil or criminal process in the area (e.g., the right to tax private property). | **Acceptance or Recordation Date.**<br>This date represents the month, day, and year on which the Federal Government accepted legislative jurisdiction. This date is called for in the case of any acquisition after January 31, 1940, (Section 355, Revised Statutes, U.S.), as well as acquisitions prior thereto where recordation or other affirmative act was required by the applicable State Statute. |
| 4 | **Proprietorial Interest Only.** This term is applied to those instances wherein the Federal Government has acquired some right or title to an area in a State, but has not obtained any measure of the State's authority over the area. In applying this definition, recognition should be given to the fact that the United States, by virtue of its functions and authority under various provisions of the Constitution, has authority with respect to areas in which it acquires an interest, and of the further fact that all its properties and functions are held or performed in a governmental rather than a proprietary capacity. | **ADDITIONAL INFORMATION FOUND IN THE DETAILED LISTING**<br><br>N (negligible)  As "N" shown in the Land Area columns indicates less than one tenth (0.1) of an acre.<br><br>R (reference)  An "R" shown in the State Statute columns indicates that additional unpublished data is on file in the Central Office of GSA. An "R" shown in the Jurisdictional Code columns and/or the Federal Law columns indicate that the propriety of the code and/or the law cited is considered doubtful by the reporting agency. |
| 5 | **Unknown.** Land will be reported under this category when there is no data or record to guide the reporting holding agency.<br><br>**EXPLANATION:**<br>The number (1 through 5) appearing in the Jurisdictional Code column indicates the legislative jurisdiction of the acreage listed on the same line in the Land columns. For example, a number 1 indicates exclusive jurisdiction by the Federal Government over the area shown in the Land column on the same line. | These listings have been carefully prepared and checked, but perfection cannot be assured. Users are asked to call to the attention of the Office of Finance and Administration, General Services Administration, Washington 25, D.C., necessary corrections as well as suggestions for alteration in the content or format of the list. |

# GENERAL SERVICES ADMINISTRATION



*Washington 25, D.C.*

SEP 3 1964

The President
The White House

Dear Mr. President:

General Services Administration has completed the second
comprehensive inventory of the jurisdictional status of
Federal areas within the States.  The compilation of this
inventory reflects the interest which GSA, together with
the Bureau of the Budget and the Department of Justice,
have in the progress being made by all Federal agencies
in adjusting the legislative status of their properties.

This inventory, which is enclosed herewith, directly com-
plements the Inventory Report on Real Property Owned by
the United States Throughout the World, as of June 30, 1962,
which was also published by GSA.

The inventory will be made available to Federal agencies and
State Governments for use as a ready reference to assist in
the solution of jurisdictional status problems and in the
development of appropriate remedial legislation.  S. 815 and
H. R. 4433 pending before Congress would facilitate the
adjustment of legislative jurisdiction over Federal areas
within the States.

Respectfully yours,

BERNARD L. BOUTIN
Administrator

Enclosure

# COUNTY CODES

| NAME | STATE | COUNTY | NAME | STATE | COUNTY | NAME | STATE | COUNTY |
|---|---|---|---|---|---|---|---|---|
| VIRGINIA | 45 | | VIRGINIA | 45 | | VIRGINIA | 45 | |
| INDEPENDENT CITY | | 000 | GREENE | | 079 | RICHMOND | | 159 |
| ACCOMACK | | 001 | GREENSVILLE | | 081 | ROANOKE | | 161 |
| ALBEMARLE | | 003 | HALIFAX | | 083 | ROCKBRIDGE | | 163 |
| ALLEGHENY | | 005 | HANOVER | | 085 | ROCKINGHAM | | 165 |
| | | | HENRICO | | 087 | RUSSELL | | 167 |
| AMELIA | | 007 | HENRY | | 089 | SCOTT | | 169 |
| AMHERST | | 009 | HIGHLAND | | 091 | SHENANDOAH | | 171 |
| APPOMATTOX | | 011 | ISLE OF WIGHT | | 093 | SMYTH | | 173 |
| ARLINGTON | | 013 | JAMES CITY | | 095 | SOUTHAMPTON | | 175 |
| AUGUSTA | | 015 | KING AND QUEEN | | 097 | SPOTSYLVANIA | | 177 |
| BATH | | 017 | KING GEORGE | | 099 | STAFFORD | | 179 |
| BEDFORD | | 019 | KING WILLIAM | | 101 | SURRY | | 181 |
| BLAND | | 021 | LANCASTER | | 103 | SUSSEX | | 183 |
| BOTETOURT | | 023 | LEE | | 105 | TAZEWELL | | 185 |
| BRUNSWICK | | 025 | LOUDOUN | | 107 | WARREN | | 187 |
| BUCHANAN | | 027 | LOUISA | | 109 | WASHINGTON | | 191 |
| BUCKINGHAM | | 029 | LUNENBURG | | 111 | WESTMORELAND | | 193 |
| CAMPBELL | | 031 | MADISON | | 113 | WISE | | 195 |
| CAROLINE | | 033 | MATHEWS | | 115 | WYTHE | | 197 |
| CARROLL | | 035 | MECKLENBURG | | 117 | YORK | | 199 |
| CHARLOTTE | | 037 | MIDDLESEX | | 119 | | | |
| CHARLES CITY | | 039 | MONTGOMERY | | 121 | | | |
| CHESTERFIELD | | 041 | NANSEMOND | | 123 | | | |
| CLARKE | | 043 | NELSON | | 125 | | | |
| CRAIG | | 045 | NEW KENT | | 127 | | | |
| CULPEPER | | 047 | NORFOLK | | 129 | | | |
| CUMBERLAND | | 049 | NORTHAMPTON | | 131 | | | |
| DICKENSON | | 051 | NORTHUMBERLAND | | 133 | | | |
| DINWIDDIE | | 053 | NOTTOWAY | | 135 | | | |
| ESSEX | | 057 | ORANGE | | 137 | | | |
| FAIRFAX | | 059 | PAGE | | 139 | | | |
| FAUQUIER | | 061 | PATRICK | | 141 | | | |
| FLOYD | | 063 | PITTSYLVANIA | | 143 | | | |
| FLUVANNA | | 065 | POWHATAN | | 145 | | | |
| FRANKLIN | | 067 | PRINCE EDWARD | | 147 | | | |
| FREDERICK | | 069 | PRINCE GEORGE | | 149 | | | |
| GILES | | 071 | PRINCESS ANNE | | 151 | | | |
| GLOUCESTER | | 073 | PRINCE WILLIAM | | 153 | | | |
| GOOCHLAND | | 075 | PULASKI | | 155 | | | |
| GRAYSON | | 077 | RAPPAHANNOCK | | 157 | | | |

## JURISDICTIONAL STATUS OF FEDERAL LAND AREAS

| GSA CONTROL NO. | | LOCATION | | | DESCRIPTION | | DATES ACQUIRED | | LAND AREA | CESSION TO LEGISLATIVE AUTHORITY | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | PRIOR | TO | ACRES - TO NEAREST TENTH | STATE STATUS | | | FEDERAL LAW EFFECTIVE/APPLIED | | EXCLUSIVE OR CONCURRENT JURIS | | |
| | | | | | | | | | | YEAR OF STATEMENT | PAGE NO. | SECTION NO. | YEAR/PAGE | PAGE NO. | NO. | DAY | YEAR |
| 1800 | 03975 | 45 | 0100 | 013 | POST OFFICE 3116 N WASH BLVD | 3 | 1936 | | .8 | 1936 | CODE | 019C | | | 04 | 20 | 1944 |
| | | | | | DEFENSE | | | | | | | | | | | | |
| | | | | | ARMY | | | | | | | | | | | | |
| 2100 | 20031 | 45 | 0100 | 013 | ARLINGTON HALL STATION | 1 | 1942 | | 87.0 | 1940 | 0761 | 0422 | | | 01 | 18 | 1944 |
| 2100 | 20032 | 45 | 9999 | 013 | ARLINGTON NATL CEMETERY | 1 | 1864 | | 411.0 | 1884 | 0186 | 0191 | | | | | |
| 2100 | 20626 | 45 | 1008 | 013 | MYER FORT | 1 | 1864 | 1942 | 474.0 | 1884 1940 | 0186 0761 | 0151 0422 | | | 12 | 30 | 1942 |
| | | | | | GENERAL SERVICES ADMIN | | | | | | | | | | | | |
| | | | | | REGION # 3 WASHINGTON | | | | | | | | | | | | |
| 4703 | 04099 | 45 | 0100 | 013 | FED OFF BLDG 2 COL PIKE & RIDGE RD | 1 | 1941 | | 18.0 | 1950 | CODE | 0724 | | | 06 | 01 | 1950 |
| 4703 | 04108 | 45 | 0100 | 013 | PENTAGON & ANNEXES COL PIKE & RIDGE RD | 1 | 1940 | | 380.0 | 1940 1940 | 0761 0761 | 0422 0422 | | | 03 06 | 10 05 | 1942 1945 |
| | | | | | FEDERAL AVIATION AGENCY | | | | | | | | | | | | |
| 6900 | 06100 | 45 | 0100 | 013 | RADAR ASR | 4 | 1949 | | .4 | | | | | | | | |
| 6900 | 06133 | 45 | 1123 | 013 | WASHINGTON NAT AIRPORT | 1 | 1938 | 1953 | 667.5 | | | | 59 | 0053 | | | |
| | 11 | | | | | 24 | | | 2,081.2* | | | | | | | | |
| | | | | | BEDFORD | | | | | | | | | | | | |
| | | | | | POST OFFICE | | | | | | | | | | | | |
| | | | | | BUREAU OF FACILITIES | | | | | | | | | | | | |
| 1800 | 03944 | 45 | 0130 | 019 | POST OFFICE 115 E MAIN ST | 1 | 1909 | | .3 | 1902 | 0565 | | | | | | |
| | | | | | DEFENSE | | | | | | | | | | | | |
| | | | | | AIR FORCE | | | | | | | | | | | | |
| 5700 | 25526 | 45 | 0130 | 019 | BEDFORD        FHG | 4 | 1958 | | 9.0 | | | | | | | | |
| | 2 | | | | | 3 | | | 9.3* | | | | | | | | |
| | | | | | BUCKINGHAM | | | | | | | | | | | | |
| | | | | | AGRICULTURE | | | | | | | | | | | | |
| | | | | | FOREST SERVICE | | | | | | | | | | | | |
| 1223 | 07711 | 45 | 9999 | 029 | LEE EXPER FOREST LU | 4 | 1935 | 1940 | 2,683.0 | | | | | | | | |
| | 1 | | | | | 1 | | | 2,683.0* | | | | | | | | |
| | | | | | CAMPBELL | | | | | | | | | | | | |
| | | | | | POST OFFICE | | | | | | | | | | | | |
| | | | | | BUREAU OF FACILITIES | | | | | | | | | | | | |
| 1800 | 03993 | 45 | 0060 | 031 | POST OFFICE 7TH & BROAD STS | 3 | 1938 | | .2 | 1936 | CODE | 019C | | | 04 | 20 | 1944 |
| | 1 | | | | | 2 | | | .2* | | | | | | | | |
| | | | | | CAROLINE | | | | | | | | | | | | |
| | | | | | COMMERCE | | | | | | | | | | | | |
| | | | | | COAST AND GEODETIC SURV | | | | | | | | | | | | |
| 1307 | 05037 | 45 | 0645 | 033 | MAGNETIC OBSERVATORY | 4 | 1941 | | 187.4 | | | | | | | | |
| | 1 | | | | | 1 | | | 187.4* | | | | | | | | |



THE ARCHITECT OF THE CAPITOL

HOME | ABOUT US | CAPITOL COMPLEX | CAPITOL VISITOR CENTER | PROJECTS | PROCUREMENT

YOU ARE HERE>> Architect of the Capitol/Capitol Complex Overview

October



Visiting   U.S. Capitol   Office Buildings   Grounds   U.S. Botanic Garden   Architecture

## Capitol Complex Overview

The United States Capitol Complex is comprised of the Capitol, the House and Senate Office Buildin U.S. Botanic Garden, the Capitol Grounds, the Library of Congress buildings, the Supreme Court Bu Capitol Power Plant, and various support facilities. In addition, work has now begun towards the co of a new Capitol Visitor Center, an underground facility to be located beneath the Capitol's east from

In addition to the information listed below, a brief history of the Capitol Complex, an aerial photogr and a map (112k) are available. The Photo Gallery section of this Web site offers downloadable hig digital images in JPEG format. These images are in the public domain and, unless otherwise noted, used without permission for educational, scholarly, or personal (i.e., nonpromotional, nonadvertisir purposes.

### The United States Capitol



The West Front of the Capitol

The Capitol is one of the most widely recognized buildings in the wc a symbol of the American people and their government, the meetin of the nation's legislature, an art and history museum, and a touris attraction visited by millions every year.

- Overview of the Building and Its Function
- How the Location for the Capitol Was Chosen
- A Brief Construction History
- A Chronology of Construction Milestones
- Architectural Features and Historic Spaces

- Works of Art
- Flags over the East and Central Fronts
- Quotations and Inscript
- Dedicatory and Commemorative Plaque

### The Congressional Office Buildings

### House of Representatives Office Buildings



DEFENDANT'S
EXHIBIT
7

Capitol Complex Overview



The Cannon Building, opened in 1908, is the oldest of the congressional office buildings.



The Longworth Building was opened in 1933 to provide additional space.



The most modern of the l buildings, the Rayburn Bu was opened in 1965.

Over the years, two other buildings were acquired for office space by the House of Representatives Congressional Hotel on C Street, obtained in 1972, was subsequently named for former Speaker Th O'Neill, Jr.; it was demolished in 2002. In 1975 a building located at Second and D Streets originall the Federal Bureau of Investigation was acquired; it was subsequently named for former Minority L Gerald R. Ford.

### Senate Office Buildings



The Russell Building, opened in 1909, is the oldest Senate Office Building.



The Dirksen Building was occupied in 1958.



The Hart Building, which the Dirksen Building, was in 1982.

### The United States Botanic Garden



The United States Botanic Garden logo and photo of the premisis.

The United States Botanic Garden was established by the in 1820 and is the oldest botanic garden in North America. living plant museum dedicated to demonstrating the aesth cultural, economic, therapeutic, and ecological importance to the well-being of humankind.

The National Garden, a new U.S. Botanic Garden facility th located on three acres west of the Conservatory site, will b showcase for unusual, useful, and ornamental plants that in the mid-Atlantic region. It will also provide "living labora environmental, horticultural, and botanical education...."



## The Capitol Grounds



Originally a wooded wilderness, the U.S Grounds today provide a park-like settir Nation's Capitol, offering a picturesque counterpoint to the building's formal arc

Aerial Photograph Taken from the Northwest (50k)

## The Library of Congress Buildings







The Thomas Jefferson Building opened in 1897, allowing the Library to move out of its former location in the Capitol.

The 1935 John Adams Building provided much-needed space for the Library's growing collections.

In 1981 the James Madis Memorial Building opene houses administrative offi well as several major col

For additional information about the Library of Congress buildings, please visit the "Jefferson's Lega at the Library of Congress Web site.

## The U.S. Supreme Court Building                     The Capitol Power Plant



The Supreme Court of the United States was housed in the Capitol from 1800 until 1935, when the Supreme Court Building opened.



The Capitol Power Plant began providing ele 1910; today, it provides steam for heating a water for cooling buildings within the Capitc Complex.

## The Capitol Visitor Center



The Capitol Visitor Center, which will be built underground adjac Capitol's east front, will contain exhibits, orientation displays, th and other facilities to make the visitor's experience in the Capitc informative and meaningful. It will also make the U.S. Capitol m accessible and secure.

## Architectural Features and Historic Spaces



The Capitol Dome (left) and the Capitol Rotunda Ceiling

Designed from the outset to house the United States Congress, Capitol was a bold architectural experiment in a new nation. Th has been enlarged and modified over the years, and it contains the most important spaces in American history.

- **The Capitol:** Dome | Rotunda | Old Senate Chamber | O Supreme Court Chamber | National Statuary Hall (The Ol the House) | Hall of Columns | Crypt | Minton Tiles
- **House Office Buildings:** Cannon Caucus Room | Canno
- **Senate Office Buildings:** Russell Caucus Room | Russel

## Works of Art




The works of art in the Capitol Complex reflect the development of the United States and the Congress range from bronze and marble statues to oil portrai frescoed murals. Their subjects include prominent A important moments in history, and allegorical repre of the nation's ideals.

The Statue of Freedom (left) and General George Washington Resigning His Commission...

Case 1:07-cv-02397-WDQ    Document 147-20    Filed 10/23/2007    Page 6 of 6

Capitol Complex Overview

Architect of the Capitol · Feedback Form